1                   **UNITED STATES DISTRICT COURT**
              **FOR THE EASTERN DISTRICT OF VIRGINIA**
2                     **Alexandria Division**

3

4   **UNITED STATES OF AMERICA,**      **:**    **Criminal Case**
                             **:**    **No. 1:23-CR-00119-LMB**
5               **Plaintiff**     **:**
                             **:**
6        **v.**                 **:**
                             **:**
7   **CONOR BRIAN FITZPATRICK,**        **:**    **January 19, 2024**
                             **:**    **12:00 p.m.**
8               **Defendant**     **:**
   .............................  :   ......................
9

10              **TRANSCRIPT OF SENTENCING HEARING**
          **BEFORE THE HONORABLE LEONIE M. BRINKEMA**
11              **UNITED STATES DISTRICT JUDGE**

12

   **<u>APPEARANCES:</u>**
13

   **FOR THE PLAINTIFF:**        **AARASH A. HAGHIGHAT**
14                        **LAUREN POMERANTZ HALPER**
                       **U.S. ATTORNEY'S OFFICE**
15                       **2100 Jamieson Avenue**
                       **Alexandria, VA  22314**
16                       **703-299-3700**

17   **FOR THE DEFENDANT:**        **PETER KATZ, ESQUIRE**
                       **116 Village Boulevard**
18                       **2nd Floor**
                       **Princeton, NJ  08540**
19                       **609-734-4380**

20

   **OFFICIAL COURT REPORTER:**   **REBECCA STONESTREET, RPR, CRR**
21                       **U.S. District Court, 9th Floor**
                       **401 Courthouse Square**
22                       **Alexandria, Virginia  22314**
                       **(240) 426-7767**
23

24                  **( Pages 1 - 31 )**

25       **COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES**

**P R O C E E D I N G S**

1
2          COURTROOM CLERK:  Court calls criminal case
3   United States of America versus Conor Brian Fitzpatrick, Case
4   Number 2023-CR-119.  May I have appearances, please, first for
5   the government.
6          MR. HAGHIGHAT:  Your Honor, Aarash Haghighat and Lauren
7   Halper for the government.
8          THE COURT:  Good morning.
9          MR. KATZ:  Good morning, Your Honor.  Peter Katz on
10   behalf of Mr. Fitzpatrick.
11          THE COURT:  All right.  The defendant is now here.
12   This matter comes on for sentencing.  Mr. Katz, have you had
13   enough time to go over the presentence report yourself and with
14   your client?
15          MR. KATZ:  Yes, I have, Your Honor.
16          THE COURT:  Are there any factual corrections, changes,
17   additions, or deletions you want made to the report itself?
18          MR. KATZ:  Factual, no, Your Honor.  We did submit a
19   request to adjust the acceptance of responsibility, as is
20   indicated in the final presentence report.  So we do have an
21   objection to that that we spelled out in our papers.
22          THE COURT:  All right.  For the record, by the way,
23   Exhibit C attached to your sentencing memorandum was a
24   psychological evaluation of your client.  Correct?
25          MR. KATZ:  Exhibit B and C --

1             THE COURT:  B and C, that's right.

2             MR. KATZ:  -- both were different types, but both

3     were --

4             THE COURT:  Yeah, those should have been provided to

5     the probation office.  So I am directing that Exhibits B and C

6     be made part of the presentence report, because the

7     Bureau of Prisons will need that.  All right?

8             MR. KATZ:  Certainly, Your Honor.

9             THE COURT:  Well, I looked at your argument about

10    acceptance of responsibility, but I think given -- in this case,

11    given the conduct of the defendant while he was on

12    supervision -- as you know, he was out on bond and a warrant had

13    to be issued by Judge Ellis, who is unable to handle this case

14    so I've taken it over for him, because the defendant had

15    violated several significant conditions of bond.  That's why he

16    is now in custody.  That kind of conduct while someone is on --

17    is awaiting sentencing is a strong indicator that acceptance of

18    responsibility is no longer appropriate.

19             Let me hear the government's position on that.

20             MR. HAGHIGHAT:  Your Honor, we agree with what you

21    described.  There's some more context we would be happy to

22    discuss in sidebar, if Your Honor would like to hear more on

23    that, but we certainly agree with the position that you

24    articulated.

25             THE COURT:  All right.  So I'm not going to change the

4

1    guideline calculations.

2           Now, in this case, with Counts I, II, and III, the

3    guidelines are the following:  The defendant has a criminal

4    history of 1, his criminal -- the offense level is a 36.  As to

5    Count I, the guidelines are up to 120 months; Count II,

6    120 months; Count III, which is the possession of child

7    pornography count, has a guideline range of 188 to 235 months.

