IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | CASE NO.  23 CR 119 (LMB) |
| CONOR BRIAN FITZPATRICK, | Sentencing: September 16, 2025 |
| Defendant. | |

### DEFENDANT'S MEMORANDUM IN AID OF RESENTENCING

Defendant, Conor Brian Fitzpatrick, by and through his undersigned counsel respectfully submits this Memorandum in Aid of Resentencing.  All the factors and considerations in our Memorandum in Aid of Sentencing dated, January 16, 2024 (Dkt. Entry No. 69) remain as pertinent as they were almost 2 years ago.  For that reason, we wholly incorporate it by reference here and respectfully request that the Court review and consider it in its entirety.  As we noted then, Conor is different.  The sentence the Court imposes must also be different.   Two additional factors – not yet apparent at Conor's original sentencing and wholly ignored by the government – must also be considered as the Court fashions a sentence sufficient but not greater than necessary to achieve the purposes of sentencing, individualized for Conor.

Ever since his sentencing – 20 months ago – Conor has been fully compliant with the Court's conditions.  For almost two years, Conor has been on home confinement with an inability to use any electronic device for the first year.  He adhered to every one of the Court's instructions.  And this is no trivial feat.  In essence, for 20 months, Conor has been in his own form of jail.  For 12 months he had no form of communication with the outside world.  In some ways, Conor's

1

punishment thus far has been more severe than if he had been in jail. Conor is well on his way to rehabilitation. Putting him in prison now for any extended period would serve no interest of society.

This dovetails with the second factor not fully evidenced during his first sentencing proceeding – the abject inability of the Bureau of Prisons to accommodate Conor's needs in a way that would not subject him to grave risks of suicide, social and emotional regression and deterioration, and cruel and unusual punishment.

As we detail below, based upon all the current factors relevant to sentencing, we submit that the Court impose a sentence on Counts One and Two of 15 years of Probation with the special condition of intermittent commitment of one year of weekends (the maximum allowed by law) along with any other special conditions the Court deems appropriate to run concurrent to a sentence on Count Three of time served with 20 years of Supervised Release. This sentence comports with the Court of Appeals dictates as well as prevents Conor from becoming institutionalized or suffering the very real risk of cruel and unusual punishment as detailed below by the Bureau of Prisons' immediate former Chief of Mental Health Services.

### I. Conor's Post-Sentencing Compliance and Rehabilitation Have Been Exemplary

On January 19, 2024 Conor left the Alexandria Federal Courthouse after his sentencing, entered his father's car, and drove back to his home in Westchester, New York. For the next 12 months he did not touch or use any form of electronic device. For the next 20 months, he did not leave his childhood home except for mental health treatment. Keep in mind that although Conor is now 22, he was 19 at the time of his offense with a social and emotional age closer to that of a much younger teenager. This punishment has been serious, severe, and difficult.

Even so, Conor has not had any issue while on probation. To the contrary, he has been 100% compliant – exceptionally strong evidence that Conor (while monitored and supervised) is on the path to complete rehabilitation and is not a danger to the community. The attached Letters of Support from Conor's mother and father – MaryAnn and Mark Fitzpatrick – and his Certified Peer Specialist from Search for Change, highlight Conor's journey and continued path to full rehabilitation. (*See* Exhibit A, Letters of Support).

It is now beyond peradventure that Conor can comply with any conditions placed on him while on probation. Conor's conduct over the last 20 months should be given substantial weight in fashioning his new sentence. Indeed, the Supreme Court has long recognized that sentencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant--if not essential--to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Pepper v. United States*, 562 U.S. 476, 480 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 246–47 (1949)). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams*, 337 U.S. at 247; see also *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.").

Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Wasman v. United States*, 468 U.S. 559, 564 (1984). The *Pepper* Court determined this firmly included post-sentencing conduct and rehabilitation. As such, the Court should strongly consider not only the significant punishment Conor has already endured, but also his status as a model probationer evincing his strong progress on the road to rehabilitation.