8           Counts I and II each carry a period of one to three

9    years of supervised release; Count III carries a period of five

10   years to a life term of supervised release.  The fine range for

11   all three counts is 40,000 to 250,000 dollars.  And under the

12   two enhancements for the special assessment, depending upon the

13   defendant's indigency, are the $5,000 under JVTA and the AVA

14   $17,000 possibility.

15          But I'm not going to address those or impose those

16   because I'm finding this defendant, who has never worked, is

17   clearly indigent and would not be able to pay those extended

18   special assessments.  So the special assessments in this case,

19   then, will be the standard $100 per count of conviction, which

20   will be $300.

21          All right.  I'll hear from the government, your

22   position on sentencing.

23          MR. HAGHIGHAT:  Thank you, Your Honor.  The government

24   respectfully submits that a significant term of incarceration is

25   needed here to reflect the seriousness of the crime, the

1    significant harm caused by the defendant's crimes, to protect

2    the public from the defendant, and to deter others who may seek

3    to follow in his footsteps of committing cybercrime.

4            As our paper outlines, the defendant's crimes were

5    incredibly serious.  I don't want to go through all the facts,

6    but, generally speaking, the defendant created and administered

7    an online forum that was delegated to helping cyber criminals

8    traffic in access devices, traffic in the stolen PII of

9    individuals, and share illicit tools of cybercrime.

10           The website he created, BreachForums, was remarkably

11   prolific and dangerous.  It attracted over 300,000 members in a

12   single year.  It's, quote, "official database," which the

13   defendant personally managed, claimed to have approximately 888

14   stolen customer databases that included approximately 14 billion

15   records.  As our paper highlights, a number of these data

16   breaches contained the sensitive PII of tens or even hundreds of

17   millions of users, and during the time it was online, this forum

18   became one of the go-to places for cyber criminals to sell

19   stolen data.

20           And why this was this website so successful?  Partly it

21   was because the defendant designed every aspect of the forum to

22   be conducive to cyber criminals who want to buy and sell stolen

23   data.  For instance, he operated himself a middleman or escrow

24   service that would allow buyers and sellers, criminals on both

25   sides, to conduct transactions with confidence that they

6

 1    wouldn't get scammed because he was a trusted middleman.

 2         Another reason he was successful is because the

 3    community viewed him as one of them.  He had himself, for years,

 4    been a prolific user of another similar website, RaidForums, a

 5    predecessor website, and he fostered a reputation for

 6    trafficking in stolen and hacked data.  In fact, he had a whole

 7    page on that website devoted to data that he was sharing from

 8    customer databases.  And when law enforcement seized control of

 9    RaidForums and arrested its founder, the defendant, rather than

10    appear deterred, rallied the RaidForums community to follow him

11    over to BreachForums.  And he designed it to mimic all the main

12    features of RaidForums.

13         And there were very real consequences of the

14    defendant's crimes.  As the victim impact statements highlight,

15    the defendant has caused victims to suffer monetary and resource

16    damages trying to respond to these data breaches and track down

17    stolen data on the dark web.  They face regulatory scrutiny from

18    the FTC or face class action lawsuits from shareholders -- or

19    not shareholders, individuals who claim to have been victims of

20    identity theft or online fraud as a result of the posting of

21    their data.  And a lot of those organizations suffer

22    reputational or business harm.  That may not be a 2B1.1 factor,

23    but certainly is a real consideration or concern here.

24         The papers describe a number of these particular

25    victims, but I just want to highlight a few.  One victim company

1   described how they were hacked and the PII of 20 million users

2   was posted on BreachForums, and they subsequently had to incur

3   approximately $180,000 responding to the incident.  The victim

4   describes how they then had to respond to the FTC, and then they

5   faced a complaint from a person in the Western District of

6   Michigan.

7          Another victim, Tacoma-Pierce Health Department, had

8   the PII of 1.5 million of their users posted on BreachForums.

9   And in an effort to investigate, remediate, and address the

10  harms that were incurred, they were forced to devote 850 hours

11  of staff time to the response.  This is time that didn't go to

12  serving the public health, which is the purpose of the

13  organization.

14         Another victim, which is termed Victim 3, we're still

15  working on the restitution claim, but that entity, which

16  provides healthcare-related support to nonprofit organizations,

17  talks about how they, quote, "suffered substantial costs in the

18  form of data breach response and remediation, security controls

19  and improvements, and the continued costs of litigation."  And

20  that victim particularly is still facing a public class action

21  lawsuit from individuals who claim to have suffered losses as a

22  result of the posting of the data.

23         Another victim who submitted a victim impact email

24  describes suffering significant reputational harms; while maybe

25  not compensable under restitution, is a real issue.

1           And these are just mere examples.  There were hundreds

2    of these databases posted that affected significant numbers of

3    organizations.