## II.     Incarceration Unnecessarily Risks Cruel and Unusual Punishment for Conor

Conor's significant autism spectrum disorder, history of suicidality—including two prior attempts—and co-occurring mental health conditions make federal prison an acutely dangerous environment. A 2024 report by the Department of Justice's Office of the Inspector General ("OIG") paints a damning picture. The report details how inmates at risk of suicide are too often neglected, and how widespread noncompliance with suicide-prevention training and drills within the Bureau of Prisons (BOP) places vulnerable inmates in grave danger. The OIG found that the BOP fails at every stage to ensure inmate safety, beginning with intake. (*See* U.S. Dep't of Just., Off. of the Inspector Gen., *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions* (Feb. 2024), https://oig.justice.gov/sites/default/files/reports/24-041.pdf (Attached as Exhibit B).)

We commend the Court to fully review the attached report of Dr. Robert Nagle -- the immediate former Chief of Mental Health Services for the Bureau of Prisons. Based upon his 24 years with the BOP, as Chief of Mental Health Services, National Suicide Prevention Coordinator, and Regional Psychology Services Administrator, Dr. Nagle concludes that the BOP cannot properly handle, accommodate, treat, or rehabilitate Conor. He further concludes that lengthy

imprisonment will be disproportionately harsh – cruel and unusual – for Conor given his exceptionally challenging complex of co-morbidities.  Dr. Nagle notes that Conor will experience:

- An elevated risk of death
- Isolation
- Exposure to abnormal and unhealthy amounts of time in restrictive housing
- Strained relationship with staff and other inmates posing outsized physical and emotional damage
- Subject to violent assaults by other inmates
- High risk of victimization – physical, emotional, and mental
- Emotional Discomfort and neglect
- Risk of victimization, sexual assault and exploitation
- Being ostracized and isolated
- Susceptible to abuses by gang members, sexual predators, and criminal miscreants
- Experience a harsher sentence than other offenders by orders of magnitude.

(*See generally* Declaration of Robert Nagle, Psy.D. (Ex. C).)

"If a lengthy sentence of incarceration is imposed, Mr. Fitzpatrick will probably be exposed to inmate machinations and may be preyed upon due to his eccentricities, social awkwardness, standoffishness, and difficulty reading and responding to emotional cues." (*Id.* ¶ 22.)

Mr. Fitzpatrick's diagnosis and its downstream consequences will have little impact on the ultimate decision made about where he is designated.  Furthermore, the BOP does not have a treatment program targeted to address the specific needs of people with ASD.

The BOP continues to experience persistent staffing problems.  This includes the hiring and retention of Psychologists, Treatment Specialists, Unit Team staff, and Correctional Officers for mental health treatment programs.

The Government's expert witness, Darryl Turner, Ph.D. – who spent a mere *18 months* as a Staff Psychologist at one BOP site *15 years ago* – explains the textbook, rote version of the BOP's tiered categorization system for assessing inmates upon entry.  Yet, as OIG found, this system is unreliable: "we found numerous instances of potentially inappropriate Mental Health Care Level assignments for some inmates who later died by suicide." (U.S. Dep't of Just., Off. of

5

the Inspector Gen., at 72 (Ex. B)).  These inmates were effectively doomed from the start. Even when assignments were correct, "some institution staff failed to communicate with each other and coordinate efforts across departments to provide necessary treatment or follow-up with inmates in distress." (*Id.* at 72.)   These breakdowns rendered the system's initial categorizations meaningless.

With all due respect to Dr. Turner, he is not an expert on the BOP's current ability to properly care for, treat, and protect, Conor.  In contrast, Dr. Nagle's two and a half decades in various nationwide leadership positions provides him with the proper background, perspective, and knowledge to so opine.

Given Mr. Fitzpatrick's complex mental health history, there is a strong likelihood that BOP's categorization process would fail him.  This means any treatment he received would fall far short of the individualized and consistent care available in the community.  Such a disruption would severely undermine his progress, heighten his risk of relapse, and hinder reintegration into society—ultimately imposing costs on society that sentencing is designed to avoid.