4           And, Your Honor, I would note that on this point about

5    reputation, you may have noticed that we did not name most of

6    those victims.  And that wasn't because we were trying to make

7    it hard to follow our brief, it was because invariably, whenever

8    we asked the victim, they wanted to be anonymous because we live

9    in a world where there are a lot of consequences for these

10   organizations when these data breaches occur.  They suffer bad

11   press, there's reputational damage, there's loss of customers

12   and business relationships, there's potential regulatory

13   scrutiny, class action lawsuits --

14           THE COURT:  Counsel, stop with the beating of the

15   lectern.  Thank you.

16           MR. HAGHIGHAT:  My apologies, Your Honor.

17           So, Your Honor, there are real world consequences, and

18   this has a real chilling effect.

19           Now, under the circumstances we explained in our

20   papers, we've relied on gain as the best estimate because it's

21   just very challenging to come up with an easily quantifiable

22   number.  But what we know from data breaches activities

23   generally is that while we've got victim impact statements from

24   organizations, this also has an impact on the individuals whose

25   PII is disseminated.  Why else would people pay thousands of

1    dollars to buy the PII of individuals?  As is described in the

2    IC3 report that was included in our papers, last year the

3    majority of reported data breach losses were suffered by

4    individuals.

5            Now, with regard to this defendant particularly, we are

6    sympathetic and sensitive to some of the matters discussed in

7    the under-seal submissions.  And we may feel personal compassion

8    for some of those issues, but the unfortunate, inescapable

9    reality is that an examination of his conduct over the course of

10   time reflects that he is a danger to the public.

11           First, there's a the under-seal activity that's

12   discussed in the PSR.  Then, in 2020, he became active as a

13   prolific percent on RaidForums, made thousands of posts and

14   became one of the website's most respected figures.  Then, when

15   RaidForums was shut down and its founder arrested, rather than

16   get deterred, he got determined and defiant.  He brazenly

17   created and founded a forum in the image of RaidForums --

18           THE COURT:  Counsel, you're repeating yourself.  I

19   heard it the first time.

20           MR. HAGHIGHAT:  Yes, Your Honor.

21           And this wasn't a single momentary decision, this was a

22   full-time activity.  He spent countless hours making terrible

23   decision after terrible decision.

24           He also, as part of the plea, possessed child

25   pornography, including videos depicting prepubescent minors.

1          Then, when he got arrested, there were a myriad of

2     pretrial issues which are discussed in our papers.  And I think

3     the unavoidable conclusion is that he can't resist the urge to

4     go online and try to reconnect with this very dangerous

5     community.  And when he's online, he engages in inappropriate

6     behavior.

7          And I believe in the papers there's a lot of discussion

8     about who he is in real life, in person.  But I think when you

9     look at our investigation, what you see is there's a disconnect

10    between the person who may be having an in-person interaction

11    with someone and the online version of him.  He may be,

12    according to some of the letters, shy, unaggressive, harmless in

13    person, but online he is confident, he is aggressive, he is

14    dangerous.  There's a reason why he was able to attract 300,000

15    people, many of whom are paying to be members of this forum, to

16    his website.  And that makes him a danger.  Because as we've

17    seen, the violations don't restrict him.

18         Now, in the brief, the defense makes a claim that cyber

19    crimes are not based in greed, and appears to suggest that we

20    agree.  We do not.  An essential element of his plea is, he had

21    an intent to defraud.  And the defendant did make six figures

22    from membership fees and selling credits, which is quite a lot

23    for a person his age, given his background.  And while it is

24    true that the defendant did not go spend it on the types of

25    material possessions you might expect, like go buy a sports car,

1     he did spend the money on things that he valued; for instance,

2     computers, servers, and internet domains.

3          We have already entered a forfeiture order in this

4     case, but you may have noticed there are over 100 domains, many

5     of which are unique domains that have actual significant value.

6     And that was a big part of what he was forfeiting, because he

7     spent thousands and thousands of dollars buying up these

8     domains.  For him, that is valuable.

9          The defendant also -- the defense also said in their

10    briefs that his crimes were not based in malice.  But we

11    disagree with that, too, or at least we would reframe it to say

12    that it's clear that the defendant has reckless disregard for

13    the consequences of it, of the conduct.

14         Like in his own -- as is discussed in the PSR, he was

15    advising people on how much to sell their stolen data, and he

16    also even advised them to try to extort the corporations before

17    trying to sell the data online.  I don't know what was in his

18    heart when he was saying that, but certainly he was fine with

19    the consequences.

20         There is, Your Honor, also a general deterrence need.

21    Our papers discuss the significant troubles with data breaches

22    generally.  And why do cyber criminals commit data breaches?

23    It's because they have a home where they can go and sell that

24    data.  They go to forums like the one that the defendant was

25    operating and they sell the stolen data to fraudsters.  So a key

1    way to stop the incentives to commit data breaches is to

2    strangle the infrastructure, the people who run that

3    infrastructure, to enable them to profit from their activities.