The OIG also found that "while the BOP requires institutions to conduct mock drills to prepare staff to respond to a potential suicide, we found that the BOP was unable to provide evidence that most of its facilities met this requirement." (*Id.* at ii*.)*   These failures created conditions where "inmates were able to advance their suicidal ideations and created increased opportunities for them to die by suicide." (*Id.* at 11.)

When crises do occur, BOP's failures compound.  The OIG reported "significant shortcomings in BOP staff's emergency responses to nearly half of the inmate deaths that we reviewed, ranging from a lack of urgency in responding, failure to bring or use appropriate emergency equipment, unclear radio communications, and issues with naloxone administration in opioid overdose cases." (*Id.* at ii.)  Even after lives are lost, the agency remains incapable of self-

6

correction: "[W]e found that the BOP was often unable to produce documents required by its own policies" and that attempts at reform are "curtailed by the decentralization of the BOP's processes." (*Id.* at 42.) Moreover, OIG reported that "in nearly one-third of inmate deaths in our scope, contraband drugs or weapons contributed, or appeared to contribute, to the death, including 70 inmates who died from drug overdoses." (*Id.* at ii.)

These findings are especially alarming in Mr. Fitzpatrick's case. He has a well-documented history of suicidality, including two prior attempts using medication in self-destructive ways. The OIG's conclusions show that the BOP is uniquely ill-equipped to protect or treat a defendant like him.

And these examples represent only part of the systemic breakdown. The OIG further noted: "Other operational challenges include staffing shortages; an outdated security camera system; staff failure to follow BOP policies and procedures; and an ineffective, untimely staff disciplinary process. One or more of these challenges was a contributing factor in many of the inmate deaths in our scope, and these longstanding challenges continue to present a significant and critical threat to the BOP's safe and humane management of inmates in its care and custody." (*Id.* at ii.)

For a defendant with Mr. Fitzpatrick's vulnerabilities, incarceration is not merely punitive—it is perilous. The BOP's systemic deficiencies render its intake and classification processes unreliable. In practical terms, placing Mr. Fitzpatrick in BOP custody – certainly for the draconian length requested by the government – would be the functional equivalent of imposing a potential death sentence, though his offense does not carry one.

### III. The Restitution Order Cannot Be Reopened on Remand

The government now seeks to expand restitution by introducing a new alleged victim (Victim-5) and evidence not previously presented. This effort is impermissible under controlling Fourth Circuit precedent and must be rejected. No valid explanation has been made regarding a more than *20-month* delay in making such an application. Indeed, a cursory review of the government's application indicates that the information provided by Victim-5 was known years before Conor's original sentencing. There is no good faith explanation, nor legal basis for such a request now.

The Fourth Circuit has made clear that "[a] district court must, except in rare circumstances, implement both the letter and spirit of the... mandate, taking into account [the appellate court's] opinion and the circumstances it embraces." *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993), quoting *United States v. Bell,* 988 F.2d 247, 251 (1st Cir. 1993) and *United States v. Kikumura*, 947 F.2d 72, 76 (3d Cir. 1991). When an appellate mandate is precise, the district court may not revisit issues that were not vacated or remanded. See *United States v. Susi*, 674 F.3d 278, 283–84 (4th Cir. 2012). Here, the Court of Appeals vacated only the custodial sentence on the ground that it was substantively unreasonable. The restitution order was neither appealed by the government nor disturbed by the Fourth Circuit. Accordingly, the mandate rule prohibits reopening restitution on remand.

In *United States v. Pileggi*, 703 F.3d 675 (4th Cir. 2013), the Court of Appeals held that the district court exceeded its authority by revisiting restitution on remand when the appellate court had vacated only the term of imprisonment. The Court emphasized that the "mandate rule barred the district court from reconsidering the restitution order on remand," and it vacated the new restitution award. Id. at 680–82. That holding applies directly here: because the restitution order was not disturbed on appeal, the government may not use resentencing to reopen it.