4           And while the defense claims mere conviction or a mere

5    presence of a felony in a press release is sufficient to deter

6    future cyber criminals, I think this example proves otherwise.

7    The prior founder of RaidForums was charged with a felony, there

8    was a press release issued, and this defendant didn't care about

9    any of that.

10          To prevent future defendants from following in the same

11   path, a significant term of incarceration is needed.

12          THE COURT:  Thank you, counsel.  I'll hear from defense

13   counsel.  Mr. Katz?

14          MR. KATZ:  Thank you, Your Honor.  Judge, as I

15   mentioned at the very beginning of our papers, Conor is

16   different.  And to analyze his case with the same vim and vigor

17   that the prosecution has done, without acknowledging the

18   unbelievable difficulties that he has faced in his life, his

19   very short life -- he's only 21 years old now; he was 19 when

20   this started, and I think the government can confirm, he began

21   in this capacity, starting on RaidForums, at an even younger

22   age.

23          And some might say, oh, well, that's an indication that

24   he has a bad heart, that he is someone who is an evil person.  I

25   think the reports that we've submitted to Your Honor, I think

1    the testimonials from his parents, I think his letter and the

2    entire circumstances of the case indicate that you cannot and

3    should not, Your Honor, quite respectfully, treat

4    Conor Fitzpatrick as if he is somebody who has master-minded

5    horrible data breaches.

6        The government is right, the conduct here is bad

7    conduct.  There's no question about that.  We have never

8    contested that.  In fact, as is clear from our papers,

9    Mr. Fitzpatrick has owned that from the very beginning of this

10   case and up until now.

11       THE COURT:  But here's the aggravating factor in this

12   case.  I would absolutely agree with you, had the conduct while

13   on supervision, pretrial supervision, not occurred.  Right?

14       You know, at this point the Court is faced with clearly

15   a young man with some significant mental health issues, very

16   significant.  And that is going to factor into the ultimate

17   sentence.  Nevertheless, the potential risk to the community is

18   something the Court must consider, and that affects how one

19   sentences a defendant.

20       Now, here, he was allowed to remain out in the

21   community while these charges were being adjudicated.  And as

22   you know from the violation proceedings, or papers, there were

23   serious violations of those conditions, which is, unfortunately,

24   for your client, a strong indication that he is not amenable to

25   control within the community.  You need to address that.

1          MR. KATZ:  I absolutely will.  I'll address that right

2     now, Your Honor.

3          I agree he violated the terms of his release, no

4     question.  And he's suffered from that.  He went into custody

5     immediately.  We did not contest that.  And I guess technically

6     today we're on for the bond hearing as well, although that's

7     somewhat moot.

8          While there's no question that violating the Court's

9     order and violating the conditions of the bond is serious,

10    100 percent - I'm not here to say otherwise - but when you look

11    at what that conduct was, he engaged in communications with

12    other individuals.  That was not criminal conduct.  He did not

13    go back and run another site, he did not access impenetrable

14    data sites, he did not attempt to commit another crime.  Yes, it

15    was a violation of the release order, and of course that's

16    something we anticipate and would expect Your Honor to take into

17    consideration.  It is a factor, no doubt.  And it's not a good

18    factor for him, of course.

19         But when you look at the conduct -- the government

20    references, I think, two separate sections in there.  When you

21    read through that one, in my opinion, is clearly in jest - maybe

22    it's in bad jest - about additional conduct.  But it is not

23    criminal in and of itself.

24         And the second one is his description of one of his

25    offenses that clearly is not a truthful statement, also not a

1    crime.  It's clear that nobody would want other people to know

2    the full nature of what you did.  And I think that those two

3    examples are not an indication that he can't follow the Court.

4           The other piece of it is, you know -- and this goes to

5    the mental health aspect of Mr. Fitzpatrick.  Number one, he had

6    never been diagnosed with anything related to what is discussed

7    in our papers.  Never.  And there was significant family

8    history.

9           And of course he must be held accountable.  He's pled

10   guilty, he is legally responsible.  And this speaks to the

11   violation as well, Your Honor.  This is somebody who is in a

12   position who has never had to address those issues.  He's had

13   two incidents, very serious medical issues that Your Honor is

14   aware of, other mental health challenges in addition to the

15   underlying condition that we detail.

16          This is somebody who then is brought into a federal

17   court system, who accepts his responsibility, discusses these

18   matters fully and completely, and who realizes he probably is

19   going to have to go into jail at some time.  He was allowed to

20   access the internet, he was allowed to communicate with the

21   people that he communicated with; he just wasn't allowed to do

22   it on an unsupervised device.  Was that wrong?  100 percent.