8

Congress has made restitution orders final, subject only to limited statutory exceptions. See 18 U.S.C. § 3664(o); *United States v. Grant*, 715 F.3d 552, 557–59 (4th Cir. 2013). None of those exceptions—such as appeal, correction of clerical error, or material change in the defendant's economic circumstances—permit the government to add new victims or increase the restitution amount at this stage. Allowing such a maneuver would contravene both the statutory framework and the finality that attaches to restitution judgments.

The narrow exceptions to the mandate rule—intervening change in controlling law, new evidence previously unavailable with due diligence, or prevention of manifest injustice—are inapplicable here. See *Susi*, 674 F.3d at 283. The government's desire to supplement the restitution record with a new victim does not meet any of these exceptions. The *Pileggi* Court rejected a nearly identical attempt to reopen restitution.

The government's request is also inconsistent with the statutory timing requirement for restitution. Under 18 U.S.C. § 3664(d)(5), restitution determinations are to be made within 90 days of sentencing. In *Dolan v. United States*, 560 U.S. 605, 608–15 (2010), the Supreme Court held that a sentencing court may finalize restitution shortly after the 90-day period if the defendant was on notice of specific, identified, potential restitution and the delay was solely attributable to the court's efforts to finalize and order the amount. However, *Dolan* emphasized that the 90-day period "does seek speed by creating a time-related directive" and does not authorize the government to reopen restitution to add new victims or expand liability years later. Id. at 613–14. Where, as here, restitution was already adjudicated, and the government failed to timely pursue claims for additional victims, *Dolan* forecloses any attempt to use resentencing as a vehicle to circumvent Section 3664(d)(5). To allow otherwise would erode both the statutory finality of restitution and the fairness interests recognized in *Dolan*.

Because the appellate mandate was limited to resentencing on the term of imprisonment, and because restitution was not appealed or disturbed, this Court lacks authority to revisit restitution. The Court should deny the government's request to present new evidence or expand restitution and should proceed to resentence the defendant consistent with the Fourth Circuit's mandate.

Conclusion

"As the Second Circuit aptly put it, 'The United States Sentencing Guidelines do not require a judge to leave compassion and common sense at the door to the courtroom.'" *United States v. Somerstein*, 20 F. Supp. 2d 454, 464 (E.D.N.Y. 1998) (quoting *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992)). In his plea for leniency, Mr. Fitzpatrick echoes these same sentiments. Based upon the reasons set forth herein, we submit that this case is unique – appropriate for a variance to a substantially below-guidelines sentence. Accordingly, and in light of Mr. Fitzpatrick's acceptance of responsibility, his personal characteristics, achievements, and suffering, coupled with all of the additional legal and equitable arguments asserted herein, Mr. Fitzpatrick respectfully requests a sentence of 15 years of probation with a special condition of one year of intermittent confinement pursuant to 18 U.S.C. § 3563(b)(10) on Counts One and Two to run concurrent with a sentence of time served and 20 years of Supervised Release on Count Three, retroactive to his original sentencing date of January 19, 2024.

                              Respectfully submitted,

                              CONOR BRIAN FITZPATRICK,
                              By Counsel

                              _____/s/_____
                              Nina J. Ginsberg, VSB# 19472
                              Greenspun Shapiro Ginsberg & Yang, PC

        3955 Chain Bridge Road
Second Floor
Fairfax, VA 22030

Peter Katz, Esq.
LAW OFFICES OF PETER KATZ, LLC
116 Village Blvd., 2nd Floor
Princeton, NJ 08540

*Attorneys for Defendant,*
*Conor Brian Fitzpatrick*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of September 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record. I further certify that a copy was emailed to the probation officer, Jennifer D. Lyerly, Jennifer_Lylerly@vaep.uscourts.gov.

_____/s/_____
Nina J. Ginsberg, Esq.