23   But I think you need to think of the context of the person.

24          And appreciate Your Honor's consideration, and I've

25   been here for the other sentencings.  I appreciate Your Honor's

1    perspective on addressing the person and the risks that they

2    pose.  I think with regard to Mr. Fitzpatrick, he really is

3    different.  As I said, I've been doing this a very long time, as

4    Your Honor has as well.  I've never had a client, or, while I

5    was a prosecutor, prosecuted anybody who has this constellation

6    of mental health issues at this age undiagnosed and untreated.

7         So I think you need to put that otherwise kind of stark

8    violation -- and it would be very easy for the Court to say he

9    violated his pretrial release, he committed these brazen acts,

10   he started up this -- yes, he did all of those things.  But who

11   is Conor Fitzpatrick?  I think that he's somebody -- and as the

12   experts indicate I think quite clearly and succinctly, he is

13   somebody who, with treatment, can be a productive member of

14   society.  He can improve.  If he goes to jail for an extended

15   period of time, as the government has recommended - 15 years,

16   their recommendation, and I'll address that in just a second - I

17   think all is going to be lost.  What is better for society, for

18   data breaches, for anybody?  Nothing.

19        And appreciate the instinct of wanting to put somebody

20   who commits these offenses in jail for a very long time.  And if

21   it's somebody who truly understands the consequences of their

22   acts, somebody who truly can understand social interactions,

23   somebody who could truly understand perspective-taking, then of

24   course I wouldn't be standing here and I wouldn't have made the

25   arguments that I made.

17

1              As I said, I appreciate we're asking for probation,

2      they're asking for 15 years.  That's not the normal dichotomy in

3      this courthouse.  I appreciate that.  But this is a different

4      situation.  And to go back to the violation, I think you have to

5      put it in the context of he was and what he was facing, and his

6      inability on his own to address those issues.  He's never been

7      given an opportunity to have proper treatment, to have proper

8      attention, and somebody really monitoring him.

9              Yes, he was on pretrial release and there was a

10     pretrial officer, but nobody was really honing in and paying

11     attention to him the way that probation can pay attention to

12     him, the intensive supervision he can get, the limitations that

13     can be put on him, with the understanding that if there's a

14     blip, then, you know, all bets are off.

15             So I mention that with regard to the post-plea conduct,

16     but I think it puts it in proper perspective, as does the entire

17     offense.

18             And I would like to talk just a little bit more about

19     some of those things.  First, with regard to the guidelines.

20     Because I think the government has framed their arguments based

21     upon what the guidelines are.  They say 188 months is an

22     appropriate sentence; it's the bottom of the guidelines.  But I

23     think, Your Honor, that the guidelines, particularly in a case

24     like this, are really -- they're not structured for a case like

25     this.

1          You have a situation where his violation, which was not

2     a crime, as I just described, yes, it violated the Court's

3     rules, but what it does with regard to the guidelines is

4     increase his guidelines from 135 to 168, to 188 to 235.  It's

5     50 percent more of a sentence because of a violation of his

6     release.  That release itself is worth 53 months of

7     incarceration over and above everything else that he would have?

8     Because I would imagine, and you could ask the government, I

9     suppose, but if the guidelines had been 135 to 168, I'm

10    guessing, because that's what the government typically does, ask

11    for a guideline sentence.

12         So I think the guidelines here and the numbers, just

13    the pure numbers, are really not an appropriate place to start.

14    Yes, of course, Your Honor has to consider them and they're

15    advisory and all of that.  But I think when you really look at

16    the numbers and the situation, it's not an appropriate place.

17         Two other things I would like to mention about the

18    guidelines.  Yes, the underlying harm is serious, and there are

19    victims.  They are real victims and there are individuals who

20    have suffered.  What's been presented to the Court -- and that's

21    in the abstract of these data breaches.  What's been presented

22    to the Court is a finite number of people who have actually been

23    victimized because of Mr. Fitzpatrick.  No doubt about it.  We

24    don't minimize that.

25         But what the guidelines have done, because of the way

```
1    they're calculated and the specific offense characteristics,

2    even using gain, we have $700,000 of loss, which is

3    Mr. Fitzpatrick's gain.  And, yes, he used that to keep the

4    institution of BreachForums going.  That was what he was trying

5    to do, no doubt there.  But it was not for greed, for him to

6    pocket money, it was because of his inability to understand, and

7    the repetitive nature and the attributes of his medical and

8    mental health, that caused him to do that.  Yes, he is

9    responsible for that.  It's not an excuse, as I mentioned.  It's

10   an explanation.  But it's one that I think the Court needs to

11   take into account.

12           And when you do that and you see the actual dollar loss

13   that we are presented, that Your Honor is presented here in this

14   case, it's not 14 billion people or millions of people.  We have

15   a finite number of people.  And the way the guidelines handle

16   it, it assesses his crime the same as if somebody had stolen

17   from my house, your house, anybody's house 250 to 550 million

18   dollars.  That's the same guideline calculation you would get if

19   you did something like that.

20           So I think it just needs to be taken into perspective

21   here a little bit about how the guidelines work in that regard.

22           The other thing I would like to just mention briefly

23   about the guidelines is the combination, the way that the

24   guidelines really more than doubles --

25           THE COURT:  Counsel, I can stop you on this point.  The
```

1    Court is going to issue a variant sentence, all right?  So the

2    guidelines become relatively...

3         MR. KATZ:  Understood.  The other thing I want to talk

4    about, Judge, is about Mr. Fitzpatrick.  I mentioned his mental

5    health conditions, and you've seen our reports, and I think that

6    that is paramount for Your Honor to take into consideration.

7         His age.  As I mentioned, this happened when he was 19

8    and 20 years old.  And that was his physical age; mentally, I

9    think, quite clearly, much younger than that.

10        I think the angst that he faced from his other mental

11   health challenges, the other episodes that are discussed in our

12   papers, and his victimization as well, I think are things that

13   Your Honor needs to take into account in fashioning an

14   appropriate sentence here.

15        Again, as far as the greed goes, this is not your

16   typical situation, as we've discussed.  And he's provided as

17   much assistance as he could with regard to this matter that's

18   also discussed in our papers and some of the government's

19   submissions as well.

20        And I would also, as I do in the papers, and I won't

21   belabor this, is what's the appropriate sentence here.  And you

22   see other cases of people who are his age committing a similar

23   type of offense and what kind of sentence they get, and nowhere

24   gets anywhere near the 15 years that the government proposes.

25   And those are not even people who had the mental health

1  challenges and the other difficulties that Mr. Fitzpatrick did.

2          Mr. Fitzpatrick can be helped.  He can be treated.

3  He's never been given that opportunity.  I understand the

4  request that we're making, and regardless of whatever the

5  sentence is that is imposed, I ask that a piece of that, whether

6  it be on probation or on supervised release, that he receive the

7  treatment that he needs so that he can become a productive

8  member of society and can avoid falling into the trap of going

9  back into this type of conduct.

10          For all those reasons, Your Honor, we do believe that

11  he can be treated, we do believe that he can be a productive

12  member of society, and ask that you impose a sentence that we've

13  asked for in our papers.

14          Thank you, Your Honor.

15          THE COURT:  All right.  Are there any victims in the

16  courtroom who want to be heard?

17          Mr. Fitzpatrick, come up to the lectern.

18          Mr. Fitzpatrick, this is your chance to say anything

19  you would like the Court to consider before sentence is imposed.

20          THE DEFENDANT:  Thank you, Your Honor.  Ever since my

21  arrest in March last year, I have been working to correct the

22  wrongs I did.  I cooperated from the start of the investigation,

23  answering all of the questions the government asked me.  I've

24  also been working on my mental health by going to therapy two

25  times a week, taking evaluations, and being open fully to any

1    treatments that would better myself.

2          When committing these crimes, I wasn't motivated by

3    money or greed, but by the people I surrounded myself with.  I

4    was never popular or felt like I had meaning, but suddenly,

5    thousands of people supported something I created.  It clouded

6    my judgment heavily and I feel nothing but remorse for what I

7    did.

8          I can only ask that you consider a lenient sentence

9    that allows me to seek further mental health treatment, attend

10   therapy, and attend rehabilitation so I can start being a

11   productive member of society.

12         Thank you, Your Honor.

13         THE COURT:  Did you write that letter yourself?

14         THE DEFENDANT:  Yes, Your Honor.

15         THE COURT:  How are you doing in jail?

16         THE DEFENDANT:  The best that you can, Your Honor.

17         THE COURT:  Well, tell me a little bit about it.

18         THE DEFENDANT:  At the start, I was in cell 24 hours a

19   day, and then 22 hours a day.  And now I'm in my cell for around

20   half the day, Your Honor.

21         THE COURT:  Do you have a cell mate?

22         THE DEFENDANT:  No, Your Honor.  I'm in the mental

23   health unit in the Alexandria Detention Center, Your Honor.

24         THE COURT:  Are you taking any classes or going to any

25   programs?

1          THE DEFENDANT:  They don't have classes or programs,

2     really, that I know of, Your Honor.  So I've just been really

3     just sitting around, Your Honor.

4          THE COURT:  This is among the most difficult cases I've

5     seen in quite a while in terms of sentencing, because the

6     interplay between the criminal justice system and the obvious

7     extremely significant mental health issues that this young man

8     has are really very concerning.

9          The Court has to consider -- I mean, he's already

10    served about two weeks in the local jail here, apparently

11    without any problems.  My concern is taking a 21-year-old young

12    man who is probably closer to a 16 or 17-year-old in terms of

13    actual maturity, I think the mental health records clearly would

14    show that, and someone with the very clear documented mental

15    health history that we have -- this is not somebody who, you

16    know, post criminal conduct all of a sudden develops mental

17    health issues.  I mean, this young man has had them for years.

18         He obviously has a supportive family.  They have had,

19    obviously, their own great tragedies in this case as well, and

20    burdens.  It's a very, very sad case.  And it's one where there

21    has to be some appreciation of, yes, this criminal conduct is

22    very serious and very bad.  And we barely touched the

23    pornography issue, but I'm certainly aware of that as well.

24    Actually, the child pornography count gives the Court a more

25    flexible, in some respects, palate to work with here than I

1    would have with just the data breach issues.

2         In this case, the defendant has been in custody for two

3    weeks, and he has survived that, but only because he's in a

4    local jail and he's in a mental health unit.  He's not in

5    general population.  This young man in general population I

6    think would just be a disaster.

7         And so, although the Court fully recognizes the

8    seriousness of this criminal conduct, I am going to sentence the

9    defendant to a sentence of time served, followed by a period of

10   20 years of supervised release.

11        Now, the way this sentence will work, then, is time

12   served is concurrent on Counts I, II, and II.  As to Counts I

13   and II, a three-year period of supervised release concurrent

14   with each other.  As to Count III, which allows the Court to

15   impose up to a life term of supervision, that's where the longer

16   term of supervised release goes into effect.  It's concurrent

17   with the other two.  I think that gives us a long-term ability

18   to control the defendant and to monitor his mental health

19   situation and his compliance with the law.

20        Obviously, if we get him on a good track, five or

21   10 years down the road, he could apply for some easing of the

22   term.  But I think this gives us the best opportunity to try to

23   protect the community as well as to not see this young man just

24   ravaged in a prison setting where he would never get the mental

25   health treatment that he needs, and he would, again, be, I

1    think, exposed to all kinds of problems.  He would clearly be a

2    potential victim.

3           So that is why I'm imposing such an extensively variant

4    sentence.

5           The terms and conditions of supervision.  And,

6    Mr. Fitzpatrick, you need to understand that if you violate any

7    of these conditions, all right, you'll be brought back to court

8    and then we can give you many, many years of incarceration.  Do

9    you understand that?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  All right.  The first condition is that you

12   must follow all the conditions of supervision that are printed

13   on the judgment order.  And so those were on pages 25 through

14   30.

15          Counsel, did you carefully go over those provisions

16   with the defendant?

17          MR. KATZ:  We did review them, Your Honor, yes.

18          THE COURT:  All right.  Secondly, you have to be

19   absolutely of uniform good behavior.  That means you cannot

20   violate any federal, state, or local laws - and that includes

21   traffic laws - while you're under supervision.  Do you

22   understand that?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  All right.  And again, you have to follow

25   all the conditions that are going to be printed on the judgment

1    order, and they're going to mostly repeat what's already in the

2    presentence report.

3         But just so you understand how this is going to

4    operate, you absolutely must continue to satisfactorily

5    participate in mental health treatment as directed by the

6    probation office.  Do you understand that?

7         THE DEFENDANT:  Yes, Your Honor.

8         THE COURT:  All right.  And if part of that treatment

9    requires the taking of medication, then you must take the

10   medication.  Do you understand that?

11        THE DEFENDANT:  Yes, Your Honor.

12        THE COURT:  You are going to have to waive any privacy

13   rights that you have to the mental health treatment so that the

14   probation office can be monitoring your compliance.  Do you

15   understand that?

16        THE DEFENDANT:  Yes, Your Honor.

17        THE COURT:  And in terms of costs, I'm going to require

18   that if you have the ability to pay any of those costs, you

19   must.  Otherwise, the probation office will have to pick them

20   up.  Do you understand that?

21        THE DEFENDANT:  Of course, Your Honor.

22        THE COURT:  All right.  Then, there is no history of

23   drug abuse in this case, so the mandatory drug testing is not

24   imposed.  However, at any point the probation office can demand

25   a drug test from you and you must comply.  Do you understand

1   that?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  Now, for the first two years of the period

4   of supervised release, you're going to be under home arrest,

5   which means you're going to be required to be in your home at

6   all times.  Do you understand that?

7           THE DEFENDANT:  Yes, Your Honor.

8           THE COURT:  I'm going to have GPS monitoring also

9   applied, and that means you're not allowed out of your home for

10  any reason other than the specific ones I'm including in the

11  order, or if you get permission in advance from the probation

12  office.

13          So you are allowed out of your home only to attend any

14  of your therapy sessions, to meet with your probation officer,

15  to attend to any physical medical problems that you might have,

16  to engage in any bona fide religious observances.  Other than

17  that, you cannot be out of your home for any reason whatsoever

18  unless you've gotten permission in advance from the probation

19  office.  Do you understand that?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  All right.  Then, you are going to be

22  required to do a whole lot of things, and these are the special

23  conditions.  I'm not going to repeat them here because they're

24  fairly extensive, but they're on pages 27, 28, 29, and 30 of the

25  presentence report.  They will be incorporated in the judgment

1    order.

2          But they include such things as, you're going to have

3    to register with the Adam Walsh Act in terms of being a sex

4    offender.  You're going to have to comply with all of those

5    requirements.  You're going to have to submit to polygraphs to

6    make sure that you comply with everything.

7          You're going to be required to provide access to any of

8    your financial information so that we can make sure that you're

9    not getting money from any illegal sources.

10          There is an issue on the first issue about restitution.

11    Is there restitution ready in this case?

12          MR. HAGHIGHAT:  Your Honor, we've asked for a

13    subsequent hearing to resolve that.  We've come to an agreement

14    on a couple, but we're still waiting on one victim.

15          THE COURT:  So the first paragraph of the special

16    conditions on page 27 will hold off on that until we take care

17    of the restitution issue.  All right?

18          But other than that, all of the other conditions.

19    You're not going to be able to have access to any places where

20    young children - that is, minors under the age of 18 -

21    congregate.  You have to have a responsible adult with you at

22    any times that you might have contact.

23          You have a younger brother.  Correct?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  He's under the age of 18?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Well, obviously you can have contact with

3    him.  I'm not going to require any restrictions there.

4          The other thing that you must be very careful about now

5    is the use of internet accessible devices.  At this point, I

6    think we have to wean you away from the internet entirely.  You

7    are not working, you really have no need for the internet at

8    this point.  You're going to be stuck in your house.

9          So I'm going to let you watch television and you can

10   listen to the radio, but at least for the first year of

11   supervision, I don't want you having any access whatsoever, zero

12   access to the internet.  It has been the source of your

13   problems.  If you've behaved well during that first year, if

14   therapy has gone well, there have been no problems, then I will

15   allow restricted access to the internet.

16         In the meantime, however, probation is going to still

17   go ahead and impose the monitoring devices.  And again, that's

18   part of the requirements that are in the presentence report.

19         And your family is going to have to be extremely

20   careful to monitor your situation so that you don't break that

21   requirement.  Do you understand that?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  If I get word that you've been on the

24   internet even just to chat with somebody, a perfectly benign

25   chat, that's a violation.  You've got to stay away from it.  Do

1    you understand that?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  All right.  Are there any other conditions

4    of supervision that the government would want at this point?

5    Again, I'm incorporating all of the special conditions that are

6    in the presentence report that cover all the necessary

7    Adam Walsh issues.  Is there anything further?

8              MR. HAGHIGHAT:  No, Your Honor.

9              THE COURT:  All right.  Counsel, Mr. Katz, is there

10   anything further that you want the Court to address?

11             MR. KATZ:  No, Your Honor.  I appreciate it.  Thank

12   you.

13             THE COURT:  Now, the last thing, Mr. Fitzpatrick, is,

14   you did, in your plea agreement give up your right to appeal

15   your convictions and your sentence.  However, you have a right

16   to appeal.  If you do want to appeal, you must notice that

17   appeal within 14 days of today's date.

18             Mr. Katz, you need to discuss that with your client.

19             MR. KATZ:  We have already discussed it, and we will

20   discuss it again, Your Honor.

21             THE COURT:  But if you cannot afford to pay for an

22   attorney, Mr. Fitzpatrick, we will appoint one for you for the

23   appeal.  Do you understand that?

24             THE DEFENDANT:  Yes, Your Honor.

25             THE COURT:  In case I didn't say it, it's a total of

1    $300 of special assessments because I'm just imposing the

2    minimum.  And those have to be paid within 90 days.  Do you

3    understand that?

4            THE DEFENDANT:  Yes, Your Honor.

5            THE COURT:  Is there anything further on this case?

6            MR. KATZ:  No, Your Honor.

7            THE COURT:  So it's going to take a while for the

8    judgment order.  The marshals can't release the defendant until

9    they get the order.  We'll try to get it to you as soon as

10   possible.  But you'll go back into custody until you're

11   released.

12           MR. KATZ:  Thank you very much, Your Honor.

13

14

15

16           **CERTIFICATE OF OFFICIAL COURT REPORTER**

17

18           **I, Rebecca Stonestreet, certify that the foregoing is a**

19   **correct transcript from the record of proceedings in the**

20   **above-entitled matter.**

21

22

23

24   **___//Rebecca Stonestreet//___          __1/24/24_____**

25   **SIGNATURE OF COURT REPORTER                      DATE**

*Rebecca Stonestreet, RPR, CRR, Official Court Reporter*