# **EXHIBIT B**



# Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions

★ ★ ★

**EVALUATION AND INSPECTIONS DIVISION**

**24-041**

**FEBRUARY 2024**



# EXECUTIVE SUMMARY

## Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions

## Introduction

The Federal Bureau of Prisons (BOP) is responsible for developing sound correctional practices and adhering to its policies that ensure the safety and security of federal inmates in its care. High-profile inmate deaths at BOP institutions, such as the homicide of James "Whitey" Bulger in 2018 and the suicide of Jeffrey Epstein in 2019, brought national focus to the BOP's operational and management challenges, and U.S. Department of Justice Office of the Inspector General (OIG) investigations of these deaths identified serious BOP job performance and management failures. Additionally, Congress and prisoner advocacy groups have expressed concerns about the BOP's efforts to prevent inmate deaths, particularly following several inmate homicides at U.S. Penitentiary (USP) Hazelton and USP Thomson.

The OIG initiated this evaluation to assess the circumstances surrounding deaths among inmates at BOP institutions that occurred from fiscal year (FY) 2014 through FY 2021 and to evaluate how the BOP seeks to prevent future deaths. We analyzed the frequency and pattern of deaths among BOP inmates in four categories: (1) suicide, (2) homicide, (3) accident, and (4) those resulting from unknown factors. We also identified potential management deficiencies and systemic issues related to those deaths, including the prevalence of long-standing operational challenges highlighted in prior OIG work.

## Recommendations

We make 12 recommendations to assist the BOP in addressing risk factors that contribute to inmate deaths.

## Results of the Evaluation

Our review of records provided by the BOP identified a total of 344 inmate deaths at BOP institutions from FY 2014 through FY 2021 that fell into one of four categories: (1) suicide, (2) homicide, (3) accident, and (4) those resulting from unknown factors. Suicides comprised the majority of these deaths, with homicides the next most prevalent. Many of the deaths that occurred under accidental or otherwise unknown circumstances involved drug overdoses.

We identified several operational and managerial deficiencies, which created unsafe conditions prior to and at the time of a number of these deaths, that the BOP must address. We also identified recurring conditions following an inmate's death that limited the BOP's ability to identify measures that would help minimize future risks to inmates in its custody.

### Suicide Represents a Significant Risk Area for the BOP, Which the BOP Can Help Mitigate through Compliance with Existing Policies

Suicide accounted for just over half of the 344 inmate deaths that we reviewed. Multiple BOP policies—in areas such as identifying potentially suicidal inmates, managing inmate medication, and managing inmate housing decisions—may help staff mitigate certain risks associated with inmate suicide. However, we found that a combination of recurring policy violations and operational failures contributed to inmate suicides. Specifically, deficiencies in staff completion of inmate assessments have prevented some institutions from adequately identifying and proactively addressing inmate suicide risks. We also found numerous instances of potentially inappropriate Mental Health Care Level assignments for some inmates who later died by suicide. In addition, more than half of the inmates who died by suicide were in single-cell confinement, or housed alone in a cell. Almost half of suicides occurred in a restrictive housing setting, where about 8 percent of inmates across the BOP were

housed as of August 2018. The BOP has recommended against single-celling, noting that it increases the risk of inmate suicide, and OIG reports have raised concerns with the BOP's single-celling of inmates, including those in restrictive housing.

Further, while existing BOP policies direct institutions to train staff on identifying signs of suicide, make appropriate referrals when staff identify suicidal inmates, and provide appropriate counseling and treatment, we found that some institution staff failed to communicate with each other and coordinate efforts across departments to provide necessary treatment or follow-up with inmates in distress. We also found that staff did not sufficiently conduct required inmate rounds or counts in over a third of the inmate suicides during our scope. Finally, while the BOP requires institutions to conduct mock drills to prepare staff to respond to a potential suicide, we found that the BOP was unable to provide evidence that most of its facilities met this requirement. These deficiencies helped foster conditions in which inmates were able to advance their suicidal ideations and created increased opportunities for them to die by suicide.

### The BOP's Response to Medical Emergencies Was Often Insufficient Due to Lack of Clear Communication, Urgency, or Proper Equipment

To properly respond to high-stress, extraordinary inmate emergency situations such as inmate hanging, attempted homicide, or drug overdose, BOP staff must be prepared to follow correct protocols and use proper, easily accessible, functioning equipment. Mere seconds in response time can potentially mean life or death for an afflicted inmate. While multiple staff we interviewed generally believed that staff responded quickly to emergencies, we found significant shortcomings in BOP staff's emergency responses to nearly half of the inmate deaths that we reviewed, ranging from a lack of urgency in responding, failure to bring or use appropriate emergency equipment, unclear radio communications, and issues with naloxone administration in opioid overdose cases. Improvements in these areas would help prepare BOP personnel to address future inmate emergency scenarios.

### A Lack of Available Information about Inmate Deaths Limits the BOP's Ability to Potentially Prevent Future Inmate Deaths

BOP policies and procedures require certain actions and reports in the event of an inmate death. However, for many of the inmate deaths we reviewed, we found that the BOP was unable to produce documents required by its own policies. Moreover, the BOP requires in-depth After Action Reviews only following inmate suicides; it does not require them for inmate homicides or deaths resulting from accidents and unknown factors. Together, these factors limit the BOP's ability to fully understand the circumstances that led to inmate deaths and to identify steps that may help prevent future deaths. To better enable it to identify and address issues surrounding inmate deaths in these circumstances, the BOP must improve its completion and organization of the mandatory records currently required by policy for all inmate deaths. Further, we believe the BOP should conduct After Action Reviews not only for suicides, but also for inmate deaths due to homicide and accident or unknown factors to help it better understand the circumstances surrounding these deaths and potentially prevent future inmate deaths.

In addition, we found that, even when the BOP obtains insights on contributing factors and recommendations for improvement following an inmate's death, the impact of that information is curtailed by the decentralization of the BOP's processes. We believe that the BOP should assess this information more broadly and consistently to help identify, track, and address recurring factors and challenges that may contribute to deaths among inmates in its custody.

### Long-standing Operational Challenges, Such as Contraband Interdiction, Further Impair the BOP's Ability to Reduce the Risk of Inmate Deaths

The OIG has repeatedly identified long-standing operational challenges, including contraband interdiction, that negatively affect the BOP's ability to operate its institutions safely and securely, some of which may increase the risk of inmate deaths. We found that, in nearly one-third of the inmate deaths in our scope, contraband drugs or weapons contributed, or appeared to contribute, to the death, including 70 inmates who died from drug overdoses. Other operational challenges include staffing shortages; an outdated security camera system; staff failure to follow BOP policies and procedures; and an ineffective, untimely staff disciplinary process. One or more of these challenges was a contributing factor in many of the inmate deaths in our scope, and these long-standing challenges continue to present a significant and critical threat to the BOP's safe and humane management of inmates in its care and custody.

# Table of Contents

Introduction..............................................................................................................................1

    Background........................................................................................................................1

    Related Prior Work...........................................................................................................2

    Scope and Methodology of the OIG Evaluation.............................................................3

Results of the Evaluation...........................................................................................................7

    Suicide Represents a Significant Risk Area for the BOP, Which the BOP Can Help Mitigate through Compliance with Existing Policies ...................................................................................... 10

    The BOP's Response to Medical Emergencies Was Often Insufficient Due to Lack of Clear Communication, Urgency, or Proper Equipment ..................................................................... 33

    A Lack of Available Information about Inmate Deaths Limits the BOP's Ability to Potentially Prevent Future Inmate Deaths........................................................................................................ 40

    Long-standing Operational Challenges, Such as Contraband Interdiction, Further Impair the BOP's Ability to Reduce the Risk of Inmate Deaths................................................................... 53

Conclusion and Recommendations......................................................................................... 72

    Conclusion..................................................................................................................... 72

    Recommendations........................................................................................................ 73

Appendix 1: Purpose, Scope, and Methodology..................................................................... 75

    Standards ...................................................................................................................... 75

    Purpose and Scope ....................................................................................................... 75

    Methodology.................................................................................................................. 75

Appendix 2: Additional Data on Inmate Deaths, FYs 2014–2021 ...................................... 80

Appendix 3: DOJ OIG Related Work....................................................................................... 85

Appendix 4: Single-Celling Practices at Site Visit Institutions ........................................... 88

Appendix 5: The BOP's Response to the Draft Report ......................................................... 89

Appendix 6: OIG Analysis of the BOP's Response ................................................................ 99

# Introduction

## Background

The Federal Bureau of Prisons (BOP) is responsible for ensuring the safety and security of federal inmates of all security levels and needs.  The BOP has publicly committed to providing a safe environment for staff and inmates; secure institutions to confine offenders; skills-building programs to offer inmates the opportunity to live crime-free lives; and staff who are ethical, professional, and well-trained.  In April 2023, the BOP updated its core values to include accountability and compassion for staff and inmates in its care, in addition to respect, integrity, and correctional excellence.  As of January 2024, the BOP employed approximately 34,600 staff responsible for the care of nearly 156,900 inmates.

High-profile inmate deaths at BOP institutions, such as the homicide of James "Whitey" Bulger in 2018 and the suicide of Jeffrey Epstein in 2019, brought national focus to the BOP's operational and management challenges that may have contributed to these deaths.  In December 2022, the U.S. Department of Justice (DOJ or Department) Office of the Inspector General (OIG) issued an investigative report on the circumstances surrounding the transfer and subsequent homicide of Bulger, finding serious job performance and management failures at multiple levels within the BOP.[1]  Those failures included prolonged single-cell confinement in restrictive housing, the transfer of Bulger to a facility with a lower level of medical care (U.S. Penitentiary (USP) Hazelton) than his prior facility without adequate consideration of his medical records, and shortcomings in communication among BOP personnel regarding the transfer process.  The OIG concluded that staff and management performance failures; bureaucratic incompetence; and flawed, confusing, and insufficient policies and procedures pose risks not just to notorious offenders like Bulger but to all inmates in the midst of a facility transfer.

In June 2023, the OIG issued an investigative report on the custody, care, and supervision of Epstein, which identified numerous and serious failures by Metropolitan Correctional Center New York staff, including that staff did not assign Epstein a cellmate as directed by the institution's Psychology Services Department.[2]  The report also found that staff failed to undertake required measures designed to ensure that Epstein and other inmates in restrictive housing were accounted for and safe, such as conducting inmate counts and 30-minute rounds; searching inmate cells; and ensuring adequate supervision of the housing unit, as well as the security camera system functionality.

In addition to concerns over these high-profile incidents, members of Congress and prisoner advocacy groups have expressed concern about the BOP's efforts to prevent inmates' deaths.  Following the deaths of two inmates at USP Hazelton in 2018, the OIG received a congressional request to investigate the

---

[1]  DOJ OIG, *Investigation and Review of the Federal Bureau of Prisons' Handling of the Transfer of Inmate James "Whitey" Bulger,* Investigations Report 23-007 (December 2022), oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-handling-transfer-inmate-james-whitey.

[2]  DOJ OIG, *Investigation and Review of the Federal Bureau of Prisons' Custody, Care, and Supervision of Jeffrey Epstein at the Metropolitan Correctional Center in New York, New York,* Investigations Report 23-085 (June 2023), oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-custody-care-and-supervision-jeffrey.

circumstances surrounding the two deaths deemed by the BOP to be homicides by stabbing.[3]  Following Epstein's suicide in 2019, the then BOP Director and other Department leaders received a congressional inquiry regarding concerns about BOP inmate suicide prevention and protocols, citing a news media-reported rise in federal prison suicides.[4]  In June 2022, the OIG received a request by a prisoner advocacy group to investigate the conditions of confinement at USP Thomson following media reporting that BOP staff abuse of inmates, including inappropriate use of restrictive housing and restraints, had led to at least five inmate homicides at USP Thomson in a 2-year period.[5]

The OIG initiated this evaluation to assess deaths among inmates in federal custody in four categories and to determine how the BOP seeks to prevent such deaths in the future.  Those four categories are: (1) suicide, (2) homicide, (3) accident, and (4) manner of death unknown.  The OIG sought to (1) analyze the frequency and pattern of deaths of inmates in BOP custody in these four categories and (2) identify any potential management deficiencies and systemic issues, including inmate management and BOP incident response, related to those deaths.  We evaluated how the BOP prepares its staff to respond to life-threatening emergencies, how its staff actually responds to life-threatening emergencies, and how the BOP documents and tracks trends related to these four categories of inmate deaths.

## Related Prior Work

The OIG has completed work in several areas that have a nexus to inmate deaths in custody, itemized in Appendix 3 of this report.  As discussed above, two OIG reports published in 2022 and 2023 specifically examined the circumstances surrounding the deaths of inmates Bulger and Epstein while they were in BOP custody.  Several more-broadly scoped OIG evaluations have identified issues in BOP operations that may contribute to the BOP's challenges in preventing inmate deaths.  For example, a 2016 report found that the BOP did not effectively implement its staff search policy to deter staff introduction of contraband and that security camera deficiencies limit the BOP's ability to deter contraband introductions.  As described later in this report, contraband introduction contributed to at least one category of inmate deaths—drug overdoses. A 2021 Management Advisory Memorandum concluded that the same deficiencies we identified in 2016 relating to contraband and cameras remained and noted that an effective security camera system is

---

[3]  Representative Eleanor Holmes Norton, letter to Michael E. Horowitz, Inspector General, U.S. Department of Justice, October 17, 2018.  The letter also requested that the OIG investigate allegations of staff brutality of inmates in restrictive housing at Hazelton.

[4]  U.S. Senator Patrick Leahy, letter to the Honorable Kathleen Hawk Sawyer, Director, Federal Bureau of Prisons; the Honorable William P. Barr, Attorney General of the United States, U.S. Department of Justice; the Honorable Donald W. Washington, Director, U.S. Marshals Service; the Honorable Mark A. Morgan, Acting Commissioner, U.S. Customs and Border Protection; and the Honorable Matthew T. Albence, Acting Director, U.S. Immigration and Customs Enforcement, October 8, 2019.  The letter referenced a news media report of a rise in federal inmate and detainee suicides.  Kevin Johnson, "Federal Prison Suicides Were Quietly Rising Before Jeffrey Epstein's Death in a New York Detention Center," *USA Today*, August 22, 2019, www.usatoday.com/story/news/politics/2019/08/22/federal-prison-suicides-rising-before-jeffrey-epsteins-death/2070689001 (accessed May 19, 2023).

[5]  Federal Anti-Solitary Taskforce, letter to Michael E. Horowitz, Inspector General, U.S. Department of Justice, June 8, 2022.  The letter referenced news media reporting on sustained inmate abuse at USP Thomson, with five suspected inmate homicides and two alleged suicides since 2020.  Christie Johnson and Joseph Shapiro, "How the Newest Federal Prison Became One of the Deadliest," *The Marshall Project* and *NPR*, May 31, 2022, www.themarshallproject.org/2022/05/31/how-the-newest-federal-prison-became-one-of-the-deadliest (accessed May 19, 2023).

essential for deterring misconduct at BOP facilities; holding those who commit misconduct accountable; and keeping staff, inmates, and the public safe. A 2017 OIG report found that the BOP did not track confinement of inmates in single cells. Inmates confined without cellmates present an increased risk of suicide. The OIG's 2023 capstone review of the BOP's response to the coronavirus disease 2019 (COVID-19) pandemic recommended that the BOP review its policies and processes for placing inmates in single cells after the BOP reported to the OIG that seven inmates died by suicide during a 14-month period while housed in single-cell confinement in quarantine units related to COVID-19. In other relevant OIG reports, a 2023 limited-scope review of the BOP's strategies to identify, communicate, and remedy operational issues highlighted that the BOP does not fully understand its staffing needs and that its insufficient internal investigations have resulted in a significant backlog of employee misconduct cases. Lastly, in 2018 the OIG found that the BOP had not met the Death in Custody Reporting Act of 2013 (DCRA) requirement to report the time of death for inmates who died in its custody and we recommended that the BOP implement plans to provide a time of death on all DCRA reports; in June 2019, the BOP added the time of death to its DCRA reports and the OIG closed the recommendation. For additional information and links to the OIG's other published work with a nexus to deaths of BOP inmates, see Appendix 3.

## Scope and Methodology of the OIG Evaluation

Our evaluation focused on inmate deaths that the BOP identified as occurring at institutions under the following categories of circumstances: (1) suicide, (2) homicide, (3) accident, and (4) unknown. The scope of our evaluation covered inmate deaths at BOP institutions that occurred over an 8-year period, from fiscal year (FY) 2014 through FY 2021, including the Bulger homicide and the Epstein suicide. Our fieldwork included extensive document review, data analysis, security camera footage review, interviews, and site visits to three BOP institutions where inmate deaths occurred during our evaluation period: Federal Correctional Complex Hazelton, Federal Transfer Center Oklahoma City, and USP Thomson. We interviewed BOP Central Office officials and staff from eight BOP institutions, along with inmates in custody at the three institutions we visited. This evaluation was scoped to focus on BOP-operated institutions. Accordingly, deaths occurring at Residential Reentry Centers and contract prisons were outside the scope of this evaluation due to the many external factors in these settings that are outside the BOP's direct control or jurisdiction.[6] For a more detailed description of our scope and methodology, see Appendix 1.

### Inmate Death Data and Documentation

In the event of any inmate death, BOP policies require the completion of several actions and associated documentation, as summarized in Table 1 below.

---

[6] Similarly, implementation of death sentences was not within our evaluation scope because such deaths are not within the BOP's control or jurisdiction. Lastly, our evaluation examined nonnatural inmate deaths, which consisted of the four categories of deaths as described above; we therefore did not examine inmate deaths resulting from natural causes.

Table 1

Actions and Associated Documentation Required in the Event of Any BOP Inmate Death

| | Description | Completed By | Submission Process |
|---|---|---|---|
| Report of Incident (BP-583) | • Standard BOP incident form summarizing death location, inmates involved, and an incident description<br>• May also include photos, fingerprints, staff memoranda, medical assessments, and inmate or staff rosters | BOP: institution's Warden or designee | • Submitted to BOP Regional Office, with a copy to Central Office's Correctional Services Administrator<br>• Compilation of primary information and telephonic notification to Regional Office should occur **immediately;** Regional Director notifies Central Office. |
| 24-Hour Death Notice | • Includes inmate's name, age, registration number, date, and preliminary cause of death | BOP: institution's Clinical Director | • Provided to BOP Medical Director at Central Office<br>• Required within **24 hours** of a death or the next duty day if the death occurs on a weekend or holiday |
| Multilevel Mortality Review (MLMR) Report (BP-S563) | • Includes comprehensive clinical summary of inmate's medical history; events leading to death; cause of death; and, if available, an autopsy report<br>• Summarizes activities by responding institution staff (who responded to the death and how quickly, actions taken, and strengths and weaknesses of response) | BOP: institution's Mortality Review Committee—Health Services Administrator (HSA), Clinical Director, a local clinical staff member, and an Associate Warden[a] | • Signed by Warden and submitted to Central Office's Office of Quality Management (OQM), with copy to Regional Director<br>• Required within **30 days** of a death (if pending receipt of autopsy report, institution should send autopsy report as soon as possible) |
| External Consultant Review | • External review of the BOP's MLMR report (see above)<br>• Identifies strengths and weaknesses in the BOP's response and may provide recommendations | Non-BOP: external physician consultant | • Submitted to Central Office's OQM; OQM sends to Regional Director and Warden where death occurred.<br>• If there are recommendations, institution must report corrective action to BOP Central Office Medical Director **within 90 days.** |
| Death Certificate | • Vital record of individual's death, governed by processes that may vary by state<br>• Documents the cause, date, and place of death | Non-BOP: external physician, medical examiner, or coroner | • BOP collects for inclusion in MLMR and submission to Central Office's OQM, if and when available.<br>• Copy to the person who received the deceased's remains<br>• Required **as soon as available** |

[a] Committee composition varies for BOP Medical Referral Centers but will include, at a minimum, the HSA, the Clinical Director, a Physician, a Nursing Director, and a Quality Improvement Coordinator.

Source: OIG analysis of BOP policies and records

In addition to the above-stated records required for all inmate deaths, there are other reviews and reports that that may be completed, depending on the circumstances of an inmate death and the discretion of regional and local BOP officials. In general, the BOP may appoint a team to conduct an After Action Review when an institution experiences a major incident and this team is responsible for preparing an After Action Report. After Action Reports should contain information describing the chronology of events and analysis of inmate actions and staff responses, as well as other observations and investigative or intelligence information. After Action Reports also may contain conclusions (both positive and negative) on the performance of staff members, recommendations for additional training or revisions to existing training that would address the shortcomings, and a cost-impact statement with estimated or actual costs involved in the incident. If multiple law enforcement jurisdictions were involved in the investigation, BOP policy requires that copies of their respective reports be included in the After Action Report.

As summarized in Table 2 below, in the event of an inmate *suicide,* BOP policy requires the completion of an After Action Review and a more comprehensive After Action Report, also known as a Psychological Reconstruction Report (see the text box). In the event of a *homicide,* BOP policy permits the Regional Director, at their discretion, to appoint an After Action Review team to investigate the incident and prepare an After Action Report. The BOP does not require After Action Reviews for deaths that occurred under accidental and unknown circumstances.

Additionally, BOP policy gives Wardens the discretion to order an autopsy to be performed on the body of any deceased inmate, in accordance with 18 U.S.C. § 4045, if a Warden believes that an autopsy is necessary to detect a crime, maintain discipline, protect the health or safety of other inmates, remedy official misconduct, or defend the United States or its employees from civil liability arising from the administration of the facility. A non-BOP coroner or medical examiner performs the autopsy. Depending on the law of the state in which the institution is located and the circumstances of death, the Warden may be required to receive written consent of a person (e.g., coroner or next-of-kin of the decedent) authorized to permit the autopsy.

**Psychological Reconstruction Report**

This is a type of **After Action Report** that is completed in the event of an inmate suicide. This report contains comprehensive information about the inmate, including the inmate's demographic information and a description of the inmate's background and personality. It contains the inmate's legal history, as well as medical and mental healthcare histories. This report also details the circumstances antecedent to the suicide incident, a full description of the suicide act and scene, and the reviewing psychologist's conclusions and recommendations for management.

Source: OIG analysis of BOP documentation

Table 2

Additional Assessments That May Be Completed in the Event of an Inmate Death

| Record/Review | Manner of Death | Required? | Description | Responsible Party |
|---|---|---|---|---|
| After Action Report | Suicide | **Yes** | • Results in Psychological Reconstruction Report<br>• Based on review of inmate's biographical, legal, medical, and mental healthcare histories<br>• Describes the circumstances of the suicide act<br>• Includes conclusions and recommendations to the institution for corrective action | BOP psychologist from another BOP location |
| | Homicide | **Discretionary** (Regional Director's Decision) | • Contains information on the inmates involved and a chronology and analysis of the events<br>• Includes conclusions and recommendations to the institution to help resolve any vulnerabilities identified in the report and a cost-impact statement | BOP official from Regional Office with geographic responsibility |
| | Accident | **No** | | |
| | Unknown | **No** | | |
| Autopsy Report | Any Death | **Discretionary** (Warden's Decision) | • Postmortem examination to determine cause of death<br>• Warden may order an autopsy and related scientific or medical tests, such as a toxicology report.<br>• BOP collects for inclusion in MLMR and submission to Central Office's OQM, if and when available. | Non-BOP coroners or medical examiners |

Source: OIG analysis of BOP policies

### *Availability of Inmate Death Data and Documentation from the BOP*

We requested from the BOP all available documents relevant to each inmate death in our evaluation scope, including the records required by BOP policy for all deaths, as well as any additional discretionary reviews or records generated in conjunction with these deaths. However, as detailed in the Lack of Available Information about Inmate Deaths section below, the BOP was not always able to provide complete and comprehensive records for these deaths. Our analysis was informed in large part by Multilevel Mortality Reviews, which the BOP was able to provide for most of the deaths, as well as After Action Reports (including Psychological Reconstruction Reports generated in the aftermath of a suicide), which were available for approximately two-thirds of the deaths we reviewed. We analyzed narrative information from these BOP reports to identify any operational and managerial deficiencies, quantify patterns in circumstances, and present trends. The figures that we present in the Results of the Evaluation are limited to information detailed in the records that the BOP made available to us.

# Results of the Evaluation

Our review of records provided by the BOP identified a total of 344 inmate deaths at BOP institutions from FYs 2014 through 2021 that fell into one of four categories: (1) suicide, (2) homicide, (3) accident, and (4) those resulting from unknown factors. The majority of these deaths were due to suicide or homicide. We also evaluated inmate deaths that occurred under circumstances that were accidental or otherwise unknown, many of which involved drug overdoses. The numbers and types of inmate deaths in each category during our review period are depicted in Figure 1.

### Figure 1

### Inmate Deaths by Year and Type, FYs 2014–2021



Source: OIG analysis of BOP data

Deaths by suicide comprised the majority of inmate deaths, followed by deaths by homicide, accident, and unknown factors, as shown in Figure 2 below. In 12 of the 344 deaths (less than 4 percent), there was not sufficient information to definitively determine the manner of death, even after autopsies were conducted in most cases. Accordingly, the manner of these deaths is categorized as "Unknown."

**Figure 2**

**Inmate Deaths by Type, FYs 2014–2021**



Source: OIG analysis of BOP data

While the category of "Accident" includes deaths by aspiration or other accidents, the majority of deaths in both the "Accident" and "Unknown" categories involved drug overdoses. Specifically, over three-quarters of the 68 deaths during our scope that fell within these two categories involved drug overdoses, as shown in Figure 3. In some instances, especially those involving drug use, the precise cause of death can be unclear or multi-determined; additionally, certain abused substances can cause death but cannot be detected by standard toxicological analytic methods. Subsequent sections of this report discuss in greater detail the role of drugs in deaths among inmates.

Table 3 below displays the 10 BOP institutions with the greatest number of inmate deaths during the scope of our evaluation. Among the 10 institutions, U.S. Penitentiary (USP) Atlanta had the greatest number of deaths during the period (17), followed by USP Terre Haute and USP Hazelton (14 each). The 10 institutions included 6 high security USPs, 2 medium security USPs, and 2 Federal Medical Centers.

**Figure 3**

**Drug Overdose Deaths Categorized as Accidental and Unknown, FYs 2014–2021**



Source: OIG analysis of BOP data

**Table 3**

**BOP Institutions with the Highest Number of Inmate Deaths, FYs 2014–2021**

| BOP Institution | Institution Security Level | Number of Inmate Deaths | Institution Inmate Population as of FY 2018 |
|---|---|---|---|
| USP Atlanta[a] | Medium | 17 | 1,864 |
| USP Terre Haute | High | 14 | 1,372 |
| USP Hazelton | High | 14 | 1,384 |
| USP Pollock | High | 11 | 988 |
| Federal Medical Center Butner | Administrative | 10 | 944 |
| Medical Center for Federal Prisoners Springfield | Administrative | 9 | 1,031 |
| USP Beaumont | High | 9 | 1,196 |
| USP Victorville | High | 9 | 1,150 |
| USP Tucson | High | 8 | 1,385 |
| USP Leavenworth | Medium | 8 | 1,492 |

Notes:  Inmate population data varied across institutions and by fiscal year during our scope.  We present BOP institution inmate population data as of March 15, 2018, which was near the middle of our evaluation period.

[a]  The BOP lowered USP Atlanta's security level from medium to low as part of a series of infrastructure and security improvements made to the institution beginning in 2021.

Source:  OIG analysis of BOP data

In Appendix 2, we provide additional trends and figures on the demographics, housing types, security levels, and causes of death for the inmates who died during our scope.  Below are examples of our findings:

- While we found that inmates were housed in a general population setting for most of the inmate deaths from FY 2014 through FY 2021 that we reviewed, we determined that 39 percent of inmates who died by homicide and 46 percent of inmates who died by suicide were housed in a restrictive housing setting.  As of August 2018, throughout the BOP about 92 percent of inmates were housed in a general population setting and approximately 8 percent of inmates were housed in a restrictive housing setting.[7]

[7]  As of August 22, 2018, approximately 8 percent of the 154,409 inmates housed in BOP institutions were in restrictive housing based on data provided by the BOP.  Specifically, 10,623 inmates were housed in Special Housing Units (SHU) throughout the BOP; an additional 399 inmates were housed in the BOP's Administrative Maximum facility in Florence,

*Continued*

- The vast majority of the inmates who died during our scope were male (97 percent) and designated by the BOP as Mental Health Care Level (MHCL) 1 at the time of death (72 percent).[8]

- White inmates comprised the majority of inmate deaths (70 percent) in our scope and, along with Native Americans (6 percent), were overrepresented in deaths compared to their proportion of the inmate population (55 percent and 3 percent, respectively).[9]

- About a quarter (24 percent) of inmate deaths during our scope were inmates with a criminal history involving a sex offense, and two-thirds (56 of 83) of these deaths were by suicide.

- Sixty-nine percent of the inmate deaths during our scope were inmates at either high or medium security levels, and 65 percent of the deaths occurred in medium and high security institutions. Medium security institutions had the highest number of accidental, suicide, and unknown inmate deaths, while homicides were most common at high security institutions.

- Suicides by hanging comprised the highest proportion of inmate deaths (46 percent) during our scope, followed by drug overdoses (20 percent) and blunt force trauma (13 percent).  Close to half (45 percent) of homicides were the result of blunt force trauma.

## Suicide Represents a Significant Risk Area for the BOP, Which the BOP Can Help Mitigate through Compliance with Existing Policies

Suicide was the most prevalent form of inmate death in BOP institutions during our evaluation scope: during the 8 years from FY 2014 through FY 2021, suicides accounted for approximately 54 percent, or 187, of the 344 inmate deaths.  From our analysis of BOP documents related to the 187 inmate suicides, and through our interviews of institution staff, a multitude of stressors appeared to contribute to the suicides. Some recurring factors included sex offender status, lack of family support, mental health issues, death of a loved one, relationship conflicts, sentence length, recent admission to BOP custody, pretrial status, planned transfer to a different institution, and deportation status.

The BOP has established requirements through a variety of policies that may help staff mitigate certain risks associated with inmate suicide.  For example, the BOP's Suicide Prevention Program is intended to assist staff in identifying and managing potentially suicidal inmates.  In addition, BOP requirements in operational areas such as staff completion of rounds, inmate medication management, staff searches of inmate housing

---

Colorado; and an additional 830 inmates were housed at the BOP's Special Management Unit (SMU) (the BOP subsequently reported to the OIG that it suspended the SMU program in February 2023).  We note that the BOP's inmate population figures fluctuated over time and that the number of inmates in restrictive housing as of August 2018 may not represent the number of inmates in restrictive housing throughout our evaluation scope.

[8]  The BOP uses MHCLs to classify inmates based on their need for mental health services.  MHCL 1 inmates are assessed by the BOP as not requiring significant mental healthcare.  See the Suicide Represents a Significant Risk Area report section, Table 4, below.

[9]  We calculated proportions of the inmate population housed in BOP institutions based on BOP-provided data as of August 22, 2018.

and work areas, and contraband interdiction practices can also help reduce the likelihood of a suicide outcome.  However, we found from BOP reports and our investigation of the custody, care, and supervision of Epstein that a combination of recurring policy violations and a multitude of institution operational failures contributed to inmate suicides.  Specifically, we found that deficiencies in staff completion of inmate assessments (described below) have prevented some institutions from adequately identifying and proactively addressing inmate suicide risks, and we found that there were numerous instances of potentially inappropriate MHCL assignments for some inmates who later died by suicide.  As detailed below, our analysis of the BOP's Psychological Reconstruction Reports indicated that multiple inmates who died by suicide likely should have been assigned a higher MHCL designation, which would have resulted in more frequent mental health interactions and possible interventions prior to the suicides.  In addition, more than half of the inmates who died by suicide were in single-cell confinement, a known risk that the BOP can start to address by completing and publishing its revised Special Housing Unit (SHU) policy and completing corrective actions on open OIG recommendations from prior reports.  We discuss these recommendations in detail below.

Further, while existing BOP policies direct institutions to train staff on identifying signs of suicide, make appropriate referrals when staff identify suicidal inmates, and provide appropriate counseling and treatment, we found that some institution staff failed to communicate with each other and coordinate efforts across departments to provide necessary treatment or follow-up with inmates in distress.  We also found that staff did not sufficiently conduct required inmate rounds or counts in over a third of the inmate suicides during our scope.  Such deficiencies helped foster conditions in which inmates were able to advance their suicidal ideations and created increased opportunities for them to die by suicide.  The number of inmate suicides increased each year from FY 2019 to FY 2021, the most recent years in our scope, and FY 2021 had the highest number (31) of suicides in a single year during our scope.  Finally, while the BOP requires institutions to conduct mock suicide drills to prepare staff to respond to a potential suicide, we found that the BOP was unable to provide evidence that most of its facilities satisfied this requirement.  We make recommendations below to improve the BOP's efforts to prevent additional inmate suicides.

## Deficiencies in Assessments, Monitoring, and Inmate Follow-up Contribute to Suicide Risk

Collectively, BOP policies detail the need for BOP staff to assess inmates' mental health needs, document concerning behaviors, and ensure that inmates receive treatment and care commensurate with their needs.  The BOP requires Psychology Services and Health Services Departments at each institution to ensure that every inmate with a clinically identified need for psychological treatment has access to mental healthcare.  As shown in Figure 4 below, established policy directs that BOP staff should conduct a range of psychological assessments and, when needed, interventions and treatment for inmates throughout their time in custody.  Policy requires that Health Services and Unit Management staff screen all inmates who enter a BOP institution within 24 hours of their arrival, and that during the screening staff may note any mental health concerns, which would then require referral to Psychology Services for prompt follow-up.  Intake and screening procedures differ depending on the inmate's status.  Specifically, pretrial or pre-sentence inmates housed at certain institutions must complete a psychological intake questionnaire within 24 hours of their arrival at an institution.  Although policy does not require Psychology Services staff to enter MHCL assignments for all pretrial inmates, staff are required to enter MHCLs for pretrial inmates in specific circumstances, such as for those pretrial inmates who self-refer or are referred to Psychology Services due to mental health symptoms.  When an institution receives a newly committed inmate, within 14 days Psychology Services staff must conduct a clinical interview of the inmate and assign an MHCL, which

determines the subsequent frequency of mental healthcare contact.[10]  For a transferred inmate, within the first month of the inmate's arrival date at an institution the inmate must complete a psychological intake questionnaire and Psychology Services personnel must conduct a clinical interview with the individual if needed.

### Figure 4

**Timeframe of Psychological Assessments Required for New Arrivals at an Institution**



Source:  BOP policy

BOP responsibilities in assessing the mental health needs of inmates and monitoring factors that may contribute to a suicide extend beyond the initial intake period.  Inmates may react to stressors through behaviors—such as refusal or noncompliance with psychotropic medication and refusal to participate in treatment programs—that can impede treatment of mental illness and potentially escalate to suicidality. BOP personnel must monitor inmates for these types of behaviors and promptly take appropriate action. According to established policy, the BOP provides suicide prevention training designed to enable all staff to identify suicide risk factors and recognize potentially suicidal behavior, with supplemental training for Health Services staff, Lieutenants, Correctional Counselors, and staff working in SHUs.  If, at any point during their custody, an inmate displays behavior indicative of self-harm or behavior that suggests that the inmate may be at risk of suicide, the BOP's Suicide Prevention Program policy dictates that Psychology Services must conduct a Suicide Risk Assessment to determine whether placement on suicide watch is warranted based upon an assessment of suicide risk factors.  For those inmates that the BOP does assess to be at risk of suicide, the BOP places the individual on suicide watch monitoring.  According to BOP policy, suicide

---

[10]  Prior to arriving at an institution, inmates new to BOP custody are assigned initial mental health screen codes as part of the designation process.  BOP Designation and Sentence Computation Center staff generate the mental health screen assignments using a medical calculator and reviewing the inmate's Pre-Sentence Report and other outside records. Following a psychologist's assessment within 14 days of arrival at an institution, the inmate's mental health screen codes are replaced with an official MHCL assignment.

watch may be conducted by staff observers or, in some cases, trained inmate companions (see the text box below).

---

### Inmate Companion Program

At the discretion of the Warden, an institution is authorized to use inmate observers in place of BOP staff to conduct suicide watches of suicidal inmates. These inmate observers, also called inmate companions, volunteer and are specially selected and trained to visually monitor suicidal inmates in designated watch rooms in shifts not to exceed 5 hours in every 24-hour period.

While we did not assess the effectiveness of the Inmate Companion Program, staff observers and inmate companions we interviewed described several benefits of the program, though some staff also described security issues that had occurred in connection with the program. In terms of benefits, BOP staff we interviewed told us that the inmate companions were more effective than BOP staff at suicide watches because they took better notes and interacted with the suicidal inmates more frequently than staff. Inmate companions whom we interviewed at two of the institutions we visited said that they valued their work helping other inmates in need. Some inmate companions told us that they looked at other inmates with empathy and learned skills from the program training they received that would help them upon release from custody. However, some staff described past security incidents that involved inmate companions smuggling contraband and exploiting the program for financial gain.

Additionally, staff told us that they believe that the Inmate Companion Program mitigates staffing shortages and provides potential cost savings for the BOP by limiting the need for institutions to mandate full-time staff to work overtime shifts to conduct these essential suicide watches. From FY 2014 through FY 2021, the BOP calculated that inmate companions observed nearly 1.2 million hours in total across the BOP.

As of November 2021, 89 of 150 BOP facilities (institutions, satellite prison camps, and a Secure Female Facility) operated an Inmate Companion Program. We contacted five institutions that had experienced inmate suicides but were not operating an Inmate Companion Program as of November 2021 and found a variety of reasons. For example, staff at one institution said that they did not have designated suicide watch cells in the institution's Health Services Department. Staff at another institution told us that they did not need inmate companions because their inmate population was generally mentally stable and it was therefore rare for inmates to require suicide watch. Staff at yet another institution told us that they did not utilize inmate companions because their inmate population was designated high security and the institution therefore lacked suitable inmate companion candidates.

Sources: OIG analysis of BOP data and OIG interviews of BOP staff and inmates

---

In addition, BOP personnel must monitor developments in other aspects of inmate management that extend beyond mental health but which may also play a role in the risk of inmate suicide. For example, BOP policy identifies that inmates in protective custody (i.e., placement in a SHU for the inmate's protection) are at high risk for suicide and policy states that inmates requesting protective custody or demanding to be housed alone may be contemplating suicide. BOP policy further states that, when an inmate requests protective custody or demands to be celled alone, Correctional Services staff should immediately notify the Suicide Prevention Program Coordinator or Psychology Services designee during normal business hours or notify the on-call psychologist during nonroutine working hours.

Our review of the BOP's records on inmate deaths identified various shortcomings relating to the management of inmates at risk for suicide, and the BOP specifically identified staff training deficiencies or the need for additional staff training in approximately 42 percent (144 of 344) of inmate deaths, including 94 suicides. Psychological Reconstruction Reports noted a need for additional training, particularly for

Psychology Services and Health Services staff or Departments.  For example, for one of the inmate suicides, a Psychological Reconstruction Report concluded that Psychology Services staff did not employ evidence-based interventions to manage the inmate's acute suicide risk and recommended additional training for the Psychology Services staff on the use of appropriate assessment and treatment of inmates with elevated suicide risk.  A Psychological Reconstruction Report for a different inmate suicide determined that a Suicide Risk Assessment was not completed for the inmate after he was referred to Psychology Services for expression of risk.  The report concluded that the two Staff Psychologists assigned to the institution were both new to the BOP, with minimal correctional experience, and that they had not attended the New Psychologist Familiarization training.  BOP reports on several other inmate suicides noted that some inmates exhibited behaviors prior to their deaths that were potentially indicative of suicide risk, such as giving away their possessions, refusing meals and recreation, pacing, and other abnormal behaviors.

During our site visits, multiple institution staff told us that training deficiencies commonly lead to communication issues between staff and inmates and that staff may not know how to deescalate situations when an inmate is at risk of committing self-harm or violence toward others.  Institution staff we interviewed also noted that staff inexperience poses risks to staff and inmate safety and creates a risk of inmate deaths.  For example, one institution staff member told us that, without a basic understanding of correctional practices, it was not safe for new staff members to escort inmates.  While we did not assess BOP-wide compliance with all staff operational training requirements, we are concerned that insufficient staff training can compromise the BOP's ability to respond effectively to inmate suicides and other deaths and potentially prevent future inmate deaths.

BOP staff also missed opportunities to identify indicators that could contribute to suicides.  Of the 187 suicides during our scope, we identified a range of deficiencies in institution staff actions prior to the suicides for more than 40 percent of these deaths.  These deficiencies included failure to complete sufficient inmate intake assessments and Suicide Risk Assessments and inadequacies in diagnoses and engagement with inmates in need of treatment.  Representative examples include:

> **Excerpt from an After Action Report Following an Inmate Suicide**
>
> The "absence of a critical mass of experienced staff deprives new staff of formal and informal mentoring, modeling and development that is critical to the safety, success, and sense of efficacy in a correctional career."  This absence of institutional knowledge "places staff and inmates at increased risk of homicide, suicide, assault or escape."
>
> Source:  BOP, Psychological Reconstruction Report

- In the case of an inmate who died by suicide, the Psychological Reconstruction Report stated that the inmate's psychosocial history information in their mental health records was not updated to reflect any changes throughout their custody that would have impacted their treatment needs; instead, the inmate's psychosocial history information was largely copied and pasted from the inmate's Pre-Sentence Investigation Report (PSR) from 7 years prior.[11]

---

[11]  A PSR is a comprehensive legal document that presents the findings of an investigation into the legal and social background before sentencing of a person convicted of a crime.  Some of the information a PSR describes includes the defendant's charges and convictions; criminal history; personal and family information; physical, mental, and emotional health; and substance use history.

- A psychologist at one institution documented concerns about suicide risk for an inmate awaiting transfer but did not conduct a formal Suicide Risk Assessment or assign an alert in the BOP's inmate management system, SENTRY, which would have warned staff at the receiving institution that the inmate had an elevated risk of self-harm.[12]  This inmate was housed in a single cell and died by suicide 1 day after arriving at the transfer center.

- In a suicide involving an inmate who had made recent suicide attempts prior to their arrival at a Federal Correctional Complex (FCC), the BOP noted that, although a psychologist met with the inmate upon the inmate's arrival to the institution and briefly the following day, the inmate was single-celled and received no follow-up care until 7 days later.  The Psychological Reconstruction Report stated that the psychologist's attempt to have the inmate double-celled lacked sufficient urgency and follow-through.  After his arrival at the institution, the inmate did not receive his personal property items that were documented as being important to his ability to cope with living in a SHU at his previous institution.  The report also noted that there was no record that any psychologist attempted to ensure that the inmate received important treatment materials; the report found that the inmate's treatment plan should have targeted Cognitive Behavior Therapy for suicidality instead of just for depression.

### *The BOP Identified Issues Related to Inmate MHCLs in About One-Fifth of the Inmates Who Died by Suicide*

As noted above, the BOP utilizes an MHCL designation system to manage inmates' mental healthcare, which varies depending on the severity of an inmate's mental illness.  In addition to assigning an MHCL upon intake, the BOP is responsible for monitoring an inmate's mental healthcare needs and adjusting this designation if an individual's needs evolve during their custody.  BOP psychologists, psychiatrists, and qualified mid-level practitioners (i.e., licensed Physician Assistants or Nurse Practitioners with specialized training in mental healthcare) determine an inmate's MHCL following a review of records and a face-to-face clinical interview; however, according to a BOP Central Office Psychology Services Branch official, in practice the MHCL is assigned only by BOP psychologists.  MHCL designations ranging from 1 to 4, described in Table 4 below, determine an inmate's frequency of clinical contacts with Psychology Services staff and may evolve over time.  At institutions established to provide care to inmates with MHCL 2–4 designations, BOP policy requires that a multidisciplinary Care Coordination and Reentry team employ a holistic approach to ensure the integration of critical aspects of mental healthcare for inmates with mental illness.  The multidisciplinary Care Coordination and Reentry team identifies potential concerns affecting inmates with mental illness and reviews inmates at a frequency commensurate with their mental health needs; the team must review MCHL 2 inmates at least annually, MHCL 3 inmates at least semiannually, and MHCL 4 inmates at least quarterly.

---

[12]  Psychology Alert, or PSY ALERT, is a designation available in the BOP's SENTRY inmate management system that only psychologists may enter or remove for inmates with substantial mental health concerns who require extra care when their housing is changed or when they are transferred to another institution.  The PSY ALERT ensures that the inmate's special psychological needs are reviewed and considered by Psychology Services staff and that any safety and security concerns are highlighted for non-Psychology Services staff when a decision to transfer the inmate occurs.

**Table 4**

**The BOP's MHCL Classification and Frequency of Required Contact**

| MHCL | Description | Frequency of Contact Requirement |
|------|-------------|----------------------------------|
| **MHCL 1**–No Significant Mental Healthcare | An individual who shows no significant level of functional impairment associated with mental illness and demonstrates no need for regular mental health interventions | • Not required to receive any regular mental health services or to have a treatment plan |
| **MHCL 2**–Routine Outpatient or Crisis-Oriented Mental Healthcare | An individual who requires routine outpatient and/or brief, crisis-oriented mental healthcare of significant intensity (e.g., placement on suicide watch or behavioral observation status) | • Evidence-based psychosocial interventions at least *monthly*<br>• Collaborative, individualized treatment plan updated at least every *12 months* |
| **MHCL 3**–Enhanced Outpatient or Residential Mental Healthcare | An individual who requires enhanced outpatient (i.e., weekly mental health interventions) or residential (i.e., placement in a residential psychology treatment program) mental healthcare | • Evidence-based psychosocial interventions at least *weekly*<br>• Collaborative, individualized treatment plan updated at least every *6 months* |
| **MHCL 4**–Inpatient Psychiatric Care | An individual who requires acute care in a psychiatric hospital because they are gravely disabled and cannot function in a general population environment | • Evidence-based psychosocial interventions and/or individual mental health contacts at least *weekly*<br>• Collaborative, individualized treatment plan updated at least every *90 days* |

Source: BOP policy

The majority of inmates who died by suicide during our scope were assigned to MHCL 1. Of the 187 inmates who died by suicide, 22 did not have MHCL 1–4 assignments at the time of their deaths.[13] Our review of BOP documentation found that BOP institution Psychology Services staff had completed MHCL assessments for at least two of these inmates but had failed to enter their MHCL designations into the BOP's SENTRY database. Additionally, multiple inmates without official MHCL 1–4 designations were pretrial or had been in custody at a BOP institution for less than 14 days, circumstances under which institution staff are not always required to give MHCL assignments. However, our review of BOP documentation also identified inmates who had been in custody at an institution for longer than 14 days yet had not received MHCL assignments; these included at least one sentenced inmate and at least one pretrial inmate who had received a Suicide Risk Assessment and would have been required by BOP policy to receive an MHCL

---

[13] Of those 22 inmates, 2 had received separate MHCL assignments outside of the MHCL 1–4 designations, which indicated that a federal court had ordered that the inmates undergo psychological or psychiatric evaluation. The remaining 20 inmates also had not received official MHCL 1–4 designations prior to their deaths: half had received initial mental health screen code assignments, and half had not.

assignment.  We present the MHCL assignments of the 187 inmates who died by suicide during our scope in Figure 5 below.

**Figure 5**

**MHCLs of 187 Inmates Who Died by Suicide, FYs 2014–2021**



Note:  The "Other" category represents the 22 inmates who died by suicide and did not have MHCL 1–4 designations at the time of their deaths.

Source:  OIG analysis of BOP data

In approximately one-fifth (34 of 187) of inmate suicides that we reviewed, after the death the BOP identified issues related to the MHCL designations and treatment of these inmates, including the assignment of potentially inappropriate MHCLs and BOP staff failures to accurately document MHCL information in BOP inmate files.  In more than half of these 34 instances in which BOP records cited concerns with the MHCL or other related issues described above, the inmate had an assigned level of MHCL 1 at the time of death.  According to BOP's classification system, these inmates were deemed by the BOP to not require any regular mental health services or have a treatment plan, as the BOP found them to not have demonstrated a significant level of functional impairment associated with mental illness.

Our analysis of the BOP's Psychological Reconstruction Reports indicated that the BOP likely should have considered assigning higher MHCLs to at least 25 of 34, or over two-thirds, of these inmates who died by suicide, especially inmates with the lowest, MHCL 1, designation.  The inmates' assigned MHCLs did not always reflect their recent mental health histories, including suicide attempts.  In the case of one inmate who died by suicide, the BOP found that the inmate remained at MHCL 1 despite a recent suicide attempt. According to the BOP's Psychological Reconstruction Report, this MHCL 1 designation negatively impacted the provision of mental health services.  In a separate suicide, the Psychological Reconstruction Report noted that BOP staff downgraded the MHCL of a recently transferred inmate, from MHCL 2 to MHCL 1,

despite a forensic evaluation completed the year prior that had diagnosed the inmate with several mental illnesses; this MHCL 1 designation meant that mental health providers would not monitor the inmate's mental illness unless the inmate requested mental health services. In the case of a third inmate who died by suicide, the Psychological Reconstruction Report noted that the inmate was given an MHCL 1 assignment "despite being viewed as chronically suicidal by psychology staff." Additionally, in the cases of 9 of 34 of the inmates who died by suicide, the Psychological Reconstruction Reports detailed other MHCL assessment and documentation issues. These cases, spanning multiple BOP institutions, all of which resulted in suicides, raise concerns about the accuracy of the BOP's MHCL assignments for suicidal inmates and the ability of these inmates to receive mental healthcare commensurate with their needs.

We identified several factors that can result in a misalignment of an inmate's MHCL with the inmate's actual mental healthcare needs. According to our review of Psychological Reconstruction Reports and BOP institution staff we interviewed, one of these factors may be staffing challenges among Psychology Services positions. In at least two Psychological Reconstruction Reports, the BOP concluded that the inmates' MHCLs were lowered due to lack of staffing rather than the inmates' mental health needs. A second possible factor driving MHCL misalignment may be inmate interest: the BOP found that in the case of one suicide Psychology Services staff had lowered the inmate's MHCL in part due to the inmate's lack of interest in treatment. The BOP's Psychological Reconstruction Report on this death recommended that Psychology Services staff should employ and clearly document their efforts to motivate inmates to participate in treatment. Third, psychologists we interviewed at some institutions said that they suspected that other institutions might have changed inmates' MHCLs to trigger a transfer of certain disruptive inmates to other institutions since the BOP tries to match inmates to institutions that have mental healthcare resources that correlate to MHCL designations. However, one Staff Psychologist explained that MHCLs are fluid in nature because an inmate's mental health can be affected by any number of situational stressors. The BOP noted in several Psychological Reconstruction Reports that institutions should exercise caution when decreasing MHCLs. Accurately assigning MHCLs, both upon intake and as an inmate's needs may evolve, is critical to ensuring that inmates receive proper care and is an area in which previous OIG work has identified challenges.[14]

To reduce the risk of inappropriate MHCL designations for suicidal inmates, we recommend that the BOP develop strategies to ensure that staff assign accurate, consistent, and timely MHCL designations to inmates.

## Single-Cell Confinement Presents a Significant Risk of Inmate Suicide

We found that more than half (102 of 187) of the inmates who died by suicide during our scope were single-celled, or housed in a cell alone, at the time of their deaths. The number of inmates who died by suicide

---

[14] DOJ OIG, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, Evaluation and Inspections (E&I) Report 17-05 (July 2017), oig.justice.gov/reports/review-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness. This report found that the BOP had reduced the MHCL designations of some inmates due to a lack of staffing that would have been necessary to address revised standards of care for inmates with mental illness. Specifically, the report found that the number of inmates designated at the higher MHCLs of 2–4 decreased by approximately 30 percent during the year after the implementation of a new mental health policy that raised the standards of care for inmates with mental illness. The OIG recommended that the BOP reassess whether the MHCL system fully captures the mental health needs of inmates, regularly monitor trends in MHCL designations, and determine incentives to increase hiring of mental health staff.

while in single-cell confinement generally rose during our scope, with the highest number of suicide deaths occurring in FY 2021. Numerous BOP documents, including Central Office memoranda to Wardens and Psychological Reconstruction Reports, recommended against single-celling and indicated that single-celling increases the risks of inmate suicide. In March 2020, the then acting Administrator of the Reentry Services Division's (RSD) Psychology Services Branch told us that single-celling "facilitates inmate suicide" through increased isolation and opportunity and that, without a cellmate, inmates are "at greater risk for being able to effectuate suicide." Figure 6 below displays the 102 single-celled inmate suicides during our evaluation period across each of the fiscal years.

### Figure 6

### Number of Single-Celled Inmates Who Died by Suicide, Out of All 187 Suicides, FYs 2014–2021



Notes: The figure above each bar represents the number of all suicides during that FY. Analysis of "single-celled suicides" includes all inmates who were assigned to a single cell at the time of their suicides. Some inmates died at a location other than where they effectuated their suicides, such as at a hospital.

Source: OIG analysis of BOP data

The risk of suicide is further compounded when inmates are single-celled while in restrictive housing settings such as a SHU, where inmates may spend up to 23 hours per day in their cells. We note that inmates may be single-celled outside of a restrictive housing setting. As seen in Figure 7 below, we found that 86 of the 187 suicides occurred in a restrictive housing setting and over two-thirds (60 of 86 suicides) that occurred in a restrictive housing setting happened while the inmate was single-celled. In March 2020, the then acting Administrator of the BOP's Psychology Services Branch told us that she believed that the greatest concern related to inmate suicide involves single-celling in a restrictive housing environment. In February 2021, the then Assistant Director of the RSD issued to all Wardens a memorandum stating that the BOP had experienced an "alarming" number of inmate suicides during FY 2021 and that "single celling must

stop, particularly in restrictive housing and quarantine, except when approved by the Warden on a case by case basis."

## Figure 7

### Inmate Suicides in Single-Cell Confinement and/or Restrictive Housing, FYs 2014–2021



102 Suicides in Single-Cell Confinement

86 Suicides in Restrictive Housing

Notes:  Of the 102 suicides that occurred in *single-cell confinement,* 42 occurred in a non-restrictive housing setting and 60 occurred in restrictive housing.  Of the 86 suicides that occurred in *restrictive housing,* 26 occurred when the inmate had a cellmate and 60 occurred in single-cell confinement.  Some inmates died at a location other than where they effectuated their suicides, such as at a hospital.

Source:  OIG analysis of BOP data

***Previous OIG Reports Have Highlighted Concerns Related to the BOP's Single-Celling of Inmates***

Previous OIG reports issued since 2017 have raised concerns with the BOP's single-celling of inmates, including those placed in restrictive housing, as it relates to inmate mental health and suicide risk:

- The OIG's 2017 restrictive housing review found that single-cell confinement may present added risks to inmate mental health and that the BOP was not limiting the length of time inmates spent in single-cell confinement, which was troubling given that research indicated that such placement could be detrimental to an inmate's mental health.[15]  The OIG recommended that the BOP establish

---

[15]  DOJ OIG, *Use of Restrictive Housing.*

in policy the circumstances that warrant the placement of inmates in single-cell confinement and track and monitor cumulative time that all inmates spend in restrictive housing, including single-cell confinement.[16]  As of February 2024, these two recommendations from our 2017 report related to single-celling remained open, along with four other recommendations from that report.  The BOP reported to the OIG in November 2023 that revisions to its draft SHU policy—which contains new guidance on the use of single-cell confinement and has been under revision since 2017—had been renegotiated with its national union and that the BOP Director would review, sign, and issue the policy.[17]  The BOP's current SHU policy, published in 2016, does not address single-celling practices.

- Our 2023 capstone review of the BOP's response to the coronavirus disease 2019 (COVID-19) pandemic identified serious failures by BOP facilities in their compliance with the BOP's March 2020 guidance regarding the single-celling of inmates during COVID-19 related modified operations.[18] Specifically, the BOP reported to the OIG that seven inmates died by suicide from March 2020 through April 2021 while housed in single-cell confinement in quarantine units related to COVID-19. We concluded in that report that inmate suicide in single cells presented a serious risk area for the BOP and that the BOP's internal oversight mechanisms had not been able to adequately address the scope of the problem.  We made two recommendations in the capstone report related to single-celling, including one referencing the 2017 restrictive housing report's open recommendations.[19]  As of January 2024, both recommendations remained open.

- The OIG's June 2023 report related to the death of Jeffrey Epstein identified numerous and serious failures in the BOP's investigation and review of Metropolitan Correctional Center (MCC) New York staff's custody, care, and supervision of one of the BOP's most notorious inmates, who died by suicide while housed alone in a SHU cell in August 2019.[20]  Among the most significant issues that

---

[16]  DOJ OIG, *Use of Restrictive Housing,* Recommendations 1 and 3.

[17]  Previous OIG reports have highlighted long-standing challenges with the process by which the BOP develops and implements, in collaboration with its national union, policies governing BOP programs and operations.  A 2022 report found that as of May 2022 the BOP had 94 policies (including the SHU policy) that had not been updated in at least 20 years and 24 OIG recommendations that as of August 2022 had remained open for an average of nearly 4 years due to policy development challenges, stalling needed corrective actions to address a range of important issues.  A 2021 Management Advisory Memorandum found that the BOP had not conducted formal policy negotiations with its national union for 20 months during the COVID-19 pandemic, which further delayed policy changes to address OIG recommendations on systemic correctional and safety issues.  See Appendix 3.

[18]  DOJ OIG, *Capstone Review of the Federal Bureau of Prisons' Response to the COVID-19 Pandemic,* E&I Report 23-054 (March 2023), oig.justice.gov/reports/capstone-review-federal-bureau-prisons-response-coronavirus-disease-2019-pandemic, 17.

[19]  DOJ OIG, *Capstone Review.*  Recommendation 1 stated, "Conduct a thorough assessment of single-celling policies and processes, including those applicable to inmates housed in quarantine and medical isolation units and to inmates vulnerable to suicide."  Recommendation 2 stated, "Ensure that actions, including any policy revisions, the BOP takes to close the two open recommendations from our 2017 restrictive housing report that reference single-celling also apply to single-celling during quarantine and medical isolation."

[20]  DOJ OIG, *Investigation and Review of the Federal Bureau of Prisons' Custody, Care, and Supervision of Jeffrey Epstein at the Metropolitan Correctional Center in New York, New York,* Investigations Report 23-085 (June 2023), oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-custody-care-and-supervision-jeffrey.

report identified was BOP staff's failure to assign Epstein a cellmate. Epstein was required to have a cellmate at all times pursuant to a written direction that the Psychology Services Department at MCC New York issued after Epstein was removed from suicide watch and psychological observation following his previous possible attempted suicide.[21] MCC New York staff had transferred Epstein's cellmate out of the institution the day before Epstein's death and did not assign him a new cellmate. As a result of the failure to assign him a new cellmate, Epstein was housed alone in his cell from the night of August 9 until he was found hanged in his cell at approximately 6:30 the following morning. The OIG recommended, among other actions, that the BOP (1) implement a process for assigning a cellmate following suicide watch or psychological observation and (2) establish procedures to ensure that inmates at high risk for suicide and for whom a cellmate is recommended will continue to have a cellmate until the recommendation is changed or rescinded, including establishing a contingency plan for cellmate reassignment.[22] As of January 2024, both of these recommendations remained open.

Some Psychological Reconstruction Reports following inmate suicides stated that BOP staff had placed the inmate in single-cell confinement, despite the inmate having known risk factors for suicide, which ultimately contributed to the inmate's suicide. Many of the Psychological Reconstruction Reports recommended against single-celling and noted that providing a cellmate is known to reduce the risk of suicide. During the COVID-19 pandemic, BOP Central Office continued to warn institutions via memoranda about the risks of suicide associated with single-celling inmates. However, our analysis of BOP data found that, even after the BOP issued these memoranda, institutions continued to single-cell inmates and inmates died by suicide while single-celled. We found that 45 inmates died by suicide between the declaration of the COVID-19 pandemic on March 13, 2020, and the end of FY 2021. Further, 29 of the 45 inmates who died by suicide were single-celled.

Additionally, in Psychological Reconstruction Reports for seven inmates who died by suicide during the COVID-19 pandemic, the BOP recommended that the institutions provide meaningful activities to inmates housed in restrictive housing or quarantine units. One such report specifically stated that "social distancing and idleness [are] core [elements] of risk for suicide in already high risk individuals." Another report stated that the absence of activities that help calm, distract, and engage inmates during the time of pandemic uncertainty enabled the inmate to "descend into an unhealthy emotional state." Both staff and inmates we interviewed for this evaluation told us that inmates housed in their cells without meaningful activities are left with idle time and may exhibit behavioral issues; one staff member explained that a lack of programming was one of the biggest challenges to reducing inmate deaths. Previous OIG work has found issues with the BOP's lack of sufficient programming for inmates. Specifically, our March 2023 capstone review found that the COVID-19 pandemic significantly affected the ability of BOP facilities to provide inmate

---

[21]  According to the BOP's Suicide Prevention Program policy, if an institution determines that an inmate has imminent potential for suicide, the inmate is placed on suicide watch in the institution's designated suicide watch rooms, where a staff or inmate observer monitors the suicidal inmate until the inmate is no longer at risk of suicide or the inmate is transferred to a medical facility. BOP Program Statement 5324.08, Suicide Prevention Program, April 5, 2007, www.bop.gov/policy/progstat/5324_008.pdf (accessed November 22, 2023).

[22]  DOJ OIG, *Custody, Care, and Supervision of Jeffrey Epstein,* Recommendations 1 and 2.

programming, and our May 2023 report on the OIG's inspection of Federal Correctional Institution (FCI) Waseca found that staffing shortages limited the institution's ability to offer inmate programming.[23]

Single-cell confinement is a management decision by the BOP.  With heightened attention and greater coordination and communication among staff, we believe that BOP institutions can limit single-celling and help reduce the risk of suicide.  Following an inmate suicide at one institution, a Psychological Reconstruction Report recommended that any decision to single-cell an inmate be made by a committee of Executive Staff, Correctional Services, Health Services, Psychology Services, and other staff and documented in TRUSCOPE to facilitate transparency.[24]  In another Psychological Reconstruction Report for a suicide that occurred at another institution, the BOP concluded that the institution was not using the Psychology Advisory List, a tool that allows Psychology Services to communicate with Correctional Services and all other staff with access to TRUSCOPE about inmates who should never be single-celled because they pose a chronic risk for suicide.  While we did not assess the efficacy of the task force or any other BOP efforts to reduce single-celling, such as the Psychology Advisory List and interdisciplinary cell-assignment committees, we believe that through such tools the BOP can leverage its resources and better coordinate efforts to reduce the prevalence of single-cell confinement and ensure that inmates are appropriately housed.

We observed different single-celling management practices, in the absence of a national single-celling policy, at the three institutions we visited.  Additionally, we recognize that certain situations can make it challenging for the BOP to limit single-cell confinement, including security and logistical considerations.  In Appendix 4, we further describe these situations based on information we learned during our site visits, as well as the different single-celling practices we observed.

During our fieldwork for this evaluation, BOP Central Office officials and institution staff we interviewed said that they understood the risks associated with single-celling.  BOP staff also told us that the BOP tries to avoid single-cell confinement as much as possible and has made some progress in monitoring the frequency and duration of its use.  In addition, in its March 2023 formal response to the OIG's 2023 capstone report, the BOP reported to the OIG that in May 2021 it established a Single Cell Task Force to review single-celling practices and inmate suicides.  The BOP also reported to the OIG that it had implemented several of the Task Force's recommendations and, based on the Task Force's work, had provided guidance to each region concerning regular review and oversight of those housed alone.  However, a BOP Central Office Psychology Services Branch official told us that, despite BOP single-celling guidance, it is difficult to implement efforts to reduce single-celling without an agency-wide policy.  The BOP also stated that since May 2021 it has implemented two successive Restrictive Housing Work Groups to reduce the number of individuals in restrictive housing and to make restrictive housing safer.[25]  In the text box below, we summarize recommendations from the Task Force's resulting report.

---

[23]  DOJ OIG, *Capstone Review*, 90, and *Inspection of Federal Correctional Institution Waseca*, E&I Report 23-068 (May 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-waseca, 34.

[24]  TRUSCOPE is a software application that provides institution staff with detailed inmate and institution security-related information and provides unit officers an electronic event log.

[25]  DOJ OIG, *Capstone Review,* Footnotes 24 and 29.  We did not assess the efficacy of the Task Force or the work groups for the capstone review or for this evaluation.

**Recommendations from the BOP's Single-Cell Task Force**

The Task Force determined that the number of inmates who engage in self-directed violence and die by suicide can be reduced by eliminating the practice of single-celling inmates. It made 11 recommendations to the BOP, including to encourage leadership communication and change policy to eliminate the use of single-cell confinement. The Task Force recommended that the BOP modify policy to limit the circumstances of single-celling and enact procedures to support accountability, as well as develop a required BOP single-cell form to standardize policy implementation. Two of the BOP's recommendations specifically referenced open recommendations from the OIG's 2017 restrictive housing report to track single-cell placement in restrictive housing and establish in policy the circumstances that warrant single-cell placement. The Task Force also recommended that institutions with high rates of inmate suicide be required to undergo review by a multidisciplinary BOP team to examine institutions' adherence to Psychological Reconstruction Report recommendations, compliance with relevant policy, issues of institution culture, and training needs. Other recommendations included developing a video as part of a staff education campaign, updating training, providing routine communication from BOP Executive Staff, and quarterly sharing of common Psychological Reconstruction Report recommendations to share suicide prevention best practices.

In an August 2023 status update to the OIG on a capstone review recommendation, the BOP reported that efforts to implement the Task Force's recommendations were ongoing. The BOP noted that each region had created forms for institutions to utilize for the purposes of tracking single-celling in restrictive housing and implemented a tracking system to monitor institutions' single-celling practices. According to the BOP, annual and specialty trainings for BOP staff incorporated common findings from Psychological Reconstruction Reports to promote best practices in suicide prevention. Additionally, the BOP stated that it had started to conduct suicide risk reduction reviews of institutions with high rates of inmate suicides, which entails a BOP multidisciplinary team examining institutions' adherence to prior Psychological Reconstruction Report recommendations, compliance with relevant policy, issues of institutional culture, and training needs. As of October 2023, the BOP's implementation of multiple Task Force recommendations was pending BOP policy revisions.

Source: BOP documentation

## BOP Staff Did Not Conduct Sufficient Rounds or Counts Prior to Over One-Third of Inmate Suicides

To ensure the safety and accountability of inmates confined in restrictive housing, such as administrative detention or disciplinary segregation, the BOP requires that staff conduct rounds in restrictive housing at least once in the first 30-minute period of an hour followed by another round in the second 30-minute period of the same hour, ensuring inmates are observed at least twice per hour. These rounds are to be conducted on an irregular schedule and no more than 40 minutes apart. The BOP also requires that staff conduct a minimum of five official inmate counts, or census checks, per 24-hour period, with an additional count conducted on weekends and holidays.[26] However, prior to at least 86 inmate deaths (68 suicides, 17 homicides, and 1 accident), the BOP determined that staff had failed to sufficiently complete rounds or counts.[27] For example:

---

[26] BOP Program Statement 5500.14, CN-1, Correctional Services Procedures Manual, October 19, 2012 (change notice issued in 2016), www.bop.gov/policy/progstat/5500_014.pdf (accessed November 22, 2023).

[27] While BOP national policy mandates that all staff conduct irregular 30-minute rounds in restrictive housing, some institutions have also implemented this requirement in general population housing units, as detailed in staff post orders. As a result, our count includes inmates housed in restrictive housing and general population.

- In one inmate suicide case, the BOP determined that staff averaged 65 minutes between rounds between 8 p.m. and 5 a.m.

- A Psychological Reconstruction Report for a different inmate suicide established that staff had conducted no rounds between 12 a.m. and 3 a.m.

- A Psychological Reconstruction Report for yet another inmate suicide stated that "had an officer conducted rounds more frequently, the officer might have observed [an inmate] braiding the rope and intervened, possibly preventing his suicide."

- In the case of a fourth inmate suicide, the BOP determined that rounds in the SHU were not conducted as documented or as required by policy on the day of an inmate's suicide. According to the Psychological Reconstruction Report, the absence of staff in the SHU during a 1 hour and 46-minute time period allowed another inmate, without staff awareness or intervention, to verbally abuse and encourage the inmate to die by suicide.

To assess whether staff conducted sufficient rounds and inmate counts at an institution we visited, we reviewed camera footage of three housing units (two regular units and a medical housing unit) at Federal Transfer Center (FTC) Oklahoma during a morning watch shift of midnight to 8 a.m. Of the three housing units we selected for review, one of the regular units did not have an assigned Correctional Officer, so Correctional Officers assigned to the other two units (one of which was a medical unit) were responsible for covering that unassigned unit. Under BOP policy, institutions such as FTC Oklahoma must conduct a minimum of five official inmate counts per day, as well as two rounds per hour no more than 40 minutes apart (translating to a requirement of 16 rounds in an 8-hour shift). While staff completed counts in all three units during this shift, we found that the two officers missed required rounds in all three housing units. Specifically, we determined that staff did not complete 65 percent (31 of 48) of required rounds during the shift we reviewed. For the medical unit in particular, staff failed to complete 69 percent (11 of 16) of required rounds.

According to an Associate Warden for FTC Oklahoma City, the institution sought to reduce the number of staff that it required to work mandatory overtime through its strategic assignment of staff to housing units. He stated that, if there were staff vacancies during a given shift and no available staff to assign to work certain housing units, the institution would choose to leave those units unassigned rather than require staff to work overtime and cover them. Staff explained that they believed that the morning watch shift was the riskiest to leave vacant (without an assigned staff member) regarding inmates' safety and well-being. A Disciplinary Hearing Officer from another institution stated that inmates knew when staff rounds would occur and therefore would be able to take advantage of the timing. As rounds are essential checks to promote accountability and verify inmate well-being, the BOP should ensure that all staff meet the expectations of its round policy.

Similarly, the OIG's June 2023 report on MCC New York staff's custody, care, and supervision of Epstein also found staff failure to conduct required rounds and counts (see the text box below). That report recommended that the BOP evaluate its inmate accountability methods and clarify supervisory staff's SHU

round duties.[28]  In total, the OIG made eight recommendations to help the BOP address multiple shortcomings to ensure that it can more effectively handle issues that arise in connection with the custody and care of inmates, including those at risk for suicide.  Recommendations included implementing measures designed to increase safety—such as staff rounds, inmate counts, and cell searches—and addressing long-standing issues with staffing shortages and gaps in institutional security camera systems. The BOP concurred with all recommendations.

<div style="background:#e8e8e8;padding:1em">

**BOP Staff Failures and Deficiencies Identified in the OIG's June 2023 Report on the Epstein Suicide**

- **Failure to assign Epstein a cellmate:**  Institution staff failed to carry out the Psychology Services Department's directive that Epstein be assigned a cellmate in the SHU cell where he was housed.

- **Failure to conduct rounds and counts:**  Institution staff failed to conduct the required 30-minute rounds and inmate counts in the SHU where Epstein was housed after 10:40 p.m. on August 9.  Institution staff also failed to conduct required SHU inmate counts after 4:00 p.m. on August 9.  These failures allowed Epstein to be unmonitored and alone in his cell from 10:40 p.m. on August 9 until he was discovered hanged in his locked cell the following day, August 10, at approximately 6:30 a.m.

- **Failure to search Epstein's cell:**  Institution staff failed to conduct and document cell searches and eliminate safety hazards in Epstein's cell on August 9, leaving Epstein with excessive linens in his cell.  The OIG identified only one SHU cell search on August 9 documented by SHU staff.

- **Falsification of inmate counts and rounds records:**  The OIG determined that several staff falsified BOP records relating to inmate counts and rounds, and two of the staff members were subsequently criminally charged.

- **Security camera failures:**  As a result of a malfunction of MCC New York's digital video recorder system that occurred in July 2019, recorded video evidence for August 9 and 10 for the SHU area where Epstein was housed was available from only one prison security camera.  While the prison's cameras continued to provide live feeds, recordings were made for only about half the cameras.

Source:  DOJ OIG, *Custody, Care, and Supervision of Jeffrey Epstein*

</div>

## Lack of Communication among BOP Departments Hampers Coordinated Suicide Prevention Efforts

We found in our review of inmate suicides that institution staff assigned to various departments—such as Correctional Services, Psychology Services, and Health Services—did not consistently share sufficient information with one another, presenting challenges to continuity of inmate mental healthcare, as well as collective suicide prevention efforts.  At BOP institutions, the Correctional Services Department contains Correctional Officers, Lieutenants, Captains, Special Investigative Services (SIS), and other custody staff who are primarily responsible for maintaining safety and security.  Psychology Services, present in all BOP facilities, is the main provider of mental healthcare to inmates.  Health Services contains personnel who are generally responsible for inmate medical care; the Health Services Division includes psychiatric personnel,

---

[28]  DOJ OIG, *Custody, Care, and Supervision of Jeffrey Epstein,* Recommendations 4 and 5.

who perform a relatively small facet of overall health services operations and provide care mainly at the Federal Medical Center institutions or as tele-psychiatry for inmates at other locations.

Several provisions of the BOP's Suicide Prevention Program emphasize the need for communication among all staff as part of the BOP's suicide prevention efforts.  Specifically, the BOP requires all staff to receive suicide prevention training, which includes staff identification and referral of suicidal inmates, as well as other suicide prevention techniques.  BOP policy requires the Suicide Prevention Program Coordinator, ordinarily the institution's Chief Psychologist, to ensure that all staff are trained to recognize signs of a potential suicide, the appropriate referral process, and suicide prevention techniques.[29]  Policy also states that Wardens will include discussions of suicide prevention at department head meetings and staff recalls to remind staff of the need to constantly observe inmates for signs of suicidal behavior.  The policy further specifies that staff should notify Psychology Services whenever an inmate housed in a SHU refuses or misses their medication; it also states that, conversely, psychologists must notify SHU staff when an inmate misses their medication.  With deliberate coordination of care among departmental staffs and increased communication among staff across departments, institutions may potentially reduce the number of suicides.

From our analysis of inmate death documents, we found that the BOP identified issues with interdepartmental communication in at least 66 inmate deaths.  These communication deficiencies were most prevalent in suicide deaths (60 of 66).[30]  BOP documentation identified communication issues between staff in multiple departments, including numerous instances of Health Services and Correctional Services not sufficiently communicating with Psychology Services about inmates who later died by suicide.  The BOP identified issues regarding the sharing of information between Health Services, Psychology Services, and Correctional Services about an inmate's refusal to take psychotropic medication; Correctional Services staff's failure to notify Psychology Services about an inmate's display of distress; and Health Services staff's failure to notify Psychology Services about an inmate's self-directed violence.  We also heard differing staff perspectives on the quality of interdepartmental communication during our site visit to one institution.  While some Correctional Services staff at this institution said that they generally believed that they maintained good communication with other departments, a Psychology Services staff member indicated that there were communication issues with Unit Team staff, whose responsibilities include routinely meeting with inmates to identify their programming needs and prepare them for reentry.  We summarize portions of a Psychological Reconstruction Report for an inmate suicide that occurred at one institution in the text box below to illustrate the consequences that can arise from deficiencies in interdepartmental communication.

---

[29]  According to the BOP's Suicide Prevention Program policy, each institution must have a Program Coordinator who is responsible for managing the treatment of suicidal inmates and ensuring that the institution's suicide prevention program conforms to the guidelines for training, identification, referral, assessment, and intervention outlined in the policy.  The policy further states that the Program Coordinator's responsibilities must not be delegated to staff other than a doctoral-level psychologist.  BOP Program Statement 5324.08.

[30]  We also found that the BOP identified interdepartmental communication issues in five homicides deaths and one accidental death.

**Example of Communication Breakdown in Advance of a Suicide**

In November 2017, Health Services staff saw an inmate after the inmate reported that he had swallowed razor blades.  However, despite evidence of self-directed violence, the Health Services provider did not refer the inmate to Psychology Services.

The inmate later got into an altercation with another inmate, which resulted in the first inmate's placement in a SHU.  Psychology Services recommended that the inmate be returned from the SHU to the compound.  However, despite this recommendation, staff decided to pursue transfer of the inmate to another institution and kept him in the SHU pending transfer.  The Psychological Reconstruction Report noted that, had increased collaboration and coordination taken place between Psychology Services and Correctional Services, it may have resulted in a decision to allow the inmate to remain at the institution and remain engaged in necessary MHCL-3 treatment.

In December 2017, the following month, the inmate engaged in self-directed violence and was subject to an immediate use of force involving the use of oleoresin capsicum spray.  Following this incident, the inmate was single-celled in a SHU but Psychology Services was not notified.  The inmate then attempted to hang himself while single-celled in the SHU.  The Psychological Reconstruction Report indicated that following this suicide attempt the inmate was assigned a cellmate in the SHU.  However, the day after his attempted hanging, the inmate died by hanging in his SHU cell.

The Psychological Reconstruction Report noted that failure to report to the on-call psychologist incidents of self-directed violence or suspicions of suicidality, as well as failure to provide for the safety of the inmate pending Suicide Risk Assessment, are violations of the BOP's Suicide Prevention Program policy.  The Psychological Reconstruction Report further noted that recent Suicide Risk Assessments and decisions around initiating suicide watches for the inmate underestimated risk and relied on the inmate's subjective self-report rather than objective markers for suicide.  Additionally, the Psychological Reconstruction Report stated that the inmate's treatment plan did not provide for any evidence-based interventions matched to his suicide-related treatment needs.

Source:  BOP Psychological Reconstruction Report

During our site visits, we observed different staff perspectives across departments on the BOP's ability to prevent inmate suicide.  For example, Psychology Services staff told us that they believed that suicides are preventable if all staff follow policy and deliver proper resources and treatment to inmates.  In contrast, however, Correctional Services staff told us that they did not believe that there was any measure that the staff or the institutions could have implemented to prevent inmate suicides.  Multiple Correctional Services staff said they believed that inmates intent on dying by suicide would eventually find the opportunity to do so.  As a result, we concluded that Correctional Services staff may not recognize the need to communicate signs of suicidal ideation to Psychology Services staff if they do not perceive the signs as a serious risk.

There are multiple contact points for non-Psychology Services institution staff to identify inmate signs of suicidality or distress.  According to the BOP's Suicide Prevention Program policy, Correctional Services staff are often the first to identify signs of potential suicidal behavior based on their frequent interactions with inmates.  The BOP's Correctional Services Procedures Manual requires staff to maintain continuous inmate accountability through a system of accurate counts and census checks.[31]  In addition to establishing minimum requirements for staff rounds and inmate counts (described above), BOP policy provides that closer observation may be required for an inmate in locked down status who is mentally ill, or who

---

[31]  BOP Program Statement 5500.14.

demonstrates unusual or bizarre behavior. During our site visits, we observed Correctional Officers visually and verbally checking in on the inmates in the SHUs. During interviews at institutions we visited, staff members stated that Correctional Officers are best positioned to notice inmates' behavioral changes that may indicate an increased risk of suicide. Additionally, medical staff routinely interact with inmates during medical appointments and when they administer prescribed inmate medication (via "pill line") and directly observe as inmates consume their medication. Inmate contacts present opportunities for BOP staff to interact with inmates, identify potentially concerning behaviors, and share that information with Psychology Services.

However, we found through our analysis of the Psychological Reconstruction Reports that staff did not always communicate to Psychology Services or Health Services psychiatry staff known concerns about inmates who later died by suicide, which limited the ability of these clinical staff to see or potentially treat the inmates. For example, as detailed in one of the Psychological Reconstruction Reports, Health Services nursing and Correctional Services custody staff had observed the inmate markedly deteriorating in his mental status a few days before the incident; however, they did not document or pass on such observations to psychiatry staff within the Health Services Department. The BOP recommended that the institution conduct specialized training to address the necessity of communicating observations of behavioral changes to clinical staff. As another example, for a different inmate suicide, the BOP determined that in three separate incidents prior to the suicide, Correctional Services staff were aware that the inmate was in emotional distress but did not notify Psychology Services.

A Chief Psychologist at one institution said that some Correctional Services staff believe that they can assess an inmate's suicidality without consulting Psychology Services and that these staff fail to notify Psychology Services when an inmate is at risk of self-harm. According to this Chief Psychologist, only psychologists can determine whether an inmate is suicidal. In addition, differences in the method of notification to Psychology Services when a staff member observes a suicidal inmate further illustrates the gap in suicide prevention efforts between departments and the need for additional BOP guidance on how to communicate such information. One psychologist told us that some Correctional Officers believe that sending an email to Psychology Services suffices as notification of a suicidal inmate; however, due to short staffing and high workloads, psychologists may not be able to check emails until late in the day, delaying necessary care and assessment of a potentially suicidal inmate. A Chief Psychologist we spoke with estimated that, due to the breakdown in communication between Correctional Services and Psychology Services, supervisory Lieutenants fail to notify Psychology Services in approximately 20 to 25 percent of inmate psychotic events and that most of the notifications that do take place occur by email instead of by phone.

We also identified breakdowns in communication among institution personnel from various departments after a death by suicide had occurred. For example, in at least three instances in our scope, the respective institutions' Psychology Services Departments were not notified that an inmate suicide had occurred. Involvement of Psychology Services can be helpful: (1) in the circumstances leading up to a potential suicide, when they can assist in identifying troubling behavior and advise on risk mitigation measures, and (2) in the aftermath of suicides that do occur, when they can support efforts to understand why the inmate may have decided to die by suicide, which would inform potential mitigation measures in the future. As the BOP noted in one of the Psychological Reconstruction Reports we reviewed, Psychology Services should be notified of inmate suicides as early as possible because Psychology Services "plays an integral role in suicide assessment, prevention, and response and has unique expertise to offer in the investigatory administrative and support roles."

Additionally, we observed some deficiencies in communications beyond the institutions where inmate suicides occurred.  BOP policy provides that after a suicide occurs the institution's Suicide Prevention Program Coordinator must "immediately" notify the Regional Office's Psychology Administrator, who authorizes the required After Action Review.  Then, this regional official must forward copies of the resulting Psychological Reconstruction Report to a Special Review Committee, which determines whether recommendations for corrective action will be addressed at the national or institutional level.  According to BOP documentation available for our review, the BOP typically completed such Psychological Reconstruction Reports shortly after the death of an inmate in situations when there was reasonable suspicion that the death was by suicide.  However, in one example, it took the BOP 29 months following an inmate suicide to complete a Psychological Reconstruction Report, which the BOP's Psychological Reconstruction Report attributed to the institution's significant delay in notifying Central Office's Psychology Services Branch of the inmate's suicide.  This delay resulted in a failure to address troubling patterns promptly, and there was an additional suicide at that institution in the period before the Psychology Services Branch received notification of the first suicide.  According to the Psychological Reconstruction Report that the BOP eventually completed, the two suicides had two consistent concerns: (1) failures in providing suicide prevention care and (2) the need to improve staff emergency response.  In a separate example, a BOP institution failed to report an inmate death as a suicide to Central Office until nearly 5 months after the suicide occurred, which, the Psychological Reconstruction Report found, limited the reconstruction team's ability to acquire information to prevent future suicides.  In both examples, the BOP noted untimely suicide notifications to Central Office as a deficiency that impairs Central Office awareness of critical information on the status of inmates in its care and custody and hinders the BOP's ability to implement timely corrective actions and assess whether such actions should occur at individual institutions or BOP-wide.

### Inaccurate and Incomplete Recordkeeping on BOP Inmate Management May Hinder the Communication of Inmate Information Across Departments

The BOP's various inmate databases serve as an important mechanism by which staff memorialize and communicate essential inmate information, including their concerns about an inmate.  Improper documentation in any part of inmate processing and management can create blind spots for other staff who rely on records and data in multiple BOP systems when making certain administrative decisions or assessments, including cell assignments, treatment plans, and Suicide Risk Assessments.  One of the most prolific issues that we observed during our review of the inmate deaths during our scope was improper completion by BOP staff of records throughout the inmate's custody before the inmate's death.  Specifically, for 36 percent of all 344 deaths in our scope (most of which were suicides), we found that there were deficiencies in records that should be maintained in BOP electronic data systems that house information such as inmates' medical health records and mental health data, as well as paper copy documents related to staff execution of job duties that require employees' certification.  For example, we observed many instances of missing or inaccurate documentation, staff failing to acknowledge and sign the post orders that contain assignments and instructions for custody posts, or misleading or falsified documentation of rounds and counts.[32]

---

[32]  Post orders are used by Correctional Services personnel to describe all assignments of work, procedures, and any special instructions regarding a specific custody post, including instructions on immediate action staff should take in an emergency.  Under BOP policy, post orders should be prepared under a Captain's supervision and direction; once staff review the post orders, they must sign and date them in acknowledgment of these orders.

Inaccurate or missing documentation may result in serious risks to inmate security and mental health. For example, for one inmate suicide the Psychological Reconstruction Report stated that the inmate had dropped out of a gang but the BOP failed to enter his gang disassociation into his Security Threat Group SENTRY assignment. This misstep resulted in administrative errors that led to his transfer to an active gang yard and delayed subsequent transfer to a more appropriate facility. The Psychological Reconstruction Report concluded that at the new facility the inmate developed a sense of despair and received threats to his safety, as well as the safety of his family; the inmate subsequently requested to be placed in a single cell in a SHU, where he died by suicide. In a Psychological Reconstruction Report for a different inmate, the BOP concluded that the contents of the inmate's psychosocial history portion of his file did not reflect any of the interim changes he experienced that would have affected his assessed treatment needs and that the inmate's treatment plan was not individualized. It is essential that the BOP maintain complete and accurate records on inmates in its care to ensure that information that is relevant and potentially critical to the safety and security of inmates and institutions can be reliably and promptly accessed by personnel responsible for the management of these inmates.

## Over 70 Percent of BOP Facilities Were Unable to Provide Evidence that They Had Completed Mock Suicide Drills as Required by BOP Policy

The BOP's Suicide Prevention Program requires all BOP institutions, including each facility within a complex, to conduct a least three mock suicide drills per calendar year, one on each shift, to simulate an inmate suicide attempt and assess staff response capabilities.[33] Mock suicide drills are hands-on, interactive trainings that can equip staff with the skills needed to respond to inmate suicide incidents; however, we found that the BOP was unable to provide evidence that most of its facilities conducted these drills in compliance with BOP requirements. As seen below in Table 5, our review of mock suicide drill completion records found that, on average from calendar year 2018 through calendar year 2020, the BOP was unable to provide evidence for approximately 72 percent (139 of 194) of its 194 facilities that those facilities had met the Suicide Prevention Program requirement to complete three mock suicide drills per year.[34] Moreover, 35 percent (67 of 194 facilities) were unable to provide evidence that they conducted a single mock suicide drill from 2018 through 2020.

The lack of mock suicide drills that we identified in our analysis of BOP data is consistent with BOP staff statements during our interviews. For example, both custody and non-custody staff told us that they have

---

[33] The BOP's Suicide Prevention Program policy requires that an institution's Captain and Chief Psychologist jointly conduct a minimum of three mock suicide emergencies annually, one on each shift (i.e., morning, day, evening) approximately 4 months apart. An FCC must complete the mock suicide drills separately at each facility within the complex. At least one of the drills must be conducted in the SHU during the evening or morning watch. Facilities that do not have a SHU (e.g., camps) are exempt from this requirement but are still required to conduct mock suicide drills annually. Following each drill, an institution's Captain and Chief Psychologist are required to complete a memorandum detailing the parameters of the mock scenario, its participants, and staff responses. BOP Program Statement 5324.08, 5.

We use the term "facilities" in this section to describe individual BOP prisons, including those within a BOP institution or FCC. For example, FCC Hazelton has two primary institutions, USP Hazelton and FCI Hazelton, and four facilities: USP Hazelton includes a high security USP with an adjacent minimum security satellite camp; FCI Hazelton includes a medium security Correctional Institution with a Secure Female Facility.

[34] Because we averaged the number of facilities across three calendar years, we rounded to the nearest whole number the count of facilities presented here. The percentage calculation is based on the rounded number of facilities.

never participated in a mock suicide drill.  This is particularly troubling because these staff worked at institutions that had multiple inmate suicides during our evaluation period.

**Table 5**

**Percentage of BOP Facilities Lacking Documentation of at Least Three Completed Mock Suicide Drills, Calendar Years 2018–2020**

| Calendar Year | Percentage of BOP Facilities Lacking Documentation of at Least Three Completed Mock Suicide Drills |
|---|---|
| 2018 | 85% |
| 2019 | 69% |
| 2020[a] | 61% |
| Average, 2018–2020 | 72% |

Notes:  We focused our analysis on the three most recent full calendar years of our evaluation scope.  We counted available individual facility confirmation memoranda; BOP policy requires institutions to document completion of the mock suicide emergency training via memorandum.

[a]  In April 2020, the BOP's Central Office issued to institution Wardens a waiver that suspended the mock suicide drill requirement for January–April 2020 due to the COVID-19 pandemic.  To account for this waiver, which affected one-third of the calendar year, our 2020 analysis assessed whether facilities conducted at least two mock drills instead of the three that are otherwise required in one year.

Source:  OIG analysis of BOP data

In one Psychological Reconstruction Report following a suicide, the BOP acknowledged that staff would benefit from responding to various suicide attempt situations and recommended that the institution improve suicide emergency trainings (i.e., mock drills) to provide staff increased confidence about responding to various suicide attempts.  We are concerned that, unless the BOP ensures that all institutions meet mock suicide drill requirements and that staff are prepared to respond to such events, deficiencies in institution staff's response to emergencies—including suicides—will continue to occur, as outlined in the BOP's Response to Medical Emergencies section of this report.

As discussed in the Chronic Staffing Challenges section, the BOP considers and trains all institution staff to be correctional workers first and non-custody staff (e.g., educational staff) may sometimes be assigned to work custody posts and manage inmates via the BOP's practice of augmentation.  Therefore, we believe that all staff, including non-custody staff, should participate in mock suicide drills to respond to a simulated

suicide scene and test their emergency response capabilities.[35]  Debriefing sessions following the drills would allow participants to discuss the exercise and receive feedback and recommendations for improvement.  Accordingly, we recommend that the BOP ensure that all institutions conduct required mock suicide drills and develop strategies to increase staff participation in those drills.  We also encourage the BOP to take swift action to address our 2023 Epstein report recommendations to evaluate inmate accountability methods and clarify SHU supervisory staff's round duties.

## The BOP's Response to Medical Emergencies Was Often Insufficient Due to Lack of Clear Communication, Urgency, or Proper Equipment

To properly respond to high-stress, extraordinary inmate emergency situations such as an inmate hanging, attempted homicide, or drug overdose, BOP staff must be prepared to follow correct protocols and use proper, easily accessible, functioning equipment.  Mere seconds in response time can potentially mean life or death for afflicted inmates.  During our site visits to BOP institutions, multiple staff we interviewed stated that they generally believed that staff responded quickly to emergencies.  However, we found significant shortcomings in BOP staff's emergency responses to nearly half (166 of 344) of the inmate deaths that occurred within our evaluation scope.  We identified recurring deficiencies ranging from a lack of urgency in emergency response, failure to bring or use appropriate emergency equipment, unclear radio communications, and issues with naloxone administration in opioid overdose cases, as described in greater detail below.  We believe that improvements in these areas would help prepare BOP personnel to address future inmate emergency scenarios.

The BOP's Standards of Employee Conduct mandate that employees respond immediately, effectively, and appropriately during all emergency situations because "failure to respond to an emergency may jeopardize the security of the institution, as well as the lives of staff or inmates."[36]  However, we found in our analysis of available BOP documentation, including Multilevel Mortality Reviews (MLMR) and After Action Reports, that in 48 percent (166 of 344) of inmate deaths that occurred during our evaluation scope there were deficiencies in connection with BOP staff's response to the inmate's medical emergency.  These included institution staff's lack of urgency in their response, staff not promptly initiating or adequately maintaining cardiopulmonary resuscitation (CPR) compressions, staff not bringing or timely applying automated external defibrillators (AED), staff experiencing difficulty using or having timely access to a properly functioning tool for cutting ligatures, and staff not timely bringing or properly using a gurney or backboard.  In addition, the BOP's documentation related to these deaths identified issues related to unclear or lackluster radio communication and shortcomings in the availability or administration of naloxone, an opioid overdose reverse medication.  See Figure 8 below for our categorization of deficiencies in BOP institutions' emergency responses to inmate deaths, as identified in our review of BOP documentation.

---

[35]  The BOP stated that all employees available to respond during a mock suicide drill are expected to participate in the drill and that participation may vary by department and by shift when the drill is conducted due to non-custody departmental hours of operation.

[36]  BOP Program Statement 3420.11, Standards of Employee Conduct, December 6, 2013, www.bop.gov/policy/progstat/3420_011.pdf (accessed January 12, 2023).

Figure 8

Categorization of Deficiencies in Institutions' Emergency Responses, FYs 2014–2021



Notes:  These figures represent total counts of each emergency response deficiency that we identified across the 344 inmate deaths in our scope.  Each death may have involved one or more of these deficiencies.  We use the "Emergency First Response Issues" category for a variety of issues with staff's *initial* response to the scene (not otherwise captured in the other categories), e.g., staff not bringing equipment to the scene and issues related to the timeliness or quality of the initial emergency response, including CPR administration.  We did not independently assess the degree to which emergency response failures identified in BOP documentation may have contributed to inmate deaths.  For a more detailed description of our scope and methodology, see Appendix 1.

Source:  OIG analysis of BOP documentation

## Staff Sometimes Failed to Initiate Adequate Lifesaving Measures and Did Not Always Respond Urgently to Emergencies That Resulted in Death

Multiple BOP-generated reports related to inmate deaths we reviewed noted that all medical emergencies should be responded to in a manner that makes it clear that staff are taking the emergency seriously and with the care and urgency demanded by the situation.  According to the BOP's Patient Care policy, a team of first responders, with documented training in first aid and CPR, should be established for each shift.[37]  The policy further states that all healthcare practitioners, including Health Services Administrators (HSA) and Assistant HSAs, as well as Lieutenants, will maintain CPR and AED certification, while other staff may request to receive such training.  Additionally, one suicide Psychological Reconstruction Report stated that all BOP staff responding to an emergency should initiate lifesaving measures until medical staff arrive and can continue the efforts.  However, in at least 73 of 344 deaths (more than one-fifth of the inmate deaths we

---

[37]  BOP Program Statement 6031.04, Patient Care, June 3, 2014, www.bop.gov/policy/progstat/6031_004.pdf (accessed January 13, 2023).

reviewed), BOP documentation revealed several emergency response deficiencies, including that institution staff lacked urgency when responding to an emergency, did not promptly initiate lifesaving measures such as CPR, or delayed transfer of the inmate to Health Services for emergency care.

The BOP's Patient Care policy follows American Correctional Association standards, which require a 4-minute response for life- or limb-threatening medical emergencies.  During our site visits to BOP institutions, multiple staff we interviewed stated that they generally believed that staff responded quickly to emergencies.  Yet, BOP Psychological Reconstruction Reports revealed that, during some life-threatening emergencies, BOP staff were walking, not running, to the scene.  For example, as noted in one MLMR for an inmate death for which the manner of death is reported as unknown, the medical response time exceeded 9 minutes, over double the 4-minute response time required by the BOP's Patient Care policy and American Correctional Association standards.  Additionally, despite procedures to transport inmates to external emergency facilities, in six of the inmate deaths we reviewed the BOP's reports noted that institution staff experienced difficulties including delays in transferring inmates to a hospital or outside Emergency Medical Services, where more advanced lifesaving equipment would be available.

## Staff Did Not Always Bring Emergency Equipment in Response to Emergencies

The availability and accessibility of emergency equipment is essential to BOP staff's ability to respond to emergency situations, such as severe inmate injuries or potential loss of life.  Such equipment in BOP institutions includes AEDs, cut-down tools, and gurneys.  In one of the Psychological Reconstruction Reports that we reviewed, the BOP stated that staff's ability to initiate lifesaving measures for an inmate who was experiencing a life- or limb-threatening medical emergency was hampered by the absence of immediate access to these emergency resources.  As described below, we found that the absence of immediate access to emergency resources arose in many other inmate death cases in our scope.  Without proper training and easy access to functional equipment, staff responding to medical emergencies are not prepared to initiate and sustain lifesaving measures during life-and-death situations.

### *Staff Failed to Bring or Were Unable to Properly Operate AEDs*

According to several BOP Psychological Reconstruction Reports, an AED can dramatically improve heart rhythm, is superior to CPR in detecting and regulating a dysfunctional heart rhythm, and should be applied as soon as possible.[38]  We found that AED issues occurred during at least 78 of the 344 inmate deaths that we reviewed.  In these 78 instances, we found issues that included the following:  staff did not bring an AED to the scene of a medical emergency, staff could not locate or were not aware of an AED's location, the AED was not functioning properly, or the application of the AED was significantly delayed.  See below for an example of an AED and other emergency response equipment.

---

[38]  In response to a draft of this report, the BOP stated that these Psychological Reconstruction Report AED descriptions were inaccurate, noting that nonmedical professionals write Psychological Reconstruction Reports.  The BOP stated that an AED does not improve heart rhythms, but rather has the potential to detect and correct one of two specific heart dysrhythmias, and that CPR itself is not intended to detect and regulate a dysrhythmia.

In numerous instances of inmate deaths, as reported by the BOP, both in homicide After Action Reports and suicide Psychological Reconstruction Reports, AEDs were not located in a housing unit for immediate access and timely application.[39] Additionally, After Action Reports documented that AEDs were unusable during emergencies due to dead batteries or missing pads.[40] Furthermore, multiple Psychological Reconstruction Reports indicated that staff were unfamiliar with proper AED use and recommended additional training. For example, in the case of one death, the AED advised a shock for an inmate but a BOP healthcare practitioner accidently powered the AED off instead of pushing the shock button. By the time the AED was powered back on, no subsequent shock was advised; the inmate ultimately died.[41] Institutional failure to maintain fully functioning AEDs, along with delays experienced by staff in locating or properly applying an AED, needlessly impeded the administration of lifesaving measures. The sooner an AED is applied to an unconscious inmate, the sooner any necessary shock can be administered, thereby increasing the chances of resuscitation. Therefore, we recommend that the BOP ensure that all appropriate staff are trained in AED use and that AEDs are strategically placed, readily available, and regularly checked to ensure that they are in working order at each BOP institution.



AED, First Aid Kit, and a Self-Contained Breathing Apparatus at USP Thomson's Camp

Source: OIG (Product Names Blurred in Image)

### Staff Did Not Properly Employ Cut-down Tools in Nearly 4 Out of Every 10 Suicide Hangings

We found that, during the period of our evaluation, hanging was the most common method inmates used to facilitate suicide. Inmates used a variety of materials, such as bed sheets, clothing, and shoelaces, as ligatures to effectuate suicide. Routine carry of a cut-down tool would allow staff to quickly cut off these ligatures, thereby allowing potentially lifesaving measures to be administered promptly. However, BOP staff experienced difficulties using or lacked timely access to a properly functioning cut-down tool in nearly 40 percent (59 out of 159) of suicide hangings. In the Psychological Reconstruction Reports, the BOP identified instances in which staff did not have, could not locate, or did not properly utilize a cut-down tool. In some instances, Correctional Officers responded to a suicide hanging by attempting to remove the ligature by hand, sometimes unsuccessfully, because they were not carrying a cut-down tool or did not have one readily available when they discovered the hanging inmate.

---

[39] In response to a draft of this report, the BOP stated that AEDs are not required to be located on housing units.

[40] The BOP's Patient Care policy states that an institution's HSA "will be responsible for maintenance and supplies (unexpired pacing pads/electrodes) for the AED according to the manufacturer's recommendations." BOP Program Statement 6031.04.

[41] The BOP's Health Services Administration policy requires all healthcare practitioners, including HSAs and Assistant HSAs, to maintain CPR and AED certification based on established standards. BOP Program Statement 6010.05, Health Services Administration, June 26, 2014, www.bop.gov/policy/progstat/6010_005.pdf (accessed April 14, 2023).

Without a BOP-wide policy relating to cut-down tools, each BOP institution is left to determine its own practices for use, possession, and placement of cut-down tools. While we learned that not all staff at FCC Hazelton and USP Thomson carried their own cut-down tools at the time of our visits, all staff at FTC Oklahoma City carried a cut-down tool on their duty belt. Several staff at USP Thomson expressed concerns with supplying every staff member with their own cut-down tool because of the additional security considerations that a cut-down tool may present, such as the risk of staff misplacing the tool and potentially allowing inmates to find it and use it as a weapon. As shown in the photograph to the right, each of the three institutions we visited used different cut-down tools of various builds and sharpness.



FCC Hazelton          FTC Oklahoma          USP Thomson

Comparison of Cut-down Tools Issued at Site Visit Institutions

Source: OIG (Product Name Blurred in Image on Right)

Because the ability to save a life during a hanging attempt is predicated on a timely response and removal of a ligature, the BOP repeatedly recommended in its Psychological Reconstruction Reports corrective actions that included placing cut-down tools in each housing unit and issuing each Unit Officer their own cut-down tool to ensure quick response to hangings. In November 2021, the BOP told us that it was drafting a new cut-down tool policy; in July 2023, the Assistant Director of the Correctional Programs Division (CPD) sent a memorandum to all Wardens, stating that effective October 1, 2023, staff at all security levels with a primary duty in a housing unit are required to obtain a cut-down tool at the beginning of their shift. The memorandum further stated that all cut-down tools currently in circulation were to be replaced by the end of FY 2023 with a standardized, approved cut-down tool. In late September 2023, an updated Central Office guidance memorandum sent to all Wardens stated that due to supply chain issues the requirement for certain staff to carry cut-down tools would be implemented on December 31, 2023. As of August 2023, the BOP had not finalized a new cut-down tool policy. We support the BOP's recent effort to establish a standardized policy on cut-down tools, and we recommend that the BOP ensure that cut-down tools in working order are accessible to staff in each housing unit at each institution, that staff are trained on proper use of the tool, and that the BOP determine whether staff should be issued and required to keep their own cut-down tool on their duty belt during their entire shift.

*Institutions Need Gurneys with Better Maneuverability*

After initiating life-sustaining measures during an inmate emergency, when appropriate, staff are to transport the injured inmate quickly and safely to a medical treatment area, according to recommendations from Psychological Reconstruction Reports.[42] Various factors such as the size of the affected inmate, as well as the distance staff must transport the inmate to receive appropriate care, necessitate that staff have access to reliable gurneys that are easy to maneuver. We found that at least 29 of the 344 inmate deaths in

---

[42] In response to a draft of this report, the BOP noted that transportation to a medical treatment area is not always indicated and that there may be instances in which it would not make sense to move an inmate to the institution's clinic, such as an incident that occurs after hours when no medical staff are present at the institution.

our evaluation scope involved staff not timely bringing or properly using a gurney or backboard.  We also found that the BOP documented instances in which staff did not transport injured inmates to Health Services for continuation of care because the institutions had only a backboard with no wheels, which would not have allowed for the continuation of CPR while transporting the inmate.

For one of the suicides that occurred at a multilevel BOP institution, the Psychological Reconstruction Report noted that only a limited number of staff could fit in the elevator when transporting an injured inmate to Health Services because the institution's gurney was an older model that took up much of the space.  During this incident, the two healthcare providers who accompanied the inmate in the elevator reported that they quickly became exhausted and were unable to continue to provide appropriate care, despite alternately performing CPR compressions.  Multiple other suicide reconstructions similarly recommended that institutions purchase new gurneys that can be raised or lowered with ease, allow better maneuverability, and have smaller dimensions so that more staff could accompany the inmate and continue CPR.  Despite these institution-specific recommendations, there are currently no BOP polices that specify the type and placement of gurneys within BOP institutions.  Without sufficient medical transport to facilitate an inmate's transfer to Health Services or Emergency Medical Services, necessary CPR may be prematurely discontinued.  We recommend that the BOP ensure that each institution has a sufficient number of maneuverable gurneys in strategic locations to provide proper medical response during inmate transport.

## Staff Did Not Consistently Utilize Clear, Descriptive Radio Communications to Describe Inmate Medical Emergencies

Accurate, clear, and descriptive communication about the nature of the emergency and transmission of important details helps prepare responding staff to bring appropriate medical supplies such as first aid supplies, an AED, cut-down tool, gurney, or naloxone, which in turn can improve the quality of care rendered.  Further, properly identifying and announcing emergencies via the radio contribute to adequate response times.  However, we found that, in at least 21 of the 344 inmate deaths that occurred during our evaluation scope, there were deficiencies regarding radio communications, including staff omitting critical information or providing inaccurate information concerning a medical emergency.  These deficiencies impeded the ability of responding medical staff to fully understand the nature of the medical emergency and, in some cases, as indicated in BOP documentation we reviewed, to arrive at the scene with all necessary medical equipment.

During our site visits to BOP institutions, BOP medical staff told us that their institution had no standardized method to call for medical assistance.  Further, medical staff told us that the announcement of a medical emergency often includes very little information.  For example, medical staff told us that, in the case of a medical emergency related to an inmate hanging, they might receive vague radio instructions, such as "Medical, I need you to step up" or "Medical emergency in Fox Unit," instead of clear, explicit information about the events at the scene.  In the cases of one inmate suicide and one inmate homicide, internal BOP reports found that staff did not announce a medical emergency when they should have.

When staff make a vague emergency announcement or do not announce an emergency, responding Health Services staff are unable to fully understand the nature of the medical situation until they arrive on the scene and, therefore, may not be able to respond most effectively.  To ensure that inmates needing emergency medical assistance receive appropriate aid, we recommend that the BOP issue standard,

enterprise-wide guidance and training to staff on using the radio to communicate clear, descriptive information during inmate medical emergencies.

## Correctional Officers' Hesitancy to Administer Naloxone May Thwart Chances of Opioid Reversal in Unconscious Inmates Suspected of Overdose

According to the BOP's Health Services Division (HSD), naloxone blocks the effects of opioids and can be lifesaving when used to reverse opioid overdose. However, staff hesitancy in administering naloxone in a timely manner may hinder delivery of the lifesaving drug to inmates who are experiencing an opioid overdose. While some Correctional Officers we interviewed stated that they were trained and comfortable in administering naloxone in the event of a suspected opioid overdose, medical staff we interviewed stated that Correctional Officers might hesitate to administer naloxone during overdose incidents. As noted in the BOP's Challenges to Effectively Interdict Contraband section below, while not all overdose deaths were caused by opioids, 20 percent (70 of 344) of the inmate deaths during our evaluation scope were due to drug overdose.

Two BOP medical staff members we interviewed told us that they believe that, despite being trained in administering naloxone, Correctional Officers would wait for medical staff to arrive and administer naloxone because Correctional Officers were uncomfortable administering naloxone themselves. Another BOP medical staff member from a different institution stated that Correctional Officers are hesitant to administer naloxone before medical staff arrive. Multiple medical staff noted that it takes time for medical staff to arrive at the scene of an emergency, and one medical staff member stated that Correctional Officers are capable of administering naloxone to inmates.[43] We are concerned that staff hesitancy in administering naloxone could impair critical lifesaving efforts; the BOP should ensure that all staff are prepared to timely administer naloxone to an unconscious inmate suspected of having overdosed on opioids.

In five cases of inmate death during our scope, we found multiple issues related to naloxone administration, such as staff failing to administer naloxone to an inmate, staff confusion regarding the provision of naloxone, and naloxone not being readily available when needed. However, as described in the Lack of Available Information about Inmate Deaths section, the absence of BOP in-depth After Action Reviews for accidental and unknown deaths prevents us from having full visibility into the prevalence of staff and operational deficiencies surrounding these types of deaths, including whether naloxone administration issues existed.

Ensuring that staff are trained and comfortable with the timely administration of naloxone is critical to helping combat the effects of an inmate's suspected opioid overdose. To ensure that staff are prepared to treat such inmates, the BOP requires all staff to receive initial training on nasal naloxone administration, followed by annual refresher training thereafter.[44] However, after the BOP began to require nasal naloxone training for staff, at least half of BOP institution staff failed to complete refresher training in FYs 2020 and

---

[43] According to the Centers for Disease Control and Prevention, naloxone is not harmful if administered to someone who is not overdosing on an opioid. Centers for Disease Control and Prevention, "5 Things to Know About Naloxone," www.cdc.gov/drugoverdose/featured-topics/naloxone.html (accessed February 8, 2024).

[44] BOP Program Statement 1610.01, Naloxone Procedures and Protocol for Reversal of Opioid Overdose, December 17, 2020, www.bop.gov/policy/progstat/1610.01.pdf (accessed February 8, 2024).

2021.  As Table 6 below shows, according to figures the BOP reported to us, most BOP staff received the initial naloxone training after it was initiated BOP-wide in 2018 but the BOP has not ensured that all staff continue to meet refresher training standards.

Table 6

Percentage of BOP Institution Staff Who Completed Initial and Refresher
Nasal Naloxone Administration Training, FYs 2018–2021

|  | Initial Training | Refresher Training |
|---|---|---|
| FY 2018 | 81% | 7% |
| FY 2019 | 83% | 77% |
| FY 2020 | 84% | 47% |
| FY 2021 | 94% | 50% |

Source:  BOP

Accordingly, we recommend that the BOP ensure that staff receive both the initial and refresher naloxone training and are fully prepared to administer naloxone to an unresponsive inmate suspected of having experienced a drug overdose.

## A Lack of Available Information about Inmate Deaths Limits the BOP's Ability to Potentially Prevent Future Inmate Deaths

Our evaluation identified a variety of shortcomings in the BOP's processes to gather and maintain evidence and other relevant information necessary to fully identify and address issues surrounding inmate deaths.  In the immediate wake of certain inmate deaths, we identified weaknesses in the BOP's collection and preservation of evidence at the scene of a death, which is particularly problematic in the case of homicides.  In addition, we found that there were deficiencies in the BOP's completion and organization of the mandatory records required by policy for all inmate deaths, which limits the BOP's ability to obtain a full picture of the circumstances of these deaths and can limit BOP officials' ability to take prompt action to identify and address emerging issues.  Further, we found that the BOP consistently conducts in-depth After Action Reviews only for deaths deemed suicides, though we believe that the BOP would benefit from conducting these reviews for the other types of inmate deaths relevant to our scope.  Conducting these reviews more universally for homicides and implementing this review for other inmate deaths—including those that would otherwise be categorized as accidental or unknown—should help the BOP better understand the circumstances surrounding these deaths.  In addition, while some of the actions that the BOP requires after an inmate death can result in insights on contributing factors and recommendations for improvement, we found that: (1) their impact is curtailed by the localization of some of these processes and (2) the BOP's Central Office does not consistently analyze this information for trends and applicability across the BOP, as we have done in this report.  The BOP can assess this information more broadly and consistently to help identify, track, and address recurring factors and challenges that may have contributed to deaths among inmates in its custody.

## Staff Did Not Consistently Follow Post-Incident Evidence Recovery Protocols

In the immediate aftermath of inmate deaths, including those resulting from homicides, suicides, and deaths occurring under unknown circumstances, the BOP utilizes Evidence Recovery Teams (ERT) to gather and collect evidence and to preserve and process crime scenes.[45]  In addition, to document the events BOP staff who respond to the scene draft memoranda, which are then attached to the Report of Incident form generated for each death.  The role that an ERT plays following an inmate homicide is especially important because an ERT collaborates with the Federal Bureau of Investigation, the regional U.S. Attorney's Office, and other law enforcement agencies to pursue the successful prosecution of crimes that occur at federal prisons.  Successful prosecution of inmates who commit crimes against staff or other inmates enhances the safety and security of inmates, staff, and the public.  When ERT members or other responding BOP staff do not properly perform their responsibilities post-incident, it can impair the timely completion of criminal and disciplinary investigations.

We identified issues related to post-incident documentation and evidence recovery across BOP institutions in numerous inmate deaths in our evaluation scope.  These issues included staff not sufficiently collecting, preserving, or documenting evidence of the crime; not preserving video footage; or not conducting mass inmate interviews, in addition to incomplete or unsigned staff memoranda describing the events of the incident.  Further, and of particular concern, we found that the BOP identified issues related to post-incident evidence recovery and documentation in almost half of the 89 inmate homicides in our scope.  For example, for one of the inmate homicides, the BOP's After Action Report concluded that staff assigned to collect evidence—such as clothing and photographs of the victim at the local hospital where the inmate was taken—were not trained in evidence-gathering procedures.  In another inmate homicide case, the After Action Report concluded that the ERT could have included more detailed information—such as the locations of bloodstains and the weapons utilized—in the sketches of the crime scene.  For both these and many other homicides, the BOP recommended that staff receive training to properly secure and document evidence, especially those staff in ERT and Special Investigative Services (SIS) roles.

ERT members are required by BOP policy to complete 8 hours of training quarterly, complete one major mock scenario and a Prison Rape Elimination Act course annually, complete four Federal Emergency Management Agency courses, and be recertified every 2 years.  However, we learned that dedicated trainings for some specialized positions, including ERTs, were delayed at the institutions we visited due to the COVID-19 pandemic.  Some staff at USP Thomson and FTC Oklahoma City expressed concerns about insufficient training for the ERT at their institution.  One SIS staff member from FTC Oklahoma City told us that the ERT had not received the required quarterly ERT training in the past few years due to the pandemic.  While we did not evaluate the extent to which ERT members had completed all required training across BOP institutions, we are concerned about these reports from staff at two institutions and the fact that ERT issues were prevalent among the homicides in our scope.  Ensuring that all ERTs are properly trained across the BOP is of utmost importance given the essential role the teams play in preserving and processing incident scenes, as well as in recovering evidence following attempted homicides, unexplained deaths, and suicides.

---

[45]  ERTs, composed of a minimum of eight BOP staff members, are described in BOP policy as part of the agency's multi-pronged strategy for responding to critical incidents.  ERTs are to work alongside other BOP Crisis Management Teams in an integrated fashion to resolve critical incidents safely.  ERTs employ various protocols, including standardized collection of evidence and related documentation, such as conducting mass interviews, collecting staff memoranda, producing an evidence recovery log, collecting fingerprints of inmates involved in an incident, and taking photographs and making sketches of the crime scene.

Accordingly, we recommend that the BOP ensure that all ERTs are properly trained on post-incident evidence recovery protocols.

## The BOP Could Not Demonstrate that It Consistently Completed Reviews Required after Inmate Deaths, Limiting Its Ability to Gain Insights on These Deaths

As described in the Introduction and Table 1 above, BOP policies and procedures require certain actions and reports in the event of an inmate death.  However, for some of the deaths in our scope the BOP was unable to produce the complete records required by its policies.  Moreover, the BOP requires in-depth After Action Reviews for some, but not all, types of inmate deaths.  These shortcomings together limit the BOP's ability to fully understand the circumstances that led to inmate deaths and to identify steps that may help prevent future deaths.  Overall, we found that, for 43 percent (149 of 344) of inmate deaths that occurred during our scope, the BOP was unable to produce documents required by its own policies.

In general, the BOP adequately generated and could produce for nearly all the deaths in our scope the Report of Incident forms (BP-583) required for any inmate death.  However, for over one-quarter (90 of 344) of inmate deaths, the BOP could not provide evidence that the institutions where the inmate deaths occurred had submitted the required 24-Hour Death Notices to Central Office.  We are concerned that institutions' failures to complete 24-Hour Death Notices delay Central Office staff's ability to promptly gain insight into deaths that occur at the institutions they oversee and limit the BOP's ability to address issues related to these inmate deaths.

Further, the BOP could not provide complete records showing that additional required reviews—namely, the BOP's internal MLMR and the non-BOP External Consultant Review (ECR)—were completed for all inmate deaths in our scope.  BOP policy requires that institution personnel (Mortality Review Committee members) complete an MLMR within 30 days of any inmate death and submit their report to the Office of Quality Management (OQM) in the BOP Central Office's HSD.  However, the BOP could not provide evidence that it had conducted an MLMR for nine deaths in our scope.  This is concerning given that the MLMR, which is a review largely conducted by clinical personnel, is designed to shed light on both the sequence of events leading to the death and the cause of death.

Of particular concern is the fact that the BOP was unable to produce evidence that ECRs were conducted for many of the deaths in our scope.  Specifically, the BOP could locate and provide records of ECRs for only 78 percent (268 of 344) of the inmate deaths, as shown in Table 7 below.  BOP policy requires that an external physician consultant review the MLMR completed by BOP personnel, as well as any other accompanying information, such as the inmate's medical record.  The ECR culminates in a report with the external consulting physician's perspectives on strengths and weaknesses in healthcare delivery surrounding the death, as well as any recommendations for improvement in local practices at the institution where the death occurred.

Table 7

Availability of ECRs, by Death Type, FYs 2014–2021

| Type of Death | Number of Deaths | Records Available | Percent |
|---|---|---|---|
| Suicide | 187 | 149 | 80% |
| Homicide | 89 | 64 | 72% |
| Accident | 56 | 45 | 80% |
| Unknown | 12 | 10 | 83% |
| Total | 344 | 268 | 78% |

Source: OIG analysis of documentation the BOP could produce for the OIG

In addition, although BOP policy requires the collection of death certificates as soon as they become available from the external parties that complete them, the BOP could produce death certificates for only 66 percent (227) of the 344 deaths in our scope, FYs 2014–2021. While a senior official from the BOP's HSD confirmed that it has always been the expectation that, at minimum, a death certificate be collected to complete the inmate's medical records following their death, 117 death certificates were unavailable for the deaths in our scope.

The BOP explained that some required documents may be missing because institutions did not notify the correct office that would be responsible for completing them, the records were never completed, the records were misplaced, or local institutions did not properly submit them to Central Office. The BOP's inability to locate or provide the required records described above raises concerns about the rigor of its processes to maintain complete and accurate information on the deaths of individuals in its custody. It further undermines confidence in the BOP's ability to track and understand the deaths among individuals in its custody, as well as to potentially identify trends that could help prevent future deaths from occurring. We recommend that the BOP develop procedures to ensure that all required death-related records are completed and collected consistently and in accordance with established deadlines.

## The BOP Requires After Action Reviews Only for Suicides

After Action Reviews are a tool available to the BOP that can be helpful in understanding the circumstances that gave rise to a major incident and corrective actions that may be warranted, as they include an analysis of the events surrounding the incident, identify any deficiencies in the BOP's handling of the incident, and may contain conclusions and recommendations. The BOP may conduct an After Action Review after major incidents, including shootings, major fires, work or food strikes, disturbances, escapes, and hostage situations; however, we found that the BOP's use of After Action Reviews varied for occurrences of inmate deaths. While such reviews are required for any inmate suicide, they are discretionary for other types of inmate deaths such as homicides and accidental drug overdoses.[46] The BOP's discretionary approach on After Action Reviews is similar to its practice of collecting autopsy reports for inmate deaths, which we found

---

[46] During our scope, the BOP did not conduct any After Action Reviews for accidental drug overdoses.

is left to the discretion of local BOP officials and which were available for only 282 (82 percent) of the 344 deaths in our scope.

In the event of an inmate death deemed a suicide, BOP policy requires the completion of an After Action Review and subsequent report (commonly referred to as a Psychological Reconstruction Report).  As described in the Introduction, that report details the circumstances surrounding the suicide, conclusions about the incident, and recommendations to the institution where the death took place.  BOP policy requires all possible evidence and documentation to be preserved to provide data and support for the investigators conducting the psychological reconstruction.  One official acknowledged that without psychological reconstruction information it would be difficult for the BOP to independently identify deficiencies or underlying contributors to a suicide and any larger management issues related to the death.  For the 187 suicides in our scope, the BOP was able to produce all but 5 of the required Psychological Reconstruction Reports.

---

**Content and Potential Value of After Action Reports**

To illustrate the value of After Action Reports, we compared available BOP documentation for two stabbing homicide deaths that occurred at the same institution during FY 2014, both of which took place against inmates classified at high security levels and at MHCL 1.  The BOP completed an After Action Report for only one of these homicides.  For the inmate homicide for which the BOP did not complete an After Action Report, BOP documentation did not identify any issues surrounding the inmate's death.  In contrast, regarding the inmate homicide for which the BOP had completed an After Action Report, the BOP's After Action Report identified multiple staff and institutional deficiencies related to the homicide and made 18 recommendations to the institution.  These included issues with interdepartmental communication, metal detection procedures, incomplete documentation, inadequate inmate assessment, gurney inaccessibility, evidence recovery, and inadequate camera angles.  The After Action Report recommended that staff fully employ metal detectors, that gang affiliations be fully explored and documented, that gurneys be staged in closer proximity, that institutional cameras be assessed for optimal performance and better coverage, and that the ERT be activated for such incidents.

Source:  OIG review of BOP documentation

---

In the event of an inmate homicide, however, After Action Reviews are not required by BOP policy.  Instead, the decision to conduct an After Action Review is at the discretion of the Regional Director with geographic jurisdiction.  Of the death documents that we reviewed for inmate homicides, we found that After Action Reports provide the greatest insight into circumstances surrounding the deaths and deficiencies that may have contributed to inmate homicides during our evaluation scope.  However, we found that Regional Directors did not appear to have initiated After Action Reviews for 39 out of the 89 (44 percent) homicides that occurred during our evaluation scope, as the BOP could not produce the reports that would have resulted from them.  See the text box above for more information about After Action Reports.

For deaths determined to have occurred under accidental or unknown circumstances, the BOP does not require After Action Reviews.  The standard required documents that the BOP must produce following all inmate deaths—Report of Incident (BP-583), 24-hour Death Notice, MLMR, and ECR—provide some information about the circumstances surrounding all death incidents.  However, compared to the BOP's After Action Reports (including the Psychological Reconstruction Reports), those four documents generally contain less detail about the circumstances of the inmate deaths and any deficiencies in either the BOP's handling of the inmates prior to their deaths or the BOP's response to the incidents.



Figure 9

All Drug Overdose Deaths by Fiscal Year, FYs 2014–2021

Source:  OIG analysis of BOP data

By not requiring the completion of After Action Reviews for homicides, accidental deaths, and deaths under unknown circumstances, the BOP is missing an opportunity to identify factors that may have contributed to these deaths, especially because autopsies are discretionary and not required for inmate deaths.  For example, during our evaluation period there was a total of 70 deaths involving drug overdose, including 17 ruled as suicides, with the remaining 53 categorized as accidental or unknown.  (Figure 9 above provides an overview of overdose-related deaths.)

For 15 of the 17 drug overdose deaths deemed suicides in our scope, the BOP completed the required After Action Reviews and made findings—such as staff not conducting thorough rounds or cell searches—that can provide insights on potential shortcomings and measures that could reduce the risk of these outcomes.  However, because the BOP does not complete similar reviews for accidental and unknown deaths, information that would be useful in understanding dozens of other inmate deaths—such as how inmates acquired or amassed drugs or how staff missed opportunities to intervene prior to a death—is unavailable.  This limits the BOP's ability to not only detect deficiencies that may have contributed to individual inmates' deaths but also to use lessons from past events to inform its management practices and lessen the risk of additional deaths.  Central Office officials agreed that the reports resulting from After Action Reviews provide more detailed information surrounding an inmate's death than other required death documents such as MLMRs.  Given that After Action Reviews compile information that provides a more complete picture of the circumstances leading to a death and can help the BOP identify factors and deficiencies that may help it reduce the risk of future deaths, we recommend that the BOP assess the benefit and feasibility of expanding its policy requiring After Action Reviews to include reviews of all inmate homicides and deaths by accidental and unknown factors, not just for inmate suicides.

## The BOP Can Enhance Its Follow-up on Findings and Recommendations from Inmate Death Reports

As described throughout this report, after an inmate death a variety of different reviews and reports may be completed, each of which involves different personnel, disciplines, and processes at the BOP. The BOP's practices to undertake and track improvement measures in response to the findings and recommendations from the various reviews generated in the wake of an inmate death depend on several factors, including the type of death, the type of report, and the content of the recommendations. Although the BOP made some changes during our evaluation scope to help improve its tracking and follow-up for internal and external review recommendations, we identified weaknesses in these processes, stemming from unclear policy as well as ambiguous and decentralized areas of responsibility. We also found that the BOP does not have a robust mechanism to collect and track the substance of post-death report recommendations at an enterprise-wide level and that many resolution activities have historically been delegated to the local institutions. This limits the BOP's ability to fully understand any systemic factors contributing to inmate deaths and to identify and implement changes that may help prevent future inmate deaths.

### After Action Reports

After Action Reports present an opportunity for the BOP to gather insights on trends and collect recommendations, although they are required only for the subset of inmate deaths deemed suicides and are discretionary for homicides. If an After Action Report is completed, follow-up responsibilities vary depending on the type of death, and we identified ambiguities and inconsistencies in the BOP's policy and practices in this area.

#### Suicides

The BOP's Suicide Prevention policy, effective since 2007, designates the BOP's Central Office with responsibility for tracking the implementation of corrective actions in response to findings of After Action Reports for suicides (also known as Psychological Reconstruction Reports). This policy requires the BOP Central Office's Program Review Division (PRD) to collect and submit completed After Action Reports to a Special Review Committee, which is responsible for reviewing these reports and assessing whether recommendations for corrective action will be addressed at the national or local institution level. The PRD is designated in this policy with responsibility for monitoring institutions' responses to those recommendations. Specifically, the policy requires that the Senior Deputy Assistant Director of the PRD track "corrective actions and [verify that] the corrective action is accomplished."

During the first 4 years of our scope, from FY 2014 through FY 2017, however, we found that the BOP did not require institutions to respond to Psychological Reconstruction Report recommendations or submit Corrective Action Plans to Central Office. Instead, the BOP deferred to local institutions on tracking and addressing recommendations. The BOP did not centrally track institutions' completion of these recommendations during that time; therefore, Central Office officials we interviewed could not speak to their implementation. Further, when we sought clarification on the role of the Special Review Committee referenced in BOP policy describing the review process for Psychological Reconstruction Reports, PRD personnel with whom we spoke were not able to identify who oversaw the Special Review Committee or who sat on it.

Since FY 2018, the BOP has required institutions to respond to Psychological Reconstruction Report recommendations through submission of a Corrective Action Plan to Central Office. Yet, we found that

there is ambiguity surrounding which Central Office personnel should be responsible for verifying corrective actions addressing these recommendations. BOP policy states that the responsibility for verification of institutions' corrective actions belongs to the PRD. However, we found that in practice the Psychology Services Branch (PSB) at Central Office is primarily responsible for recommendations made in Psychological Reconstruction Reports, according to personnel we interviewed from both the PRD and the PSB. As described by a PSB official we interviewed, within 60 days of receiving Psychological Reconstruction Report recommendations, the institution where the suicide occurred must produce a memorandum with a Corrective Action Plan to address the recommendations; the PSB then decides whether to accept or reject this plan. If the PSB finds the proposed corrective actions insufficient, the process repeats on a 30-day cycle until the PSB accepts the institution's proposal. However, neither these timeframes nor the PSB's role in reviewing institution responses to Psychological Reconstruction Report recommendations is codified in policy.

In November 2021, consistent with a suggestion by a BOP task force convened earlier that year to evaluate methods for reducing suicides, the Assistant Director of Central Office's Reentry Services Division (RSD) stated in a memorandum to all Regional Directors that agency leadership needed to be better informed about emerging trends in inmate suicides and the recommendations generated by Psychological Reconstruction Reports. The memorandum included a new psychological reconstruction "Quarterly Report" prepared by Central Office, which detailed common recommendations from Psychological Reconstruction Reports associated with the suicide deaths that occurred across the BOP during that quarter. The goal in sharing the Quarterly Report was to help institutions learn about and implement suicide prevention best practices—which the memorandum acknowledged sometimes outpace policy requirements. Notably, the memorandum urged, but did not require, Regional Directors to share the Quarterly Report with regional staff and Wardens. This Quarterly Report highlighted several of the issues we identified throughout this evaluation as areas for improvement, including recommendations to offer substance abuse treatment to inmates, eliminate single-celling of inmates, increase staff access to cut-down tools, and improve staff completion of necessary documentation related to inmate deaths.[47]

Although we find this Quarterly Report to be a positive step, as recently as 2023 we found that the BOP does not centrally track the contents of Psychological Reconstruction Report recommendations in a single file for all BOP institutions. Instead, Central Office maintains separate files for each deceased individual, without the ability to sort by recommendation topic area across more than one individual or institution; its central tracking is limited to showing the overall status of whether an entire Psychological Reconstruction Report has been adequately addressed and closed, without specifics of the recommendations. As a result, Central Office personnel lack the ability to view recommendations for more than one inmate at a time or sort recommendations for all deaths by keyword or relevant operational area. We believe that this limits the BOP's ability to identify any enterprise-wide trends related to inmate suicides.

We are concerned that the BOP has not had a clear and consistent process for reviewing Psychological Reconstruction Reports in the wake of suicides, assessing them for broader trends, and holding institutions accountable for corrective actions in response to their findings. The BOP's past practice of not requiring

---

[47] In response to a draft of this report, the BOP stated that, in addition to its Quarterly Reports, it disseminates guidance and talking points for Wardens. The BOP further stated that the PSB presents lessons learned during annual staff training and national psychologist trainings, including Psychologist Familiarization, Chief Psychologist Familiarization, and Brief Cognitive Behavioral Therapy for Suicide Prevention.

institutions to demonstrate corrective actions limited Central Office oversight and institutions' accountability during a period when numerous suicides occurred at institutions across the BOP and when Psychological Reconstruction Reports for these suicides frequently contained similar recommendations.  Even after 2018, when the BOP began requiring institutions to obtain Central Office approval of localized corrective actions in response to these reports, it did not aggregate this content across all institutions and could not readily identify the total number of recommendations made to all institutions during our evaluation period.  A BOP official told us that the Special Review Committee, responsible for assessing whether recommendations should be considered at the national level, had not been active during their tenure.

A PSB official said that most institutions resolved their open Psychological Reconstruction Report recommendations within a fiscal year, and all Psychological Reconstruction Report recommendations made to institutions during our 8-year evaluation scope appeared to have been closed as of September 2023.  However, we are concerned that the BOP missed opportunities to learn from information gathered in the aftermath of inmate suicides and apply lessons from the Psychological Reconstruction Reports to help mitigate the risks of the same issues recurring.  Our evaluation identified problematic patterns in recommendations from these reports, including repeat instances of recommendations made on similar topics, sometimes to the same institution over several years (see the text box for an example).  We concluded that the BOP should improve its processes to ensure that operational deficiencies identified in these reports are adequately remedied and to help prevent them from recurring.

> **Example of Repeat Psychological Reconstruction Report Recommendations:  USP Atlanta**
>
> We identified five AED-related recommendations from FY 2014 through FY 2021 made to USP Atlanta, which had the most inmate deaths during the years of our evaluation scope.  The BOP issued four of these AED-related recommendations to this institution during the last 3 years of our evaluation scope, including one in FY 2019, two in FY 2020, and one in FY 2021.  Three of these recommendations were related to ensuring that AEDs were placed in housing units or located in close proximity to them; the fourth recommended that staff receive refresher training regarding an AED's location in a SHU and emphasized the importance of retrieving an AED immediately after discovering an unresponsive inmate.
>
> Source:  OIG analysis of BOP Psychological Reconstruction Reports

### Homicides

The BOP's Correctional Services Procedures Manual requires Central Office to distribute a consolidated summary of recommendations from After Action Reports for major incidents (including homicides) that occurred across the BOP to all Regional Directors, institution Wardens, and Correctional Services Administrators.[48]  Specifically, the policy establishes that the CPD's Office of Emergency Preparedness is responsible for preparing and distributing these summary reports, and a CPD official explained that distribution of this report generally happened on an annual basis.  According to the policy, all Wardens then should review with their staff each summary that Central Office disseminates and determine whether changes are warranted at their local institutions.

For FYs 2014–2018, the first 5 years of our evaluation scope, the BOP was unable to locate the summary reports required under BOP policy, though a CPD official said that he was not aware of any year in which the

---

[48]  BOP Program Statement 5500.14.

BOP had not issued these summaries. After 2018, there was ambiguity in the frequency with which such reports were required and distributed. We were told that in 2018 BOP Executive Staff gave verbal direction to begin distributing the summary reports quarterly instead of annually, although the BOP was unable to provide evidence that it had issued any quarterly summary reports from FYs 2018–2021. For FYs 2019–2021, Central Office was able to demonstrate that it had prepared and distributed a summary of recommendations from After Action Reports on an annual basis.

As a general matter, we are concerned that the BOP was unable to demonstrate that it consistently compiled and shared with all institutions important lessons that may have been learned regarding inmate homicides for which After Action Reviews were undertaken. Further, Central Office, specifically the CPD, has not conducted its own headquarters-level analysis of After Action Review findings and recommendations for homicides, according to one CPD official we interviewed. Instead, highlights from these recommendations appear to have been circulated sporadically to all the local institutions, with no further action required. The process as described to us limited the extent to which recommendations generated in the aftermath of an incident at one institution, which may have been applicable more broadly across BOP institutions, were socialized across the BOP and assessed for relevance at locations other than where the incident occurred.

With respect to the specific institutions where a homicide occurred, we also found that Central Office does not require local officials to implement or respond to recommendations made in After Action Reports generated after homicides at those institutions. Instead, it is at the discretion of the Regional Director to decide whether the institution where the homicide occurred should respond to or implement these recommendations. Further, according to the CPD, in the instances when a Regional Director may request a response to the recommendations, there is no standardized timeframe for an institution to provide it, although the Regional Director may impose their own deadlines. Although we were told in 2021 that the BOP was considering requiring institutions to provide responses to Central Office, this was not the case through at least August 2023. Under the existing decentralized process, we found that Central Office does not track the status of After Action Report recommendations and lacks insight into any corrective actions taken at the direction of Regional Offices. We are concerned that this lack of a central, standardized, and timebound process does not position the BOP to review and verify that institutions sufficiently implement recommendations generated through After Action Reports and obtain an accurate picture of overall actions taken in response to serious issues identified in the aftermath of inmate homicides.

### Multilevel Mortality Reviews and External Consultant Reviews

As described previously, MLMRs and ECRs are required by BOP policy for all deaths. Although the reports resulting from these reviews are generally less detailed than the After Action Reports, they include observations about the strengths and weaknesses of the BOP's response in individual scenarios and may contain recommendations specific to each incident, with a focus on healthcare.

BOP policy requires each institution to establish a healthcare quality improvement system to measure the effectiveness of healthcare delivery systems and clinical outcomes, identify and reduce errors, and improve overall staff and patient safety. Mortality review is one of nine major areas encompassed by this overall BOP healthcare quality improvement system. MLMRs and ECRs are steps required for all inmate deaths as part of the BOP's mortality review process, which also requires that the OQM at Central Office annually prepare a system-wide analysis of trends from these post-death reviews. Local institution personnel are responsible for conducting MLMRs, while external physician consultants complete the ECRs. As we discuss

further below, local, regional, and headquarters-based BOP officials play different roles in the follow-up on findings and recommendations from the MLMR and ECR reports.

### Multilevel Mortality Review

For each inmate death, BOP policy requires institution personnel to complete an MLMR within 30 days and submit their resulting report to Central Office, specifically the OQM within the HSD. The Warden of the institution where the death occurred must review and sign the MLMR report, and the appropriate Regional Director is to receive a copy. We learned that, while MLMRs commonly contain recommendations, the process for addressing these recommendations varies.

BOP institutions sometimes complete a Root Cause Analysis (RCA) of process and system failures that may have contributed to the inmate death outcome, although we found that this process varies depending on the nature of the death, as well as the content of the MLMR and its recommendations. Under certain circumstances, the BOP requires institutions to complete and submit RCAs to the Medical Director at Central Office (through the appropriate Regional Director's office) within 45 days. For example, an RCA is required in the event of an unexpected death occurrence that may have been associated with the healthcare provided to the inmate. Institutions can also elect to conduct an RCA on their own initiative. However, not all inmate deaths and MLMRs will trigger an RCA. Further, the scope of an RCA may be limited to certain recommendations contained within an MLMR report. According to BOP policy, the RCA review is intended to evaluate healthcare delivery by identifying significant strengths and weaknesses; if completed, the RCA triggers Corrective Action steps to promote and expand strengths and correct deficiencies. Institutions may also undertake Corrective Action steps even if an RCA is not completed, for instance at the request of the Central Office OQM or if the institution proactively decides to identify and complete Corrective Action steps on its own.

We learned that Central Office tracks MLMR recommendations only if they result in an RCA or formal Corrective Action steps described above, as opposed to all recommendations made in MLMRs (see the text box). If an MLMR identifies a weakness that did not rise to the level of requiring an RCA or Corrective Action, Central Office involvement and tracking are not required. Under BOP policy, if MLMRs identify opportunities to improve the quality of care, institutions must incorporate a plan of action for improvement in their local quality improvement programs and quality improvement committees composed of staff at the local institutions should follow up on these improvement measures. As described in BOP policy, the Regional Health Services Administrator (HSA) and the Clinical Specialty Consultant should monitor institution progress and ensure that corrective measures are "implemented satisfactorily." However, according to a Central Office HSD official, in practice it is up to the local institution to track and fix itself any issues identified in MLMRs that did not meet the threshold of requiring an RCA or Corrective Action.

> **MLMR Recommendations from FYs 2014–2021 Not Resolved as of FY 2023**
>
> As of September 2023, available data indicated that the BOP had open or unresolved MLMR recommendations calling for an RCA or Corrective Action from one inmate death in FY 2014. This included recommendations for the institution to hire an additional staff member and develop a single radio channel to help medical staff respond to emergencies.
>
> Source: OIG analysis of data available from the BOP

For instances in which Central Office does become involved in the MLMR process, we found that its tracking was limited to manual entries on a spreadsheet designed to provide the OQM with a status overview and position it to ensure that recommendations are closed out at the end of the year. An OQM official acknowledged that the available data was "very limited" and said that the OQM was considering updating its tracking method through an electronic system to make it more user friendly. According to one official we interviewed, historically the OQM's verification that an institution had adequately addressed MLMR recommendations, via RCA or Corrective Action steps, was a "check the box" process to verify receipt of the RCA or Corrective Action Plan from the institution, without any follow-up with institutions. An OQM representative told us that there "definitely needed to be some improvements" to the MLMR process that was in place prior to 2023, and we identified instances in which recommendations deriving from MLMRs appeared to go unaddressed for many years (see the text box on MLMR recommendations). According to officials we interviewed, beginning in January 2024 the BOP expects to enhance its process to follow up on at least the portion of MLMR recommendations that trigger RCAs or Corrective Action steps by having its Regional Offices check in with the institution nurses who serve in a designated quality improvement role, 6 months and 12 months after implementation, to ensure that the solutions were sustainable, met the intent of the recommendation, and worked as intended.

### *External Consultant Review*

For each inmate death, BOP policy also requires that an external consultant review the MLMR to identify strengths and weaknesses of healthcare delivery. The ECR culminates in a report provided to Central Office's OQM, as well as the Regional Director and the Warden of the institution where the death occurred. The ECR may endorse the recommendations from the BOP's internal MLMR, or it may offer other recommendations.

> **ECR Recommendations from FY 2014–2021 Not Resolved as of FY 2023**
>
> As of September 2023, available data indicated that the BOP had open or unresolved ECR recommendations calling for an RCA or Corrective Action steps for 12 inmate deaths during our evaluation scope. Of particular concern, five of the deaths associated with these recommendations date back to FY 2014.
>
> Source: OIG analysis of data available from the BOP

Like MLMR recommendations, ECR recommendations may require institutions to complete an RCA and/or take Corrective Action steps. Similar to its practice for MLMRs, we found that the Central Office OQM does not track all recommendations from ECRs; it tracks only ECR recommendations leading to an RCA or formal Corrective Action steps, using the same status-oriented spreadsheet described above. If an ECR makes recommendations, the local institution must document compliance with the recommendations and report to the Central Office Medical Director within 90 days on any actions taken in response. An OQM official explained that Regional Offices may provide guidance to institutions on their implementation of RCAs or Corrective Action Plans and that regional officials have access to the central tracking spreadsheet to help them monitor when responses are due from institutions. According to the BOP, its plan to establish 6- and 12-month regional check-ins with institutions beginning in 2024 includes follow-up for RCAs and Corrective Action steps generated from ECRs in addition to those from MLMRs.

ECRs can be a mechanism that brings to light important outside perspectives and recommendations to improve the quality of care provided to inmates. For example, one ECR for a 2015 inmate death recommended that an institution conduct an RCA in response to quality of care concerns; as a result of this RCA, according to the BOP, the institution implemented improvements to local processes and provided

additional training to its physicians on mental health management. However, the value of ECRs is diminished if there is no accountability for ensuring that their findings and recommendations are addressed. For example, the BOP acknowledged that risks potentially persisted nearly a decade after a 2014 ECR identified issues in areas such as medication management in recommendations that were not closed as of 2023. Our own analysis of available data found several instances in which it appears that ECR recommendations were not promptly or adequately addressed.

To assess how all the BOP's post-death reporting processes played out in practice, we reviewed as an example the available MLMR, ECR, and After Action Reports resulting from inmate deaths that occurred at one of the institutions we visited during our fieldwork, USP Thomson. During our evaluation scope, a total of five inmate deaths occurred at this institution: one homicide in FY 2020, followed by two homicides and two suicides in FY 2021. Although multiple post-death reviews and reports were conducted—including MLMRs, ECRs, and After Action Reports, which generated dozens of recommendations—we found that, under the BOP's processes described above, this institution had no requirement to respond to or implement many of the recommendations associated with the deaths (see text box below for further details). We are particularly concerned about the repeated issues that persisted at this institution in multiple deaths during the end of our evaluation period.

---

**Recommendations to USP Thomson Resulting from Five Inmate Deaths**

- **After Action Reports:** The BOP completed After Action Reports for all 5 deaths (2 suicides and 3 homicides), resulting in a total of 44 recommendations. For the 17 recommendations associated with the suicides, the institution was required to submit Corrective Action Plans to Central Office. For the 27 recommendations associated with the homicides, there was no Central Office requirement for the institution to respond to or implement them.

- **MLMR reports:** Three of the five deaths triggered MLMR recommendations; however, based on available BOP data, none of these recommendations required USP Thomson to complete RCAs or Corrective Action steps. Thus, they did not meet the threshold that would trigger Central Office involvement and there was no BOP requirement that the institution implement these recommendations.

- **ECR reports:** Although ECRs are required for all deaths, the BOP was unable to provide ECR reports for four of the five deaths. The one ECR report that was available did not contain recommendations.

Common recommendation topics from the above reports related to staff training, AEDs, and post-incident documentation and evidence recovery. Of note, reports for both inmate suicides that occurred in the same month of FY 2021 recommended that USP Thomson limit single-celling of inmates, which was a practice that USP Thomson had continued despite Central Office's March 2020 directive to limit single-celling to the greatest extent possible.

Source: OIG analysis of BOP documentation

---

In general, we found that, while the BOP has established numerous processes and mechanisms that have the potential to shed light on the circumstances surrounding inmate deaths, identify shortcomings, and yield recommendations for needed improvements, several aspects of these processes limit their utility and efficacy. For example, we found that portions of BOP policy governing the resolution of MLMRs, ECRs, and After Action Reports are ambiguous; moreover, the BOP could not demonstrate compliance with certain aspects of its own policy for many years within our scope. In addition, the BOP's steps for reviewing and addressing the findings of these post-death reports involve many separate and often siloed entities across

the BOP and even within its Central Office. The BOP also has not historically required involvement beyond the local institution level to address many of the different findings and recommendations that can be generated through the post-death reviews, which limits transparency and accountability. Further, even when the BOP has tracked resolution of recommendations in the wake of an inmate death, its centralized tracking has historically focused on status rather than substance and has allowed for some recommendations to persist without closure for nearly a decade. Collectively, these shortcomings limit the BOP's ability to both understand any systemic factors contributing to deaths among inmates in its custody and identify and implement changes that may help prevent future inmate deaths across the federal prison system.

The BOP has taken some steps to collect and assess the information available to it in the form of post-death reports. For example, as required by policy, Central Office's OQM conducted a system-wide trend analysis of all inmate deaths for all but one year of our evaluation scope.[49] In 2021, the OQM analyzed Special Housing Unit (SHU) suicide data and other data on both confirmed and suspected drug overdoses. In addition, according to an HSD official, a recent OQM trend analysis identified recurring issues with naloxone administration at BOP institutions; the official said that the analysis would inform Central Office's future guidance to institutions regarding naloxone. However, as described above, we found that BOP efforts in this area have not always been consistent, prompt, or broad in scope. BOP officials we interviewed noted that the BOP is seeking to make its analysis of trends among inmate deaths more objective and consistent, though they acknowledged that past activities such as the categorization of types of death could have been variable and subject to interpretation. A BOP official told us that they are in the process of changing some of their practices for the tracking and closure of findings and recommendations from post-death reviews and expressed a desire to automate some of the BOP's data processes to improve the accuracy, timeliness, and breadth of its analysis. Improvements in these areas are necessary to promote transparency and enhance accountability on issues surrounding inmate deaths across the BOP. Additional sections of this report contain OIG observations and recommendations based on our own review of the available records for each of the deaths in our scope, which the BOP has not fully leveraged for insights on deaths among inmates. To better enable it to understand and manage the issues surrounding inmate deaths, we recommend that the BOP clarify responsibility for tracking at an enterprise level the reports and recommendations required in the wake of an inmate death by suicide, homicide, accident, or unknown factors and assess the information contained therein for broader trends, applicability, and implementation.

## Long-standing Operational Challenges, Such as Contraband Interdiction, Further Impair the BOP's Ability to Reduce the Risk of Inmate Deaths

The OIG has repeatedly identified long-standing operational challenges that negatively affect the BOP's ability to operate its institutions safely and securely, some of which may increase the risk of inmate deaths. Those challenges include insufficient contraband interdiction; staff failures to follow BOP policies and procedures; an outdated security camera system; staffing shortages; and an ineffective, untimely staff discipline process. During this evaluation, one or more of these same operational challenges were identified—by both the BOP in its post-death reviews and the OIG in our documentation reviews—as

---

[49] According to the BOP, it did not conduct this analysis in 2020 due to resource limitations stemming from the COVID-19 pandemic.

contributing factors in many of the inmate deaths in our scope.  We concluded that these challenges impair the BOP's ability to prevent inmate deaths.

## The BOP's Challenges to Effectively Interdict Contraband Compromise Its Ability to Prevent Inmate Deaths

Reducing the prevalence of contraband is critical to maintaining the safety and security of institutions; but, according to BOP staff we interviewed for this evaluation, its presence in BOP institutions is at an all-time high.[50]  Contraband drugs and weapons pose a direct risk of inmate self-harm or violence that could result in death; accordingly, BOP policy prohibits the possession, manufacture, or introduction of a weapon or sharpened instrument, along with the introduction, making, use, or possession of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia not prescribed for an inmate by medical staff or in excess of a medical prescription.[51]  The BOP considers inmate possession or use of these items to be "the greatest severity level of prohibited acts."  Yet, for nearly one-third of the 344 inmate deaths in our scope, contraband drugs or weapons contributed, or appeared to contribute, to the death.  Many of the deaths in our scope appeared to involve overdoses of both illicit and prescription drugs, and additional deaths were the result of contraband weapons and other items used to effectuate homicide stabbings and suicide lacerations.  While the BOP has employed a variety of strategies to interdict contraband, OIG work has consistently found that BOP staff do not always follow established correctional policies and procedures to detect and intercept contraband and that contraband is prevalent throughout BOP institutions.  During our analysis of BOP documentation for this evaluation, we found dozens of documented instances of one or more correctional practice deficiencies relating to contraband interdiction preceding inmate deaths.  Such deficiencies identified by the BOP included staff not properly searching housing units or cells, insufficiently pat searching inmates, improperly using metal detectors, and insufficiently supervising inmates who serve in roles that allow them the opportunity to serve as conduits for contraband items.  As part of its efforts to help prevent future inmate deaths, the BOP should redouble its efforts to detect and interdict contraband in its institutions, including through efforts to screen staff, inmates, and incoming mail; search housing units

---

[50]  BOP policy, citing 28 C.F.R. § 500.1(h), defines contraband as "material prohibited by law, or by regulation, or material that can be reasonably be expected to cause physical injury or adversely affect the security, safety, or good order of the institution."  Dangerous contraband is further defined as "any drug, alcohol, narcotic, illicit drug, and other intoxicating substance or controlled dangerous substance; any firearm, weapon, explosive, or any lethal or poisonous gas; or any other substance or object designed or used to kill, injure, or disable."  BOP Program Statement 5510.15, Searching, Detaining, or Arresting Visitors to Bureau Grounds and Facilities, July 17, 2013, www.bop.gov/policy/progstat/5510_015.pdf (accessed April 5, 2023).

The regulatory definition of contraband underwent a technical change in 2015, after the BOP policy was issued. Contraband and Inmate Personal Property:  Technical Amendment, 80 Fed. Reg. 45883, 45884 (Aug. 3, 2015).  The current regulatory definition of contraband is:  "material prohibited by law, regulation, or policy that can reasonably be expected to cause physical injury or adversely affect the safety, security, or good order of the facility or protection of the public."  28 C.F.R. § 500.1(h) (2024).

See Appendix 3 for related prior OIG work on contraband introduction.

[51]  BOP Program Statement 5270.09, Inmate Discipline Program, July 8, 2011, www.bop.gov/policy/progstat/5270_009.pdf (accessed March 3, 2023).

and personnel; supervise inmates who have opportunities to facilitate contraband introduction and transmission; and complete updates to its security camera system.

*Contraband Drugs in BOP Institutions Contributed to Inmate Deaths*

The presence of drugs in BOP institutions has contributed to numerous inmate deaths, both directly through overdoses and more indirectly as a contributing factor in suicides, as well as homicides.  According to BOP documentation we examined, 70 of the 344 inmates in our scope died from overdoses of both contraband drugs (synthetic cannabinoids, methamphetamine, fentanyl, or heroin) and prescription drugs used improperly.  Synthetic cannabinoids were the single most prevalent form of drug involved in inmate drug overdose deaths, as BOP documentation indicated that they contributed to nearly one-third (22) of the 70 overdose deaths.[52]  During one of our site visits, a BOP staff member told us that the most prevalent drugs at their institution were synthetic cannabinoids.  A staff member at another institution also stated that synthetic cannabinoids, and occasionally buprenorphine and naloxone, were most prevalent.[53]  In addition to synthetic cannabinoids, drugs that frequently contributed to inmate drug overdose deaths that occurred during our scope included methamphetamine, which contributed to nine overdose deaths; fentanyl, which contributed to eight overdose deaths; and heroin, which contributed to four overdose deaths.[54]

We also found that at least 11 of the 70 inmate drug overdose deaths involved misuse of medications that the BOP had prescribed to the inmates.[55]  Another two inmates died by suicide from overdose of medication that they had purchased from their institution's commissary.  In the case of one inmate who died by suicide from overdose of multiple medications, the BOP noted that the inmate was able to amass a large quantity of medication and that such excess can result in overdose, misuse, or bartering with other inmates.

Inmates' ability to use illicit drugs smuggled into BOP institutions or misuse BOP-prescribed drugs or drugs available at commissary presents significant risks to inmate safety.  In addition to accidental overdose deaths, drug use can directly or indirectly contribute to suicide outcomes, and multiple BOP staff told us that inmates who use drugs may be victims of violence related to drug debt.  A BOP staff member also told

---

[52]  According to the Drug Enforcement Administration, synthetic cannabinoids, colloquially known as K2 or spice, are a category of synthetic drugs that mimic tetrahydrocannabinol, the main ingredient in marijuana.  Abuse of these products can cause severe side effects, including nausea, vomiting, agitation, anxiety, seizures, stroke, coma, and death by heart attack or organ failure.

[53]  The combination of buprenorphine and naloxone did not appear to directly contribute to any of the inmate deaths in our scope, based on our review of BOP documentation.

Buprenorphine, an opioid, and naloxone can be prescribed to treat opioid dependence.  According to the Drug Enforcement Administration, buprenorphine was a controlled substance as of November 2023.

[54]  We present the most common types of drugs that contributed to inmate overdose deaths, but we do not list all the drugs that contributed to overdose deaths.  In some of the drug overdose deaths, multiple drugs contributed to the overdose.  For example, one inmate died by overdose of methamphetamine and fentanyl.

[55]  For the other 59 drug overdose deaths, the death resulted from either illegal drug use or available BOP documentation revealed that the inmate was not prescribed the medication or did not definitively indicate whether the inmate was prescribed the medication that contributed to the overdose.

us that inmates who are under the influence of illicit drugs can behave in an unpredictable, violent, and dangerous manner. Of the 70 drug overdose deaths in our scope, the BOP classified 45 as accidental overdoses. The BOP ruled an additional 17 as suicides; for an additional 8, drug overdose was the immediate cause of death, but the BOP was not able to definitively determine the circumstances leading to the death (resulting in an "unknown" categorization).

In addition to facilitating suicide via overdose, we found that contraband drug use may have contributed to suicide deaths by hanging. For several inmates who eventually died by hanging, BOP documentation noted a role of drug use and identified staff failures to address it prior to the inmates' suicides. A Psychological Reconstruction Report following one of these deaths stated: "It is widely recognized that most individuals who habitually use a harmful substance require repeated offers of support and treatment to learn being how to avoid use. Without offering treatment at all, inmates using substances may feel hopeless about being able to stop on their own. Hopelessness is a risk factor for suicide." In the case of another inmate who died by hanging, a Psychological Reconstruction Report noted that the inmate's recent consumption of a synthetic cannabinoid may have exacerbated their fearfulness, as the drug is known to cause users both short- and long-term effects, including paranoia, hallucinations, and agitation. A Psychological Reconstruction Report for another inmate who died by hanging stated that both BOP staff and inmates at one institution acknowledged that drugs were "widely available" and that "inmates appear to engage in drug transactions with little to no anticipated consequences." In a November 2021 Psychological Reconstruction Quarterly Report to all Regional Directors, the BOP's RSD noted that substance abuse or withdrawal had recently occurred in the cases of two inmates who died by hanging. In the Quarterly Report that included these deaths, Central Office highlighted repeated recommendations to different institutions for the benefit of all institutions, including that they offer substance abuse treatments to inmates in active drug use. The BOP's Quarterly Report further stated that active use and withdrawal from K2 as well as buprenorphine and naloxone elicit depressive symptoms, altered mental status, physical pain, and suicidal ideation. The Suicide Represents a Significant Risk Area section of this report discusses BOP failures in providing evidence-based treatment for inmates facing substance abuse problems, and below we discuss BOP staff failures to limit the availability of contraband drugs.

Inmate drug debt also contributed to various types of inmate deaths, based on the BOP documentation available. For example, Psychological Reconstruction Reports for two inmate suicides by hanging indicated that prior to their deaths the inmates experienced hopelessness about their inability to repay their drug debt. Similarly, an After Action Report following an inmate homicide noted that the inmate victim had accumulated drug debt and other inmates had carried out a deadly assault to clear the inmate victim's debt. A BOP staff member at one of the institutions we visited explained that both spontaneous and premeditated violence often occurred among inmates due to drug debt.

Contraband drugs are introduced into BOP institutions through a variety of methods, including via inmate mail, books, magazines, staff, visitors, and drones. The prevalence of inmate drug overdose deaths and other drug-related deaths in BOP institutions highlights the need for the BOP to interdict contraband more closely and ensure the safe administration of medications that it provides to inmates in its custody. One Psychological Reconstruction Report for a suicide in our scope recommended that the BOP consider policy changes, commissary restrictions, or other strategies to help reduce the likelihood of a pain medication overdose. Another strategy the BOP has approved for institutions that determine it is necessary to help reduce the availability of contraband is the practice of photocopying a portion of general (nonlegal) inmate

mail.[56]  As part of this initiative, staff photocopied the contents of general inmate mail and provided the photocopies, rather than the original contents, to inmates.  All three institutions we visited were photocopying mail, and many institution staff we spoke with told us that this intervention was successful in helping reduce the quantities of illegal drugs entering their institutions.  One Warden estimated that the quantity of contraband drugs in their institution had decreased by nearly 75 percent since staff had begun photocopying inmate mail.  However, staff acknowledged that the program has not gained momentum across the BOP because copying inmate mail is resource intensive.  Given the significant safety risks and threats to inmate livelihood posed by contraband's presence in BOP institutions, we encourage the BOP to explore all strategies for interdicting contraband drugs and other prohibited items in its institutions—a long-standing challenge on which the OIG has made numerous recommendations for corrective action.

In response to a draft of this report, the BOP stated that it has assessed the effectiveness of photocopying inmate mail and determined that photocopying mail is a short-term solution whereas digital processing of paper mail (scanning) provides greater security.  The BOP also stated that it conducted a pilot for digital mail scanning at two BOP institutions with a high incidence of drug overdoses that eliminated synthetic and opioid drugs coming into the facilities via general non-legal mail.  The BOP stated that the digitization of both general and legal mail across the BOP would have a positive impact to contraband interdiction but that the development, implementation, and use of such technology could risk burdening employee resources and requires significant budget resources that have not yet been allocated.

### Contraband Weapons in BOP Institutions Contributed to Inmate Deaths

In addition to contraband drugs, contraband weapons have contributed to numerous inmate deaths in BOP institutions.  We found that at least 37 inmates died from contraband weapon use during our evaluation scope.  For homicides, stabbing by a makeshift weapon was the second most frequent manner of homicide death (after blunt force trauma), with 29 inmate victims dying in this way.[57]  An additional eight suicides in our scope were due to laceration from prohibited items.  BOP policy classifies all weapons, including knives, as "hard contraband," which refers to any items that pose a serious threat to the security of an institution and are not ordinarily approved for inmate possession or admission into an institution.[58]  Some institution Special Investigative Services (SIS) staff told us that inmates can make contraband weapons from materials found inside a BOP institution, such as locks, belts, socks, and bed frames.  BOP staff explained that inmates sometimes also melt down polystyrene foam or plastic to mold into makeshift knives or blades that could bypass metal detectors.  SIS staff at one institution we visited estimated that about 70 to 80 percent of its

---

[56]  BOP policy requires staff to attempt to deliver legal mail to inmates within 24 hours of receipt and processing by the institution.  Institution staff we interviewed during fieldwork observed that it can be challenging to determine the authenticity of legal mail and that counterfeit legal mail from fictitious law offices has been another source of contraband introduction.  According to Special Investigative Services personnel, BOP staff cannot photocopy legal mail due to attorney-client privilege concerns but they can attempt to verify the identities of the originating legal offices.

[57]  There were also 40 homicides by blunt force trauma and 19 homicides by strangulation during our scope.  BOP documentation did not always explicitly identify the items or weapons that may have been used to effectuate a homicide.

[58]  See BOP Program Statement 5580.08, Inmate Personal Property, August 22, 2011, www.bop.gov/policy/progstat/5580_008.pdf (accessed March 3, 2023).

inmates possessed some type of contraband weapon. Below are examples of confiscated contraband weapons at the institutions we visited.



Examples of Contraband Weapons Confiscated at Three BOP Institutions

*Top Left,* Metal Knife at FCC Hazelton; *Top Right,* Plastic Knife at FTC Oklahoma City; *Bottom Left,* Metal Spike at USP Thomson; *Bottom Right,* Garrot at FTC Oklahoma City

Source: OIG

***Institution Staff Did Not Consistently Follow BOP Policies and Procedures to Interdict Contraband***

The BOP relies on established procedures and staff adherence to policy to adequately detect and confiscate contraband, including dangerous contraband that contributes to inmate deaths. However, our review of

BOP documentation pertaining to the 344 inmate deaths in our scope identified numerous instances in which BOP staff did not appear to have followed or fully executed certain correctional policies and procedures to identify and interdict contraband. In connection with the inmate deaths that occurred during our scope, we identified issues regarding the BOP's supervision of inmate orderlies (who may facilitate transmission of contraband), searches of housing units and cells, and use of metal detectors and pat searches. See Table 8 below for a breakdown of these issues by type of inmate death, described in greater detail below.

Table 8

Issues with Staff Searches and Supervision of Inmates, by Death Type,
FYs 2014–2021

| | Orderly Supervision | Housing Unit/Cell Search | Metal Detector/ Pat Search |
|---|---|---|---|
| Homicide | 3 | 8 | 14 |
| Suicide | 7 | 9 | 1 |
| Accident | 0 | 0 | 0 |
| Total | 10 | 17 | 15 |

Note: These 42 instances occurred across 36 inmate deaths.

Source: OIG analysis of BOP documentation from 344 deaths

Inmates with greater freedom of movement around an institution can serve as a mechanism whereby contraband is introduced or transported, and we found that the BOP did not always adequately supervise these individuals in the circumstances preceding some inmate deaths. For example, in a Special Housing Unit (SHU), assigned inmates are securely separated from the general inmate population in a more restrictive setting but other inmates can access a SHU when performing roles such as orderly functions or maintenance. BOP policy recognizes the heightened risk of contraband in a SHU and requires staff to both: (1) search and screen via metal detector each inmate (including orderlies) entering a SHU, and (2) constantly supervise those inmates while they are inside a SHU. BOP policy also requires that items allowed into a SHU must be kept to "an absolute minimum" and that all objects brought into a SHU must be thoroughly inspected and searched to prevent contraband introductions.

Failure to properly supervise inmate orderlies in the SHU may afford assigned SHU inmates the opportunity to receive contraband that may be used in a dangerous manner. As the BOP stated in one Psychological Reconstruction Report, "Orderlies should be under the direct supervision of staff at all times" and "should never be permitted to pass items to other inmates." However, we identified instances in which staff failed to supervise in accordance with policy inmates who entered the SHU prior to 10 inmate deaths. For example, according to BOP documentation, inmate orderlies passed contraband items to SHU-assigned inmates under their cell doors in several instances preceding inmate deaths. In addition, prior to two other inmate deaths, BOP staff did not properly secure inmate orderlies while staff were moving other inmates in the SHU. The BOP should ensure that BOP staff at all institutions properly supervise inmate orderlies in the

SHU to prevent orderlies from passing items into inmate cells and reduce the risk of safety and security incidents that can result in death.

### Staff Failures to Conduct Housing Unit and Cell Searches Presented Opportunities for Inmates to Possess Dangerous Items Prior to Inmate Deaths

Our review of BOP documentation also found that, prior to 17 deaths by homicide or suicide, staff failed to search, or did not sufficiently search, housing units or inmates' cells.[59]  In these instances, some inmates were able to possess a contraband weapon or "excess personal property"—such as medication, razors, or bed sheets—in contravention of restrictions established in BOP policy.[60]  Searches by BOP personnel of inmate housing units are one strategy to detect prohibited items in the possession of inmates, and both Central Office and institution staff we interviewed told us that such searches are an essential way of interdicting contraband.  BOP policy requires each institution to establish procedures to ensure that all housing units and work areas are searched "routinely, but irregularly" to detect contraband.  At two institutions we visited, staff stated that Correctional Officers were expected to search five cells per typical 8-hour shift.  However, during our site visits, institution staff told us that they did not believe that searches occurred frequently enough due to staffing shortages.

BOP documentation evinced that staff failure to conduct searches resulted in inmate possession of contraband items that contributed to inmate homicides and suicides.  For example, in the case of an inmate homicide by stabbing, an After Action Report found that staff needed to initiate routine cell searches, to include examinations of walls and searches for weapons.  In another example, an inmate hid an excessive number of laundry sorting straps that assisted a suicide by hanging.  Additionally, a Psychological Reconstruction Report regarding another inmate suicide stated that, although staff had searched the inmate's cell three times, including the day prior to the inmate's suicide by drug overdose, staff noted in the BOP's electronic contraband tracking database that they did not find contraband.  However, a property search of the cell following the inmate's death revealed that the inmate had amassed over 1,000 pills and the BOP's reconstruction report indicated that, if staff had prevented the inmate from acquiring the large amount of medication, the suicide may have been prevented.  Another Psychological Reconstruction Report recommended that Correctional Services staff develop, provide, and document training for all staff emphasizing the high-risk nature of medication hoarding and the need for frequent and thorough searches commensurate with policy and post orders.  In the OIG's June 2023 report related to the death of Jeffrey Epstein, we concluded that there was an excessive amount of linens in Epstein's cell at the time of his death and that BOP policy did not specifically address the issue of excessive bed linens.  In that report, we recommended that the BOP "evaluate its cell search procedures and make changes as may be appropriate to improve those procedures through policy, training, or other measures."[61]  Separately, our November 2023 Federal Correctional Institution (FCI) Tallahassee inspection report identified serious issues with inmate search procedures at that institution, which potentially afforded inmates the opportunity to

---

[59]  We made this determination based on BOP After Action Reports for inmate homicides and Psychological Reconstruction Reports for inmate suicides.  As we discuss in a previous section of this report, the BOP does not conduct After Action Reviews for accidental deaths and deaths due to unknown factors, which may limit its ability to gain insights into issues related to those deaths.

[60]  BOP policy outlines requirements for identifying, managing, handling, and limiting inmate personal property.  BOP Program Statement 5580.08.

[61]  DOJ OIG, *Custody, Care, and Supervision of Jeffrey Epstein,* Recommendation 7.

introduce contraband, including drugs, into the female prison.  We encourage the BOP to take swift corrective action to address the housing and cell search shortcomings identified in those reports.

### *Staff Use of Metal Detectors and Pat Searches Was Sometimes Insufficient*

In addition to housing unit and cell searches, BOP policy stipulates that inmates themselves are also subject to searches to locate contraband and deter its introduction and movement.  BOP staff use pat searches, visual searches, and electronic devices (including walk-through or handheld metal detectors and whole body imaging devices) to search inmates.[62]  As one institution staff member explained, it is important for Correctional Officers to thoroughly search inmates for contraband items such as weapons on an inmate's person, rather than merely searching common hiding places.

In 15 cases of inmate death (14 of which were homicides), the BOP found that staff did not sufficiently pat search inmates or effectively use metal detectors to screen inmates.  In 11 of these instances, all of which were homicides, BOP documentation specifically noted that staff failed to use metal detectors or pat search inmates when removing inmates from cells, did not confront inmates who activated walk-through metal detectors, and allowed inmates to routinely circumvent metal detectors by simply walking around them.  In addition, the BOP documented a range of other staff failures involving searches of inmates or their belongings prior to their deaths, including failures to visually search inmates upon their admission to the SHU, to immediately search inmate assailants after their placement in hand restraints, to sufficiently screen inmates using whole body imaging devices, and to place inmate laundry bags through a metal detector upon return to the SHU.  For example, according to one Psychological Reconstruction Report, staff did not properly use a whole body imaging device when an inmate arrived at a detention center the day prior to their death, despite the fact that, according to one official cited in the report, all inmates arriving at that institution are expected to undergo screening via the whole body imaging device to detect contraband brought in from the community.  As one After Action Report from another inmate death noted, the "lack of proper search and metal detection procedures contributed to the environment surrounding the incident" and "had proper procedures been in place, the possibility of detecting the weapon would have been significantly increased."

The BOP should ensure that staff routinely search inmates and use all available electronic devices that can help curb the presence of contraband within its institutions.  Metal detectors are among the electronic screening devices routinely used by BOP staff to detect and interdict contraband in its institutions, and the BOP has noted that they can help identify and eliminate hard contraband entering and departing housing units.  An After Action Report following one homicide noted the value of such devices, finding that walk-through metal detectors installed at one institution after an inmate homicide, if used properly and consistently, would help detect and eliminate hard contraband from entering the institution.  Concerningly, however, staff we interviewed at all three of the institutions we visited expressed doubts regarding the effectiveness of metal detectors.  Specifically, staff from all three institutions described issues with metal

---

[62]  For BOP policy on inmate searches and body imaging, see BOP Program Statements 5521.06, Searches of Housing Units, Inmates, and Inmate Work Areas, June 4, 2015, www.bop.gov/policy/progstat/5521_006.pdf (accessed November 22, 2023), and 5522.03, Whole Body Imaging, June 15, 2017, www.bop.gov/policy/progstat/5522_003.pdf (accessed May 10, 2023).

detectors, including that the metal detectors sometimes malfunction, do not consistently detect metal, and may alert randomly when staff with metal keys or chains are nearby.

Further, while some institutions have upgraded to more advanced metal detectors designed to recognize the amount and location of embedded metal in an inmate's body (such as from a previous wound or surgery) via bio-registered inmate profiles, we heard conflicting views on their effectiveness and ability to distinguish this metal from other contraband. One Warden we interviewed expressed the belief that bio-registered metal detectors have helped stop weapons smuggling by inmates who claimed they had embedded metal in their bodies. However, a supervisor of the inmate intake process at the same institution stated that these types of metal detectors do not accurately detect metals in addition to any embedded metals registered on an inmate's metal profile. In response to a draft of this report, the BOP stated that it has a continuous evaluation process in place for all the devices that constitute its contraband interdiction system, including metal detectors, and that as of January 2024 it was evaluating the effectiveness of a selected number of institutions' metal detector systems.

An increased focus by the BOP on detecting and interdicting contraband, while holding inmates and staff accountable, could help reduce the presence of contraband in its institutions and in turn decrease the prevalence of inmate violence, self-harm, and death in BOP custody. To reduce the risk of contraband possession and inmate death, we encourage the BOP to address all open OIG recommendations pertaining to weaknesses in contraband interdiction and search processes that past OIG work has identified across the BOP. This includes not only our recommendation on housing searches from the 2023 Epstein report but also four recommendations from our 2016 review, which was focused specifically on the BOP's efforts to interdict contraband.[63] Among other findings, the 2016 contraband report identified the BOP's own staff as one source of contraband introduction and recommended that the BOP develop uniform guidelines for conducting random pat searches of institution staff; further define and restrict the size and content of personal property that staff may bring into institutions; and better define thresholds for confiscation, investigation, and corrective action. Yet, nearly 8 years since that report's publication, the BOP has not implemented an effective staff search policy to deter the introduction of contraband in this manner. We continue to believe that corrective actions in these areas should be a priority for the BOP and that the BOP must improve its searches of not only housing areas but also staff and inmates, through all methods that are permissible under BOP policy and available to institutions. We recommend that the BOP evaluate existing electronic devices used for inmate screening to identify whether they are functioning as intended, and, if necessary, implement any needed adjustments or upgrades.

## Updating the BOP's Security Camera System Remains a Critical Area for Improvement

Functional security cameras that produce clear footage are also an important tool to help the BOP maintain institutional safety and security, provide evidence in criminal and disciplinary investigations, and help the BOP understand the circumstances leading to inmate deaths. However, despite the critical importance of a well-functioning security system, past OIG work has consistently identified camera system deficiencies as a long-standing issue and this evaluation identified further specific examples of the negative consequences of these deficiencies. Specifically, our evaluation found numerous instances in which security cameras were inoperable, yielded poor quality footage, or did not provide adequate area coverage in circumstances of an

---

[63] DOJ OIG, *Contraband Interdiction Efforts*.

inmate death.  As summarized in a 2021 OIG Management Advisory Memorandum, OIG reviews, audits, and investigations since at least 2013 have repeatedly identified inadequacies in the BOP's security camera system that affected the safety and security of BOP institutions and the ability of law enforcement to hold bad actors accountable for crimes and administrative misconduct.[64]  Although the OIG's 2016 contraband report identified significant BOP security camera system deficiencies—including an insufficient number of cameras to capture alleged misconduct, poor quality video, inoperable cameras, and inadequate video storage—OIG work 5 years later found that these same deficiencies persisted.  In addition, our November 2023 FCI Tallahassee inspection report found that both the female prison and the male detention center lacked the number of cameras necessary to sufficiently observe staff and inmate activities and that these facilities had many blind spots that create opportunities for inmates to engage in inappropriate behavior without detection.

---

### Security Camera Issues at USP Atlanta

We found that camera functionality was a significant issue at USP Atlanta, where, during our evaluation scope, there were 17 inmate deaths, among the highest across all BOP institutions.  Our analysis found that, of the BOP institutions that experienced inmate deaths, USP Atlanta had the greatest number of camera issues, accounting for over 10 percent (7 of 64) of the camera issues we associated with inmate deaths.  During a separate 2023 OIG review of the BOP's systemic operational challenges, we found that camera issues posed serious operational security risks to institutions, including USP Atlanta.  The BOP also documented extensive issues with the security cameras at USP Atlanta:  according to a security report that the BOP completed in August 2020, more than half (142 of 263) of the security cameras at USP Atlanta were either inoperable or not working properly.  The prevalence of camera issues at USP Atlanta is one notable example of the scope of challenges the BOP faces in achieving fully functional camera systems to support safe, secure, and accountable institutions.

The BOP has since implemented changes to USP Atlanta, including infrastructure and security improvements, lowering the security level of the institution from medium to low, and initiating security camera upgrades.  As of September 2023, the BOP reported to the OIG that over 40 percent of USP Atlanta's new digital cameras had been installed to replace analog cameras and that over 60 percent of the required fiber to support the digital cameras had been installed.

Sources:  OIG analysis of BOP documentation and DOJ OIG, *Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues* (May 2023) and *Audit of the Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions* (May 2023)

During this evaluation, we identified many of those same security camera deficiencies at numerous institutions that had experienced inmate deaths (for an example, see the text box).  In at least 64 instances of inmate death, cameras were not present in certain areas, were inoperable, yielded poor quality footage, were improperly synced, or did not provide adequate area coverage.  Significantly, 19 of the deaths that we identified as featuring camera issues were homicides.  The BOP identified that video evidence is a critical element to aid criminal investigations.  An After Action Report following one inmate homicide revealed that a housing unit's camera angle was inadequate to monitor the unit, despite investigative staff reporting that they made numerous requests to adjust the angle prior to the incident.  During all three of our site visits, SIS staff, who are responsible for investigating inmate assaults, suicides, illegal activity, and staff misconduct, told us that their camera systems could have better quality footage, system compatibility, and

---

[64]  OIG, Management Advisory Memorandum:  Notification of Needed Upgrades to the Federal Bureau of Prisons' Security Camera System, E&I Report 22-001 (October 2021), oig.justice.gov/reports/management-advisory-memorandum-notification-needed-upgrades-federal-bureau-prisons-security.  See also Appendix 3.

coverage.  Camera deficiencies have made it difficult for SIS staff to easily identify inmates when reviewing camera footage and thus to hold inmates who commit violence accountable.

The use of video evidence is critical to protecting staff and inmate safety, providing evidence in criminal and disciplinary investigations, and supporting the collection of information in the aftermath of significant events such as inmate deaths.  The OIG's 2021 Management Advisory Memorandum recommended that the BOP develop a comprehensive strategic plan for transitioning to a fully digital camera system that addresses the camera functionality and coverage deficiencies the OIG identified.  Relatedly, the Prison Camera Reform Act of 2021 required the BOP to take similar steps and to report its plan and progress to Congress (see the text box below).

Given that security camera system improvements enhance safety and accountability at federal prisons, we support the BOP's continued efforts to comply with the Prison Camera Reform Act of 2021 and address prior OIG findings and recommendations on deficiencies in security camera functionality.  These efforts would help the BOP curb contraband introduction, reduce the risk of inmate death, and hold accountable individuals whose actions result in death at BOP institutions.

> **Prison Camera Reform Act of 2021**
>
> Enacted in December 2022, the Prison Camera Reform Act of 2021 requires the BOP Director to evaluate, plan, and implement upgrades to the BOP's security camera, land-mobile radio, and public address systems to address deficiencies in those systems.  The stated purpose of the Act is to ensure that all BOP correctional facility systems have the necessary capabilities and coverage to ensure both the health and safety of staff and inmates and the documentation and accessibility of video evidence relating to misconduct, maltreatment, or criminal activity within the facilities.
>
> Source:  Prison Camera Reform Act of 2021, Pub. L. No. 117–321, 136 Stat. 4430 (2022) (codified at 18 U.S.C. § 4042 note)

## Chronic Staffing Challenges May Hinder Efforts to Reduce Inmate Deaths

We found that several staffing-related challenges may collectively hinder the BOP's efforts to mitigate inmate deaths.  Shortages in staffing have been a long-standing issue, and the BOP specifically identified insufficient staffing as an issue in many of the inmate deaths in our scope.  Understaffing in Health Services and Psychology Services positions in particular strained the ability of staff at institutions where inmate deaths occurred to provide adequate care to mentally ill inmates.  To compensate for staffing shortages, institutions we visited used the practice of augmentation (assigning non-Correctional Officer staff to Correctional Officer duties) or mandated available staff to work overtime shifts.  We found that both practices burdened existing staff and potentially contributed to staff fatigue, sleep deprivation, decreased vigilance, and inattentiveness to duty.  Finally, although this evaluation did not include a review of the BOP's staff discipline process, we found that the BOP investigated numerous allegations of staff misconduct that occurred during the deaths in our scope and staff we interviewed found the discipline process lengthy and ineffective, a challenge that the OIG has previously highlighted.  To promote safety and security at its institutions and reduce the risk that understaffing, augmentation, mandated overtime, and ineffective staff discipline contribute to inmate deaths, the BOP must employ a comprehensive approach to address its chronic staffing issues.

**BOP Staffing Shortages, Particularly in Health and Psychology Positions, Hinder the Provision of Treatment and Programs for Mental Health Needs and Substance Abuse Disorders**

Although an assessment of the BOP's staffing across all institutions was beyond the scope of this evaluation, previous OIG work has repeatedly identified staffing as a significant challenge and our fieldwork and document analysis indicated that BOP staffing shortages contributed to the risk factors we identified for the inmate deaths we reviewed.[65]  The BOP specifically identified insufficient staffing as an issue in at least 30 of the inmate deaths in our scope.  During all three of our site visits, institution staff told us that they believed that staffing shortages, especially in Correctional Services positions, were among the biggest challenges to the BOP's efforts to prevent and respond to inmate deaths and that these shortages posed the greatest threat to ensuring the safety and security of inmates and staff.  In addition, understaffing in Health Services and Psychology Services positions can limit an institution's ability to provide treatment and programs that may help mitigate the risk of inmate death, including mental health and substance abuse programming.

Shortages in Health Services and Psychology Services positions occur for a variety of reasons.  Staff we interviewed attributed these shortages to high stress, high workloads, and less-than-competitive pay compared to job offerings in their surrounding communities.  This is consistent with findings from the OIG's work featured in a September 2023 Pandemic Response Accountability Committee (PRAC) report on personnel shortages in federal healthcare programs during the COVID-19 pandemic, which found that the BOP has consistently struggled to fill Health Services positions at its institutions and that numerous factors impair the BOP's ability to recruit and retain Health Services personnel.  These factors include a limited labor pool, location, noncompetitive pay, the hiring process, limited promotion opportunities, challenges of the job, and available schedules.  As described in one Psychological Reconstruction Report that followed an inmate suicide, the "inability to hire and retain psychologists creates an unsustainable workload and leads to the premature loss of other department staff."

At institutions where the inmate deaths in our scope occurred, the Health Services and Psychology Services Departments contended with significant staffing shortages, which hindered these institutions' capacity to manage and address the needs of inmates in their custody.  For example, the BOP's Psychological Reconstruction Report for one inmate suicide concluded that the institution where the death occurred had reassigned psychologists and treatment specialists to correctional posts via augmentation on a daily basis for over 2 months, which significantly hampered the ability of the Psychology Services Department to meet its vital functions, including providing services to mentally ill offenders and facilitating substance abuse and cognitive-behavioral treatment programs.  According to the BOP, the reassignments of these clinical personnel to other duties through augmentation was inconsistent with the Psychology Services Manual, which specifies that psychologists and treatment specialists will not be assigned non-psychology duties except in emergency situations.[66]  In another instance, the Psychological Reconstruction Report for an inmate suicide noted that at the time of the inmate's death the institution operated a Mental Health Care

---

[65]  For prior OIG work on BOP staffing issues, see Appendix 3.  OIG findings in the Waseca report (23-068), Tallahassee report (24-005), and the Pandemic Response Accountability Committee (PRAC) healthcare staffing report (PRAC-2023-03) shed additional light on the extent of challenges the BOP faces in healthcare staffing and some of the effects of those shortages.

[66]  BOP Program Statement 5310.17, Psychology Services Manual, August 25, 2016, www.bop.gov/policy/progstat/ 5310_017.pdf (accessed November 22, 2023).

Level (MHCL) 2 mission without a single Staff Psychologist on the roster, which presented a clear gap in mental healthcare for those inmates.

Our site visits to three different institutions also yielded evidence of understaffing, particularly in the critical areas of Health Services and Psychology Services. At the time of our site visit to Federal Correctional Complex (FCC) Hazelton in November 2021, there was only one Clinical Physician and a contract physician for the entire complex that housed over 3,400 inmates, when the Clinical Director told us that there should be 4 additional staff doctors to adequately provide care for that inmate population. According to one Staff Psychologist at this site, the staffing shortages in Psychology Services forced staff to cover roles and responsibilities of multiple positions, which resulted in an inability to provide treatment to inmates. Separately, another Staff Psychologist who administered the Medication Assisted Treatment (MAT) Program there told us that he could not administer MAT to every inmate who qualified for the program because there were not enough clinicians or medical staff to prescribe and administer the medication. This Staff Psychologist said that he believed that MAT was highly effective in reversing opioid addiction and that he wished more inmates could receive the treatment. At the time of our site visit to U.S. Penitentiary (USP) Thomson in June 2022, the institution had not had an on-site full-time Staff Physician for over a year and nearly half of its 12 nursing positions were vacant. According to the HSA and nurses we interviewed, this led to longer wait times for inmates to receive medical attention, mandatory overtime shifts for nurses, and a lack of nursing staff during night shifts. At Federal Transfer Center (FTC) Oklahoma City, there were staffing shortages among Health Services positions, specifically pill line technicians; this meant that nurses had to cover the time-consuming process of medication delivery to inmates' cells twice daily, resulting in missed flu shots and insulin rounds.

Staffing shortages in Psychology Services and Health Services can negatively affect the availability and quality of treatment, programming, and general medical and mental healthcare provided to inmates—including the provision of treatment and programs designed to treat substance abuse disorders and mental illnesses that can contribute to the risk of inmate deaths. Psychological Reconstruction Reports noted that inadequate mental health treatment was a contributing factor for some suicides, and one Chief Psychologist we interviewed directly associated staffing levels for Psychology Services with an institution's ability to screen inmates for suicidality and provide preventive treatment that could reduce the instances of suicide. In addition, Psychological Reconstruction Reports detailed concerns related to the availability of inmate treatment services and programs, as well as recommendations that institutions offer certain programs to inmates or provide staff training to increase their awareness of programs. These programs include Nonresidential Drug Abuse Treatment Program (NRDAP) and the MAT Program for inmates with substance abuse disorder; Sex Offender Management Program (SOMP) for sex offenders; Recovery Independence and Stability for Everyone (RISE); Steps Towards Awareness, Growth, and Emotional Strength (STAGES); and Resolve program.[67]

---

[67] NRDAP is designed to treat substance abuse disorders. The primary goal of SOMP is to reduce the need to place sex offenders in protective custody and to create an institution climate conducive to voluntary participation in treatment designed to target dynamic risk factors associated with reoffence in sex offenders. The MAT Program combines medication with counseling and behavioral therapy to treat substance abuse disorder. The RISE program provides specialized support to individuals with mental illness by concentrating supportive resources on a housing unit where those with similar needs live together. The STAGES program is designed to treat inmates with serious mental illnesses

*Continued*

In multiple inmate suicides in our scope, the BOP identified shortages or the need for additional staff in Psychology Services (e.g., Staff Psychologists and treatment specialists), which may have negatively impacted the inmate's ability to receive proper treatment, programming, or mental healthcare. For example, one Psychological Reconstruction Report concluded that vacancies among Psychology Services staff caused an undue burden on the institution's Psychology Services Department, resulting in challenges such as providing the appropriate number of psychology contacts with the inmate in accordance with their MHCL, generating timely documentation, and making accurate diagnoses. A separate Psychological Reconstruction Report stated that Psychology Services' inability to provide appropriate clinical follow-up after conducting a Suicide Risk Assessment of the inmate was "directly tied to the need for adequate staffing in Psychology Services." In addition, some reconstruction reports determined that Psychology Services staffing shortages affected institutions' ability to provide SOMP services for inmates in need of sex offender treatment or STAGES programs for inmates with personality disorders. These examples help illustrate the consequences that can occur when the BOP is unable to maintain adequate staffing levels, particularly in medical and mental healthcare positions. BOP staffing challenges and staffing of healthcare positions in particular have been similarly identified in other recent OIG work.[68] The findings from this evaluation, demonstrating how staffing shortages have been associated with numerous inmate deaths, amplify the concerns from our prior work, and we encourage the BOP to continue its efforts to address this critical issue.

### The BOP's Reliance on Mandated Overtime and Augmentation Can Negatively Affect Staff Morale and Performance, Posing Risks to Institutional Safety and Security

In an effort to mitigate the effects of chronic staffing shortages, the BOP uses stopgap measures such as mandatory overtime and temporary reassignment through augmentation to cover custody posts. Although these measures can help the BOP cover critical staffing posts that otherwise would face gaps, these measures, especially when used extensively, can present drawbacks to institution operations, as past OIG work has observed.[69] This evaluation made further observations about examples of such drawbacks.

All three institutions we visited had experienced staffing challenges that necessitated stopgap measures to ensure continuity of operations and coverage of Correctional Officer posts. For example, according to one After Action Report from one of the three institutions, the Correctional Services staffing complement at the time of one inmate's death was at approximately 50 percent. At FTC Oklahoma, only 129 of 147 (88 percent) authorized Correctional Officer positions were filled at the time of our visit, and the institution's Warden said that an additional 15 to 20 individuals in positions officially "filled" were in reality unavailable to work on any given day due to variety of reasons such as parental leave, military leave, or temporary requirements that certain staff conduct only light duty due to having incurred workplace injuries. Personnel at FCC Hazelton similarly cited these factors, as well as probation and refusals to report for work, as reasons why actual

---

and a primary diagnosis of borderline personality disorder. Resolve programs are designed to address trauma-related psychological disorders and improve inmates' level of functioning.

[68] For example, our 2023 inspection of FCI Waseca found that staff vacancies had severely curtailed the institution's ability to provide psychology and substance abuse programs, while our 2023 FCI Tallahassee inspection identified a concern with Health Services Department operations that was caused by staffing shortages. Additionally, the September 2023 PRAC report on healthcare staffing shortages identified Health Services personnel shortages as a long-standing challenge for the BOP, which impacted both Health Services staff and inmates receiving care. See Appendix 3.

[69] See, for example, the DOJ OIG's Waseca and Tallahassee inspections and the limited-scope review. See Appendix 3.

staffing capacity fell short of the staffing levels reflected in vacancy data, even when those levels were consistent with BOP targets.

A BOP staffing assessment was beyond the scope of this evaluation, and the BOP has acknowledged that it lacks reliable data on the exact staffing levels it requires at each institution.  Nevertheless, both the After Action Reports compiled by the BOP and BOP personnel we interviewed during site visits highlighted that stopgap measures to cover staffing shortages may contribute to staff performance deficiencies, which in turn create risks of inmate deaths.  As noted in one Psychological Reconstruction Report for a death in our scope, the absence of experienced staff "leads to burnout and stress and places staff and inmates at risk of homicide, suicide, assault, or escape."  The BOP's report on this death further stated that errors of omission, such as in log entries, rounds, and evidence preservation, are "caused and/or amplified by staffing pressures."  Staff we interviewed during our fieldwork at two different institutions echoed these sentiments and expressed the belief that, due to staffing shortages, Correctional Officers were overworked, were less vigilant, and conducted fewer rounds.  One Lieutenant told us that inmates could take advantage of officers' sleep deprivation and try to distract them to evade detection of prohibited acts.  A Correctional Services supervisor at one institution that we visited described overworked staff as "walking zombies" and a security risk.  These concerns were mirrored in a separate February 2021 U.S. Government Accountability Office (GAO) report on BOP staffing and employee wellness programs, which noted that when staff are mandated to work double shifts they become exhausted and their observation skills are decreased, according to BOP union officials interviewed for that report.[70]  Our 2023 Epstein report also cited staff fatigue as a contributing factor in staff failure to conduct inmate accountability measures such as rounds and counts.

The use of mandatory overtime to compensate for staffing shortages can present drawbacks that were highlighted in both the BOP's After Action Reports and our own interviews with staff at the institutions we visited.  In one After Action Report from USP Thomson, the BOP observed significant understaffing of Correctional Services positions and concluded that "mandatory overtime is an unsustainable routine practice causing mental and physical exhaustion" among staff.  At FTC Oklahoma, one Lieutenant told us that staff may sometimes be mandated to work double shifts for 3 consecutive days.  Correctional Officers at FTC Oklahoma also told us that newer staff often bear the brunt of working the mandated overtime shifts as more senior officers claim seniority and, as a result, a Health Services Department staff member said, newer hires are quitting and "dropping like flies."  Personnel we interviewed at FTC Oklahoma explained that frequent mandated overtime can lead to worn out, short-tempered staff who could take out frustrations on inmates, as well as instances in which staff call in sick when they are too tired to perform their duties properly and safely.  One staff member we interviewed at FTC Oklahoma cited mandatory overtime as a specific factor that can affect an institution's ability to identify potentially suicidal inmates, explaining that staff who were fatigued due to frequent mandatory overtime were not as aware of or attentive to the signs that could indicate potentially suicidal behavior in inmates.  Staff at FCC Hazelton similarly expressed concerns about mandatory overtime and reported at the time of our visit that Correctional Officers there could be mandated to work 16-hour days up to 4 times per week.  The OIG's November 2023 FCI Tallahassee inspection report noted that the excessive use of overtime can cause staff to become tired and less observant and that mandatory overtime negatively affects staff morale; in that report, we found that FCI

[70] GAO, *Bureau of Prisons:  Opportunities Exist to Better Analyze Staffing Data and Improve Employee Wellness Programs,* GAO-21-123 (February 2021), www.gao.gov/products/gao-21-123 (accessed April 14, 2023), 36.

Tallahassee management had used overtime and augmentation in the year prior to our inspection to fill the equivalent of approximately 32 positions to compensate for vacancies in Correctional Officer positions.

BOP personnel we interviewed during a site visit also explained how the temporary assignment of non-Correctional Officer personnel into Correctional Officer positions (augmentation) can impede the chances that staff identify potentially abnormal or concerning behavior prior to an inmate death.  Staff who are not Correctional Officers may not have the correctional experience or rapport with inmates that would enable them to recognize potentially concerning behaviors, according to staff we interviewed.  An After Action Report following an inmate suicide at FTC Oklahoma City further illustrated some of the drawbacks of augmentation, citing staff reports of being "emotionally and physically fatigued and experiencing increased feelings of powerlessness as they [were] required to frequently work rapport alternate posts."  One Human Resources official there told us that she and her staff of Human Resources personnel were assigned to work in custody posts through augmentation every couple of weeks.  A union official at FCC Hazelton told us that he believed that augmentation is a "terrible crutch" and that augmented staff are still expected to complete their primary duties in addition to fulfilling the custody posts.

We are concerned that staff exhaustion and performance deficiencies, exacerbated by staffing shortages and the measures the BOP has adopted to address them, may impair the ability of BOP institution staff to identify concerning inmate behaviors and take appropriate action, both in the circumstances that may precede a death and in the event that an inmate death occurs.  The BOP has explored some strategies to recruit and retain personnel, including at the institutions we visited for this evaluation.  For example, USP Thomson instituted a 25 percent retention bonus for staff.  At FCC Hazelton, a Human Resources official agreed that retention incentives could help alleviate the issues of staff fatigue and burnout at that institution, which this staff member described as experiencing constant turnover through resignation or transfer.  However, recruitment and retention incentives were not in place at FCC Hazelton at the time of our fieldwork and USP Thomson staff we interviewed acknowledged that they were not a cure for the staffing challenges.  While USP Thomson staff found that the retention bonus helped recruit and retain some staff there, they did not believe that this approach was enough to incentivize sufficient personnel to work at this rural and demanding location.

To help the BOP identify and address some of its staffing challenges, both the OIG and the GAO have made recommendations in this area.  Specifically, the GAO's February 2021 report made four recommendations to improve BOP staffing levels.[71]  In addition, the OIG's May 2023 limited-scope report also found that the BOP does not fully understand what its staffing levels should be at an enterprise level nor does it appear to have an optimal alignment of allocated positions at an institution level.  In that report, we recommended that the BOP develop and implement a reliable method to calculate appropriate staffing at those levels; as of September 2023, the recommendation remained open.

The BOP concurred with these recommendations and has reported some actions that it has begun to address its chronic staffing issues.  For example, the BOP hired a consulting firm in June 2021 to help calculate staffing needs at BOP institutions, identify and address the effects of its staffing challenges, assess the risk of overtime and augmentation use, and develop an overtime calculation tool.  In February 2022, the then BOP Director acknowledged in testimony to Congress that maintaining appropriate staffing levels is

---

[71]  GAO, *Opportunities Exist.*

critical to the safety and security of federal prisons and articulated several strategies that the BOP was pursuing at that time to help assess institutional staffing levels and reduce overreliance on overtime and augmentation. According to this testimony from BOP leadership in 2022, the work of the consulting firm would: (1) recommend a process to calculate appropriate staffing levels continuously across locations and positions; (2) recommend effective staffing incentives; (3) evaluate the negative effects and risks associated with overtime and augmentation use and mitigation strategies; and (4) evaluate the effectiveness of employee assistance programs based on resiliency outcome metrics such as retention, staff suicide, safety incidents, and absenteeism. We encourage the BOP to continue its work to address the staffing challenges identified by the OIG and others who have assessed this aspect of its operations.

### *The BOP's Staff Discipline Challenges Undermine Institution Safety and Security*

BOP staff policy violations and misconduct have been identified in a series of oversight findings and present significant barriers to the BOP's ability to ensure institutional safety and security, including effective risk mitigation for death among the inmates in its custody. In general, the OIG has found, and recent BOP leaders have agreed, that the existing BOP staff discipline process is plagued by inefficiencies and is not working optimally to ensure accountability and professionalism among the more than 34,000 BOP staff. The OIG's May 2023 report on BOP systemic operational challenges found that the BOP's staff discipline process was untimely, insufficiently resourced with internal investigative personnel, and fundamentally ineffective. This significantly limited the BOP's ability to effectively enforce its own Standards of Employee Conduct and keep pace with the volume of its employee misconduct cases. Specifically, as of September 2022, we found in that report that the BOP had over 7,500 open employee misconduct cases (with only 60 dedicated Special Investigative Agents available to investigate them); we also found more than 2,200 additional cases in which misconduct had been sustained through a completed investigation but the BOP had not yet imposed discipline on the staff found responsible for misconduct.

Subsequent investigative work has continued to identify deficiencies in staff conduct and discipline, some of which specifically relate to instances of inmate death. For example, the OIG's June 2023 investigative report on the circumstances surrounding Jeffrey Epstein's suicide found staff failure to conduct required rounds and counts and false certification by staff of documentation that they had conducted such measures, which led to Epstein being unmonitored and locked alone in his cell, where he ultimately died by suicide. During the current evaluation, we also learned that the BOP's own Office of Internal Affairs investigated numerous allegations of staff misconduct that occurred in the cases of inmate deaths during our evaluation period. Although evaluating specific Office of Internal Affairs investigative cases was outside the scope of this evaluation, we identified deficiencies in the BOP's staff discipline process as a further factor that contributes to the BOP's challenges in reducing the likelihood of death among the inmates for whom it is responsible.

BOP personnel at various levels have agreed with the need for significant change to address this issue. During our site visits, staff at all three institutions we visited described the BOP's staff discipline process as lengthy and ineffective. Similarly, the prior BOP Director and Deputy Director who were in place at the time of the operational challenges we identified in our May 2023 report respectively described the BOP's employee discipline process as "horrible" and one in which "it takes too long to get anything done." The current BOP Director echoed concerns with staff discipline in congressional testimony in 2022, during which she affirmed the BOP's commitment to reorganizing and increasing staffing for the BOP's Office of Internal Affairs. While individuals responsible for conducting investigations in the field have traditionally reported to their local Wardens, the BOP Director announced plans to change this process and instead route internal investigation reporting to the BOP's Central Office. The Director also described staffing complement

additions to "hopefully get rid of the backlog of cases that we have right now, make them more streamlined, make them more efficient, and hold people accountable in a more swift and sure fashion."

The OIG's May 2023 limited-scope report recommended that the BOP develop a specific, multiyear plan to evaluate its ongoing and proposed changes to the employee discipline process and decrease its backlog of employee misconduct cases and adjudications. The BOP concurred with this recommendation and has reported that its efforts to improve the employee discipline process include changes to its investigatory process and the hiring of additional staff to investigate misconduct. Staff discipline issues remain among the most significant challenges the BOP faces in consistently achieving safety and accountability among the personnel inside its institutions, and the BOP must continue its corrective actions in this critical area.

# Conclusion and Recommendations

## Conclusion

In the 8 years of our evaluation scope, from FY 2014 through FY 2021, there were 344 inmate deaths in BOP institutions nationally.  Available BOP documentation that details the circumstances surrounding these inmate deaths demonstrates significant recurring issues and contributing factors, including inadequate staff response to inmate emergencies; failure to properly assess, manage, and monitor inmates at risk for suicide; and deficiencies in the BOP's ability to collect, maintain, and learn from evidence and post-incident documentation.  Additional long-standing and well-documented challenges in BOP operations, including contraband interdiction, security camera coverage, and understaffing, further exacerbated these conditions and hindered the BOP's ability to control the risk of death among inmates in its custody by suicide, homicide, and other causes.

Suicide was the most prevalent form of inmate death in BOP institutions during our evaluation scope, accounting for over half of the inmate deaths.  While the BOP has established requirements through a variety of policies that may help mitigate certain risks associated with inmate suicide, we found that a combination of recurring policy violations and a multitude of operational failures at institutions contributed to inmate suicides.  Deficiencies in staff completion of inmate assessments prevented some institutions from adequately identifying and proactively addressing inmate suicide risks, and we found numerous instances of potentially inappropriate inmate Mental Health Care Level assignments for some inmates who later died by suicide.  Additionally, although the BOP has recommended against single-celling inmates, noting that it increases the risks of inmate suicide, we found that more than half of the inmates who died by suicide from FY 2014 through FY 2021 were in single-cell confinement.  Further, we found that some institution staff failed to communicate with each other and coordinate efforts across departments to provide necessary treatment or follow-up with inmates in distress.  We also found that staff did not sufficiently conduct required rounds or counts of inmates, important opportunities to monitor inmate well-being, in over a third of the inmate suicides during our scope.  Finally, while the BOP requires institutions to conduct mock suicide drills to prepare staff to respond to a potential suicide, the BOP was unable to provide evidence that most of its facilities satisfied the mock suicide drill requirement.  Under these conditions, inmates were able to advance their suicidal ideations and ultimately died by suicide.  To effectively mitigate the risk of death by suicide among inmates in its custody, the BOP must address the recurring issues we identified.

To properly respond to high-stress, potentially life-threatening inmate emergency situations—such as hanging, attempted homicide, or drug overdose—BOP staff must be prepared to promptly follow correct protocols and use proper, easily accessible, functioning equipment.  However, we found significant shortcomings in BOP staff's emergency responses to nearly half of the inmate deaths in our evaluation scope.  These shortcomings include a lack of urgency in emergency response; failure to bring or use appropriate emergency equipment; unclear radio communications; and issues related to administration of naloxone, an opioid reversal medication.  We believe that improvements in these areas would help prepare BOP personnel to address future inmate emergency scenarios.

In the instances in which an inmate death ultimately occurred, we found a variety of information collection, recordkeeping, and post-death review deficiencies that limit the BOP's ability to maintain a full and accurate

understanding of the deaths that occur in its custody, discern any trends in circumstances, and identify any corrective actions that may be necessary to help prevent future deaths from occurring. Immediately following these deaths, we found, the BOP did not always follow its post-incident evidence recovery protocols. Further, during our assessment of the records and reviews that the BOP requires in the aftermath of a death, we found that the BOP was unable to produce documentation required by its own policy for 43 percent of the inmate deaths during our scope. We also found that the BOP is inconsistent in its requirements for post-death reviews, depending on the circumstances of the death, and that it requires After Action Reviews only for suicides but not homicides, accidents, or deaths of unknown manner. Accordingly, we believe that the BOP should conduct After Action Reviews following all suicide, homicide, accident, and unknown-manner inmate deaths. In addition, although the reports and reviews that the BOP requires following these deaths have the potential to yield valuable information for management officials, we found the BOP's past use of these records to be limited and localized. The BOP's weaknesses in these areas identified during our evaluation limit its ability to broadly and consistently glean lessons learned, understand any systemic factors and challenges contributing to these deaths, and identify and implement any enterprise-wide changes that may be warranted to minimize deaths among inmates in its custody.

Finally, several long-standing and enterprise-wide operational challenges for the BOP, which have been documented in other OIG work and generally undermine the safety and security of the federal prison system, were a factor in many inmate deaths included in this evaluation. For example, we found that contraband drugs and weapons contributed, or appeared to contribute to, nearly one-third of the inmate deaths in our scope. In addition, we found numerous instances in which security cameras were inoperable, yielded poor quality footage, or did not provide adequate coverage in circumstances of inmate death. We also observed that staffing shortages in institutions and an ineffective staff discipline process continue to pose risks to inmate safety. Although the BOP has taken some steps to begin addressing these issues, the BOP must employ a comprehensive approach to address these chronic challenges and continue to prioritize corrective actions in these areas if it is to maintain a safe and secure environment for both staff and the inmates in its custody.

## Recommendations

To address persistent operational deficiencies and improve its ability to mitigate risks that contribute to deaths of inmates in its custody, we recommend that the BOP:

1. Develop strategies to ensure that staff assign accurate, consistent, and timely Mental Health Care Level designations to inmates.

2. Ensure that all institutions conduct required mock suicide drills, and develop strategies to increase staff participation in those drills.

3. Ensure that all appropriate staff are trained in automated external defibrillator use and that automated external defibrillators are strategically placed, readily available, and regularly checked to ensure that they are in working order at each BOP institution.

4. Ensure that cut-down tools in working order are accessible to staff in each housing unit at each institution, that staff are trained on proper use of the tool, and that the BOP determines whether

staff should be issued and required to keep their own cut-down tool on their duty belt during their entire shift.

5. Ensure that each institution has a sufficient number of maneuverable gurneys in strategic locations to provide proper medical response during inmate transport.

6. Issue standard, enterprise-wide guidance and training to staff on using the radio to communicate clear, descriptive information during inmate medical emergencies.

7. Ensure that staff receive both the initial and refresher naloxone training and are fully prepared to administer naloxone to an unresponsive inmate suspected of having experienced a drug overdose.

8. Ensure that all Evidence Recovery Teams are properly trained on post-incident evidence recovery protocols.

9. Develop procedures to ensure that all required death-related records are completed and collected consistently and in accordance with established deadlines.

10. Assess the benefit and feasibility of expanding its policy requiring After Action Reviews to include reviews of all inmate homicides and deaths by accidental and unknown factors, not just for inmate suicides.

11. Clarify responsibility for tracking at an enterprise level the reports and recommendations required in the wake of an inmate death by suicide, homicide, accident, or unknown factors, and assess the information contained therein for broader trends, applicability, and implementation.

12. Evaluate existing electronic devices used for inmate screening to identify whether they are functioning as intended, and, if necessary, implement any needed adjustments or upgrades.

# Appendix 1:  Purpose, Scope, and Methodology

## Standards

The OIG conducted this evaluation in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

## Purpose and Scope

We undertook this evaluation following high-profile inmate deaths at BOP institutions, such as the homicide of James "Whitey" Bulger in 2018 and the suicide of Jeffrey Epstein in 2019.  In October 2018, the OIG received a congressional request to investigate the circumstances surrounding the deaths of two inmates at U.S. Penitentiary (USP) Hazelton in 2018 that the BOP deemed to be homicides by stabbing.  An October 2019 congressional inquiry to the BOP Director, the Attorney General, and other federal leaders raised concerns about the BOP's inmate suicide prevention and protocols.  The OIG initiated this evaluation in February 2020 to assess the circumstances surrounding deaths among inmates in federal custody and to evaluate how the BOP seeks to prevent future inmate deaths.  This evaluation sought to (1) analyze the frequency and pattern of suicide, homicide, accidental, and unknown deaths of inmates in BOP custody and (2) identify any potential management deficiencies and systemic issues, including inmate management and BOP incident response, related to those deaths.  We evaluated how the BOP prepares its staff to respond to life-threatening emergencies, how its staff actually responds to life-threatening emergencies, and how the BOP documents and tracks trends related to inmate deaths.

The scope of this evaluation covered inmate deaths at BOP institutions that occurred over an 8-year period, from FY 2014 through FY 2021, including the Bulger homicide and the Epstein suicide.  We focused on nonnatural inmate deaths that the BOP identified as having occurred at institutions under the following categories of circumstances:  suicide, homicide, accident, and unknown; we therefore did not examine inmate deaths resulting from natural causes.  For the purposes of this evaluation, the OIG did not consider legal executions as part of our scope because such deaths are not within the BOP's control or jurisdiction.  We focused on BOP institutions; Residential Reentry Centers and contract prisons fell outside the scope of this evaluation due to the many external factors in these settings that are outside the BOP's direct control or jurisdiction.  Our fieldwork spanned February 2020 through August 2023 but included two pauses:  from March 2020 through June 2021, when the OIG shifted resources from this evaluation and other work to conduct extensive pandemic-related oversight, and from February through May 2022 to support another OIG evaluation of the BOP.

## Methodology

Our fieldwork included extensive document review, data analysis, interviews, site visits, and security camera footage review.  We visited three BOP institutions where inmate deaths had occurred during our evaluation period:  Federal Correctional Complex (FCC) Hazelton, Federal Transfer Center (FTC) Oklahoma City, and USP Thomson.  We interviewed BOP Central Office officials and staff from a total of eight BOP institutions, along with inmates at the three institutions we visited in person.  The following sections provide additional information about our methodology.

## Document Review

We requested from the BOP all available documents relevant to each inmate death in our evaluation scope, including the records required by BOP policy for all deaths, as well as any additional discretionary reviews or records generated in conjunction with these deaths.  In response, the BOP provided over 8,300 files corresponding to what we ultimately determined from the BOP's files was 344 inmate deaths by suicide, homicide, accident, and unknown manner that had occurred during those 8 years.  These files included Reports of Incident (BP-583) and corresponding attachments, 24-Hour Death Notices, Multilevel Mortality Review (MLMR) reports, External Consultant Reviews, autopsy reports, death certificates, homicide After Action Reports, suicide Psychological Reconstruction Reports, and staff memoranda.  We specifically analyzed 183 suicide Psychological Reconstruction Reports and 50 homicide After Action Reports to develop our analysis used throughout the report.  We describe each of these documents, including the parties responsible for completing them and the applicable submission processes, in Tables 1 and 2 of this report.  Additionally, we reviewed a multitude of BOP policies covering areas of responsibility for Correctional Services, Health Services, Psychological Services, Special Investigative Services (SIS), Receiving and Discharge, and the Trust Fund.  Further, we reviewed institutional Strength and Staffing Reports along with Custody Duty Rosters.

However, the BOP was not always able to provide complete and comprehensive records for these deaths.  As discussed in the Lack of Available Information about Inmate Deaths section, we found that for 43 percent (149 of 344) of inmate deaths that occurred during our scope the BOP was unable to produce documents required by its own policy.  For example, following the OIG's review of BOP records and multiple OIG requests to the BOP, the BOP confirmed that it did not complete, or was unable to provide to the OIG, 5 suicide Psychological Reconstruction Reports and 39 homicide After Action Reports.  Except for one undetermined death review for an inmate death from an unknown manner, which was documented in a Psychological Reconstruction Report format, the BOP did not conduct After Action Reviews for accidental or unknown-manner deaths.  Therefore, the figures that we present in the Results of the Evaluation are limited to information detailed in the records that the BOP made available to us.  Our analysis was informed in large part by MLMRs, which the BOP was able to provide for most of the deaths, as well as After Action Reports, which were available for approximately two-thirds of the deaths we reviewed.

Although our evaluation did not cover specific BOP Office of Internal Affairs investigative cases for the purposes of assessing the BOP's staff discipline process, we reviewed certain staff misconduct allegations related to inmate deaths during our scope to understand the challenges the BOP faces in reducing the likelihood of death among the inmates for whom it is responsible.

## Data Analysis

We analyzed BOP-provided data as of October 27, 2023, on inmate deaths by suicide, homicide, accident, and unknown manner from FY 2014 through FY 2021.  Specific data points included a deceased inmate's registration number, name, sex, race, manner of death, specific cause of death, date of death, assigned institution, assigned housing location within the institution, security level designation, and Mental Health Care Level (MHCL) designation at the time of death.[72]  Additionally, we utilized the files described above,

---

[72]  As noted in the Suicide Represents a Significant Risk Area section of this report, some inmate deaths occurred at an external location, such as at a hospital.

mainly homicide After Action Reports and suicide Psychological Reconstruction Reports, to determine the prevalence of staff and operational deficiencies surrounding an inmate death, as identified by BOP staff who authored the reports.

To assess the range of staff and operational deficiencies that the BOP identified in its internal inmate death records, we created categories based on our analysis of issues described in BOP documentation; the categories included a variety of issues, such as those related to staff conducting rounds or counts, staff's response to an inmate's medical emergency, and security camera or evidence recovery issues.  As the circumstances and BOP-documented issues varied across the deaths, we developed the categories by grouping common and related issues.  See Table 9 below for a full list of deficiencies presented in our report that we identified based on our analysis of BOP documentation.

While we present throughout this report the deficiency categories most relevant to our findings, this report does not detail every issue that may have occurred in connection with all the deaths in our scope.  We based our document analysis on the available records the BOP provided to us for each inmate death in our scope.  Because our analysis was limited to the documents available to us, it may not capture the full universe of issues that may have occurred in connection with all the deaths in our scope.  Further, internal BOP reports related to the inmate deaths may have included recommendations for improvement without explicitly detailing all the issues that might have triggered the recommendations; accordingly, our analysis may not capture the full universe of these internal BOP recommendations.

## Table 9

### OIG-Identified Deficiencies Used in Analysis of BOP Documentation

| Deficiency | Deficiency Includes Issues Related To: |
| --- | --- |
| Insufficient Staff Training and Additional Training Recommended | Staff failure to complete required training or BOP recommendations for staff to take additional or remedial training |
| Inmate Assessment and Psychology Services Inmate Engagement Issue | Inmate assessment issues, such as failure to complete sufficient inmate intake assessments and Suicide Risk Assessments, as well as inadequacies in diagnoses and engagement with inmates in need of treatment |
| Potentially Inappropriate MHCL or Other MHCL-related Issue | Issues related to the MHCL designations and treatment of inmates, including the assignment of potentially inappropriate MHCLs and BOP staff failures to accurately document MHCL information in inmate files |
| Single-Celling | An inmate's placement in single-cell confinement at the time of their death |
| Rounds or Counts Issue | Staff failing to sufficiently complete rounds or counts |
| Interdepartmental Communication Issue | Cooperation or communication issues between departments, such as between Health Services (or other departments such as Custody Services) and Psychology Services |
| Documentation Issue | Deficiencies in records that should be maintained in BOP electronic data systems that house information such as inmates' medical health records and mental health data, as well as paper copy documents related to staff execution of job duties that require employees' certification |

**Table 9 (Continued)**

| | |
|---|---|
| Emergency First Response Issue | Equipment not brought to a medical emergency scene and issues related to the timeliness or quality of the initial emergency response, including cardiopulmonary resuscitation administration.  This category does not include the following deficiencies, which are captured in separate categories:  use of automated external defibrillators (AED), cut-down tools, gurneys or backboards, naloxone, or radio communications. |
| Transfer to Hospital or Outside Care Delay Issue | Staff difficulties in transferring inmates to a hospital or outside Emergency Medical Services |
| AED Issue | Scenarios in which staff did not bring an AED to the scene, staff could not locate an AED or were not aware of an AED's location, the AED was not functioning properly, or the AED application was significantly delayed |
| Cut-down Tool Issue | Suicide by hanging scenarios in which staff experienced difficulty using, or lacked timely access to, a properly functioning cut-down tool |
| Gurney Issue | Scenarios involving staff not timely bringing to the scene or properly using a gurney or backboard |
| Radio Communication Issue | Deficiencies regarding radio communications, including staff omitting critical information or providing inaccurate information concerning a medical emergency |
| Naloxone Administration Issue | Issues with the administration of naloxone, such as staff failing to administer naloxone to an inmate, staff confusion regarding the provision of naloxone, or naloxone not being readily available when needed |
| Post-Incident Evidence Recovery and Documentation Issue | Issues include staff not sufficiently collecting, preserving, or documenting evidence of the crime, preserving video footage, or conducting mass inmate interviews, along with incomplete or unsigned staff memoranda describing the events of the incident. |
| Inmate Supervision in Special Housing Unit (SHU) Issue | Instances in which staff failed to supervise in accordance with policy inmates who entered a SHU |
| Housing Unit or Cell Search Issue | Staff failed to search, or did not sufficiently search, housing units or inmates' cells. |
| Metal Detector or Pat Search Issue | Scenarios in which staff did not sufficiently pat search inmates or effectively use metal detectors to screen inmates |
| Security Camera Issue | Scenarios in which cameras were not present in certain areas, were inoperable, yielded poor quality footage, were improperly time synced, or did not provide adequate area coverage |
| Insufficient Staffing Issue | Insufficient number of BOP staff, including medical, psychology, and correctional staff |

Source:  OIG analysis of BOP documentation

To assess the extent to which staff conducted rounds and counts at FTC Oklahoma City, we reviewed institution security camera footage of staff movements during one shift.  We also reviewed BOP facilities' mock suicide drill completion memoranda from calendar years 2018 through 2020 to assess facilities' compliance with the BOP's mock suicide drill requirement during those years.

For our analysis of inmate deaths related to contraband, while BOP documentation we reviewed did not differentiate whether an item associated with an inmate's death was considered contraband in accordance with the BOP's definition, we could reasonably conclude that some deaths clearly involved a contraband item.  For example, deaths such as overdose of an illegal drug or homicide using a prohibited weapon clearly involved contraband.  We also considered items used to facilitate lacerations as contraband.  For the purposes of our analysis, we also categorized deaths as involving contraband in instances of overdoses of BOP-prescribed medications that were either not prescribed to the inmate or for which the quantity was not consumed in the manner prescribed.

## Interviews

We conducted in-person and telephonic interviews with officials from the BOP's Central Office, a Regional Office, and various Wardens and Chief Psychologists at BOP institutions across the country, along with a substantial number of interviews with institution staff during site visits.  In total, we interviewed 175 BOP staff members.  We also spoke directly with several dozen inmates housed at three different institutions.  We interviewed Central Official staff from the Health Services Division, Reentry Services Division, Psychology Services Branch, Correctional Programs Division, Program Review Division, Trust Fund Branch, and Office of General Counsel.  During site visits, we interviewed executive-level staff, including Wardens and Associate Wardens, along with staff from Correctional Services, Health Services, Psychology Services, Unit Teams, Special Investigative Services (SIS), Human Resources, Disciplinary Hearing, Receiving and Discharge, Trust Fund, union officials, and inmates.

## Site Visits

Based in part on the concerns identified through the media reporting and stakeholder inquiries discussed above, along with factors such as prevalence of inmate deaths, institution security levels, inmate population types, building characteristics, and institution missions, we conducted site visits to FCC Hazelton in Bruceton Mills, West Virginia; FTC Oklahoma City in Oklahoma City, Oklahoma; and USP Thomson in Thomson, Illinois.  In June 2022, the OIG received a request by a prisoner advocacy group to investigate the conditions of confinement at USP Thomson following news media reporting that BOP staff abuse of inmates, including inappropriate use of restrictive housing and restraints, had led to at least five inmate homicides at USP Thomson during a 2-year period.  At Hazelton, we toured and observed each of its facilities, including its camp, Federal Correctional Institution, Secure Female Facility, and USP.  At FTC Oklahoma City, we toured the FTC, and at USP Thomson, we observed both the camp and the USP.  During site visits, we toured the following areas:  general population and restrictive housing units, Health Services, Psychology Services, SIS, Receiving and Discharge, Food Service, suicide watch rooms, libraries, recreation areas, education areas, commissary, mail rooms, and a UNICOR facility.

# Appendix 2:  Additional Data on Inmate Deaths, FYs 2014–2021

| Table 10 | | | | | |
|---|---|---|---|---|---|
| **Manner of Death by Fiscal Year** | | | | | |
| Fiscal Year | Accident | Homicide | Suicide | Unknown | Grand Total |
| 2014 | | 16 | 22 | | 38 |
| 2015 | 3 | 12 | 18 | 2 | 35 |
| 2016 | 7 | 6 | 15 | 1 | 29 |
| 2017 | 5 | 7 | 23 | | 35 |
| 2018 | 13 | 9 | 29 | 1 | 52 |
| 2019 | 10 | 12 | 24 | 3 | 49 |
| 2020 | 10 | 10 | 25 | 4 | 49 |
| 2021 | 8 | 17 | 31 | 1 | 57 |
| **Grand Total** | **56** | **89** | **187** | **12** | **344** |
| Source:  OIG analysis of BOP data | | | | | |



**Figure 10**

**Specific Cause of Death**

Note:  "Other" deaths include chokings on food, on-the-job-deaths, ingestions of a toxic substance, complications from oleoresin capsicum spray, and deaths that were suspected as drug overdoses or for which the autopsy report was pending.

Source:  OIG analysis of BOP documentation



**Figure 11**

**Specific Cause of Death, by Type of Death**

Note:  "Other" deaths include chokings on food, on-the-job deaths, ingestions of a toxic substance, complications from oleoresin capsicum spray, and deaths that were suspected as drug overdose or for which the autopsy report was pending.

Source:  OIG analysis of BOP documentation



**Figure 12**

**Death Count by Inmate Gender**

Note: Aside from one transgender accidental death, all female and transgender deaths were suicides.

Source: OIG analysis of BOP data



**Figure 13**

**Death Count by Inmate Race**

Note: The BOP includes Hispanics in the "White" category.

Source: OIG analysis of BOP data



**Figure 14**

**Death Count of Sex Offenders, by Type of Death**

Note: There were 83 sex offender deaths in our scope.

Source: OIG analysis of BOP data



**Figure 15**

**Death Count by Mental Health Care Level (MHCL)**

Note: The "Other" category represents the 29 inmates who did not have official MHCL 1–4 designations at the time of their deaths.

Source: OIG analysis of BOP data



**Figure 16**

**Death Count by Inmate Security Level at Time of Death**

Note: Security levels are not assigned prior to completion of an Inmate Load and Security Designation Form.

Source: OIG analysis of BOP data



**Figure 17**

**Death Count by Institution Security Level or Type at Time of Death**

Note: The BOP classifies the following institution types as administrative security level: Administrative Maximum facility (ADMAX), correctional and detention centers (jails), medical centers, and transfer centers.

Source: OIG analysis of BOP data



**Figure 18**

**Death Count of Inmate's Assigned Housing Unit Type at Time of Death, by Type of Death**

Note: The "Other" category includes inmates who were in medical units or whose housing was unclear.

Source: OIG analysis of BOP data



**Figure 19**

**Death Count by Inmate Race and by Type of Death**

Note: The BOP includes Hispanics in the "White" category.

Source: OIG analysis of BOP documentation



**Figure 20**

**Death Count of Inmate MHCL at Time of Death, by Type of Death**

Note: No inmates who died by accident were at MHCL 3 at the time of death. The "Other" category represents the inmates who did not have official MHCL 1–4 designations at the time of their deaths.

Source: OIG analysis of BOP data



Figure 21

Death Count by Institution Security Level or Type at Time of Death and by Type of Death

Note: The BOP classifies the following institution types as administrative security level: ADMAX, correctional and detention centers (jails), medical centers, and transfer centers.

Source: OIG analysis of BOP data



Figure 22

Death Count by Inmate Security Level at Time of Death and by Type of Death

Note: Security levels are not assigned prior to completion of an Inmate Load and Security Designation Form.

Source: OIG analysis of BOP data

# Appendix 3: DOJ OIG Related Work

For an **overview on challenges facing the BOP,** see:

- DOJ OIG, *Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues*, Evaluation and Inspections (E&I) Report 23-065 (May 2023), oig.justice.gov/reports/limited-scope-review-federal-bureau-prisons-strategies-identify-communicate-and-remedy;

- DOJ OIG, *Audit of the Federal Bureau of Prisons' Efforts to Maintain and Construct Institutions*, Audit Report 23-064 (May 2023), oig.justice.gov/reports/federal-bureau-prisons-efforts-maintain-and-construct-institutions; and

- DOJ OIG, *Compendium of Non-Investigative Reports on the Federal Bureau of Prisons*, oig.justice.gov/news/compendium-non-investigative-reports-federal-bureau-prisons.

For prior OIG reporting on **death reporting requirements,** see:

- DOJ OIG, *Review of the Department of Justice's Implementation of the Death in Custody Reporting Act of 2013*, E&I Report 19-01 (December 2018), oig.justice.gov/reports/review-department-justices-implementation-death-custody-reporting-act-2013.

For prior OIG reporting on the **homicide of James "Whitey" Bulger,** see:

- DOJ OIG, *Investigation and Review of the Federal Bureau of Prisons' Handling of the Transfer of Inmate James "Whitey" Bulger*, Investigations Report 23-007 (December 2022), oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-handling-transfer-inmate-james-whitey.

For prior OIG reporting on the **suicide of Jeffrey Epstein,** see:

- DOJ OIG, *Investigation and Review of the Federal Bureau of Prisons' Custody, Care, and Supervision of Jeffrey Epstein at the Metropolitan Correctional Center in New York, New York*, Investigations Report 23-085 (June 2023), oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-custody-care-and-supervision-jeffrey.

For prior OIG reporting on **single-celling,** see:

- DOJ OIG, *Investigation and Review of the Federal Bureau of Prisons' Custody, Care, and Supervision of Jeffrey Epstein at the Metropolitan Correctional Center in New York, New York*, Investigations Report 23-085 (June 2023), oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-custody-care-and-supervision-jeffrey;

- DOJ OIG, *Capstone Review of the Federal Bureau of Prisons' Response to the COVID-19 Pandemic*, E&I Report 23-054 (March 2023), oig.justice.gov/reports/capstone-review-federal-bureau-prisons-response-coronavirus-disease-2019-pandemic;

- DOJ OIG, *Evaluation of the Federal Bureau of Prisons' Policy Development Process*, E&I Report 22-115 (September 2022), oig.justice.gov/reports/evaluation-federal-bureau-prisons-policy-development-process; and

- DOJ OIG, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*, E&I Report 17-05 (July 2017), oig.justice.gov/reports/review-federal-bureau-prisons-use-restrictive-housing-inmates-mental-illness.

For prior OIG reporting on **contraband introduction** at BOP institutions, see:

- DOJ OIG, *Management Advisory Memorandum: Notification of Urgent Security Concerns Involving Staff Entering BOP Facilities*, Investigations Report 21-06 (August 2021), oig.justice.gov/reports/management-advisory-memorandum-notification-urgent-security-concerns-involving-staff;

- DOJ OIG, *Audit of the Department of Justice's Efforts to Protect Federal Bureau of Prisons Facilities Against Threats Posed by Unmanned Aircraft Systems*, Audit Report 20-014 (September 2020), oig.justice.gov/reports/audit-department-justices-efforts-protect-federal-bureau-prisons-facilities-against-threats;

- DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts*, E&I Report 16-05 (June 2016), oig.justice.gov/reports/review-federal-bureau-prisons-contraband-interdiction-efforts; and

- DOJ OIG, *The Federal Bureau of Prisons' Drug Interdiction Activities*, E&I Report I-2003-002 (January 2003), oig.justice.gov/reports/federal-bureau-prisons-drug-interdiction-activities.

For additional prior OIG reporting on the insufficiency of BOP **security camera systems,** see:

- DOJ OIG, *Investigation and Review of the Federal Bureau of Prisons' Custody, Care, and Supervision of Jeffrey Epstein at the Metropolitan Correctional Center in New York, New York*, Investigations Report 23-085 (June 2023), oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-custody-care-and-supervision-jeffrey;

- DOJ OIG, *Management Advisory Memorandum: Notification of Needed Upgrades to the Federal Bureau of Prisons' Security Camera System*, E&I Report 22-001 (October 2021), oig.justice.gov/reports/management-advisory-memorandum-notification-needed-upgrades-federal-bureau-prisons-security; and

- DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts*, E&I Report 16-05 (June 2016), oig.justice.gov/reports/review-federal-bureau-prisons-contraband-interdiction-efforts.

For prior OIG reporting on the BOP's **medical personnel staffing** challenges, see:

- DOJ OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee*, E&I Report 24-005 (November 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-tallahassee;

- Pandemic Response Accountability Committee (PRAC), *Review of Personnel Shortages in Federal Health Care Programs During the COVID-19 Pandemic*, PRAC Report 2023-03 (September 2023), www.pandemicoversight.gov/oversight/our-publications-reports/health-care-staffing-shortages;

- DOJ OIG, *Inspection of Federal Correctional Institution Waseca*, E&I Report 23-068 (May 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-waseca; and

- DOJ OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, E&I Report 16-02 (March 2016), oig.justice.gov/reports/review-federal-bureau-prisons-medical-staffing-challenges.

For prior OIG reporting on the BOP's **staffing challenges,** including use of **overtime** and **augmentation,** see:

- DOJ OIG, *Department of Justice Top Management and Performance Challenges 2023*, oig.justice.gov/reports/department-justice-top-management-and-performance-challenges-2023;

- DOJ OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee*, E&I Report 24-005 (November 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-tallahassee;

- DOJ OIG, *Inspection of Federal Correctional Institution Waseca*, E&I Report 23-068 (May 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-waseca;

- DOJ OIG, *Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues*, E&I Report 23-065 (May 2023), oig.justice.gov/reports/limited-scope-review-federal-bureau-prisons-strategies-identify-communicate-and-remedy; and

- DOJ OIG, *Management Advisory: Analysis of the Federal Bureau of Prisons' Fiscal Year 2019 Overtime Hours and Costs*, Audit Report 21-011 (December 2020), oig.justice.gov/reports/management-advisory-analysis-federal-bureau-prisons-fiscal-year-2019-overtime-hours.

For prior OIG reporting on delays in the BOP's **staff discipline** process, see:

- DOJ OIG, *Limited-Scope Review of the Federal Bureau of Prisons' Strategies to Identify, Communicate, and Remedy Operational Issues*, E&I Report 23-065 (May 2023), oig.justice.gov/reports/limited-scope-review-federal-bureau-prisons-strategies-identify-communicate-and-remedy;

- DOJ OIG, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee*, E&I Report 24-005 (November 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-tallahassee; and

- DOJ OIG, *Inspection of Federal Correctional Institution Waseca*, E&I Report 23-068 (May 2023), oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-waseca.

# Appendix 4:  Single-Celling Practices at Site Visit Institutions

We recognize that there are challenges that may make it difficult for the BOP to limit single-cell confinement in certain situations.  There may be security and logistics-related circumstances in which single-celling is unavoidable.  For example, institutions may need to place an inmate in single-cell confinement if there are no other compatible cellmates for the inmate.  Further, cases in which an inmate may pose safety and security risks to other inmates or may require protection from other inmates, due to any range of security threat group affiliations, may necessitate the BOP placing an inmate in single-cell confinement.  There may also be situations in which inmates have to be single-celled because, for example, there is an odd number of inmates in the housing unit or an inmate's cellmate has had to be transferred out.  At Federal Transfer Center (FTC) Oklahoma City, not all single-celling is avoidable because inmates may be moved out of their cells to be transferred to their destination institution, thus leaving behind their cellmate.

In the absence of an established national policy on single-celling, we observed different single-cell management practices across the three institutions we visited.  At Federal Correctional Complex (FCC) Hazelton, the Correctional Services Department generates a weekly report of single-celled inmates and the reasons for single-celling decisions while the Psychology Services Department generates daily reports of inmates who should not be placed in single-cell confinement.  These reports are shared with appropriate staff, including the Warden and the Regional Office.  FTC Oklahoma City did not have specific single-cell management procedures due to the prevalence of single-cell confinement as the high traffic of inmates transferring through the institution made single-celling unavoidable.[73]  At FCC Hazelton, one of the six inmates who died by suicide was single-celled; while at FTC Oklahoma City, five of the seven inmates who died by suicide were single-celled.

At USP Thomson, a committee consisting of the Associate Wardens, the Captain, Special Investigative Services supervisors, Unit Managers, and Psychology Services staff convene twice per week to evaluate cell pairings to reduce single-celling while ensuring the safety and security of the cellmates.  Due to the high security classification of the inmate population at the Special Management Unit (SMU), various factors, such as security threat group, gang affiliation, and sex offender status, posed significant considerations in the cell assignment decisions.[74]  A psychological reconstruction team for one of the suicides that occurred at USP Thomson recommended "double-celling inmates except under extraordinary security conditions, and only after the Chief Psychologists' and Captain's review and the Wardens' approval."

---

[73]  Staff at FTC Oklahoma City told us that prior to the pandemic holdover inmates usually stayed at the FTC for a short duration, anywhere from 2 days to 2 weeks.  However, due to COVID-19 related disruptions, inmates had been staying at the FTC much longer than normal, up to several months.  For example, we interviewed one inmate who had been at the FTC for 4 months at the time of our visit.  Due to the unique mission as a transfer center, we found that longer stays at the FTC were particularly challenging for holdover inmates because their access to personal property, commissary, programming, recreation, and care was much more limited compared to inmates' access at traditional BOP facilities.

[74]  USP Thomson operated the BOP's only SMU.  In a May 2023 status update to the OIG addressing open recommendations from our 2017 review of the BOP's use of restrictive housing for inmates with mental illness, the BOP stated that it suspended the SMU program at USP Thomson in February 2023.

# Appendix 5:  The BOP's Response to the Draft Report



**U.S. Department of Justice**

Federal Bureau of Prisons

*Office of the Director*

*Washington, DC 20534*

February 8, 2024

MEMORANDUM FOR ALLISON RUSSO
                     DEPUTY ASSISTANT INSPECTOR GENERAL,
                     EVALUATION AND INSPECTIONS

FROM:               Colette S. Peters, Director

SUBJECT:         Response to the Office of Inspector General's (OIG) Draft Report:
                       Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons
                       Institutions

The Federal Bureau of Prisons (FBOP) appreciates the opportunity to formally respond to the Office of the Inspector General's (OIG) above-referenced draft report. Thank you for your thorough and thoughtful evaluation.

At FBOP, any unexpected death of an adult in custody (AIC) is tragic. As noted in the OIG's report, we have already taken many steps to mitigate these deaths and we welcome OIG's recommendations as a way to further our efforts.

It is a priority for FBOP to address the physical and mental health needs of those in our care and custody.  Individuals in our care have often engaged in high-risk activities prior to incarceration that predispose them to acute and chronic illness, including higher incidence of mental illness, and substance use disorders. The rate of individuals who meet the clinical criteria for one or more substance use disorders is significantly higher in the FBOP population, at 31.8%, compared to 16.5% in the general U.S. population. Additionally, there is a growing body of literature studying the phenomenon of accelerated aging, wherein AICs present physiologically with characteristics 10-15 years older than their biological age. This premature health decline is thought to be due to the cumulative effect of exposure to confinement once in custody, and the factors that influenced their lives before incarceration that predispose them to poor health (e.g., social determinants of health, substance use disorders, poor access to health care, etc.).

Because our population is more susceptible to health and personal circumstances that can

Page 1 of 10

increase mortality risk, we use many approaches to prevent AIC deaths in each of our institutions. The FBOP screens all AICs entering our custody for substance use disorder, including those in active use or at risk for withdrawal. We screen for infectious diseases that may place the AIC as well as employees and other AICs at risk, such as tuberculosis and COVID. We screen for chronic and acute diseases, like Hepatitis C and HIV, as well as sexually transmitted diseases. The FBOP offers preventive health clinics that follow guidelines recommended by the U.S. Preventive Services Task Force (USPSTF) to detect diseases like colon, cervical, and breast cancers, offers immunizations for a wide range of infectious diseases, and provides education on healthier lifestyle choices, like exercise, weight loss, and commissary selection.

For many of our AICs, the care we provide is the first opportunity they have had in their lives to have access to consistent medical care and follow up. We know that health is inextricably linked to reentry success, and we do everything in our capability to send AICs home healthier than they were we they arrived on our doorstep. In many cases, I am proud to say, we succeed.

We have long prioritized suicide prevention. We train our employees on how to recognize risk indicators for suicide, get help for those at risk of suicide, and respond when an individual is attempting suicide. For example, each institution has a Clinical Psychologist designated as a Suicide Prevention Program Coordinator. These coordinators monitor at-risk individuals and guarantee adherence to assessment and intervention protocols. Also, we train and equip our employees to respond to suicide attempts. Specifically, we train employees on the appropriate use of CPR, AEDs, Narcan, and cutdown tools and ensure employees have access to those tools in the workplace.

We also have doctoral level psychologists at our institutions throughout the country providing mental health care to AICs. Any time a risk of suicide is suspected, psychologists swiftly conduct Suicide Risk Assessments. When we identify individuals at possible risk for self-harm, they are immediately safeguarded, and assessments then prompt short-term and long-term treatment plans individualized to each AIC's mental health. We work to continuously monitor, research and implement best practices as they relate to suicide prevention.

Substance use and overdoses can also lead to death. We take a multidisciplinary approach to treating substance use disorders, including Opioid Use Disorder (OUD), which affects approximately 2.7 million Americans, including 15-20% of those in our custody. Dangerous substances like fentanyl pose a health risk to those in our custody as well as our employees. We have incorporated evidence-based treatments, like Medication Assisted Treatment (MAT) and substance use disorder treatment, into our programming. These programs tackle various facets of the issue, preparing individuals to reenter their communities successfully. MAT is available across all Bureau facilities and collaborations with agencies such as the Drug Enforcement Agency (DEA) and Substance Abuse and Mental Health Services Administration (SAMHSA), Office of National Drug Control Policy (ONDCP), National Institute on Drug Abuse (NIDA), and the Justice Community Opioid Innovation Network (JCOIN) ensure consistent accessibility and success.

To reduce the risk of death by overdose, either through use or accidental exposure, we continuously work to combat contraband entering our institutions. We have heightened screening

of mail and publications and have implemented counter drone initiatives, both of which have been used to surreptitiously introduce contraband into FBOP facilities. We continue exploring innovative methods to reduce physical correspondence which may have been adulterated with illicit substances. For example, we have introduced electronic tablets in select facilities where individuals in our custody can maintain communication with friends and family without relying on physical correspondence. Concurrently, we are examining advanced screening tools, like field test kits and hyper-spectral scanners (which can detect organic vs. non-organic contraband, i.e. weapons vs. drugs), to safeguard our institutions further and maintain essential communication methods. Utilizing advanced screening tools mitigates the introduction of dangerous contraband entering our institutions and ensures the security and safety of employees and adults in custody.

To improve our capability to respond to the introduction of illicit substances, we have made the opioid reversal agent naloxone (Narcan) available in all of our institutions. All FBOP employees within the facility are trained to administer life-saving doses of naloxone to anyone suspected of experiencing an opioid overdose. By integrating OUD treatment within our existing primary and mental healthcare system, we can ensure coordination of care, consistent practice, and meaningful risk reduction.

FBOP continues to improve mechanisms to track and evaluate naloxone use and is developing a dashboard to capture all use of naloxone and patient outcomes more effectively. Current tracking methods show in the past 12 months, naloxone was administered by FBOP employees over 3,700 times to approximately 2,600 AICs at 91 institution complexes (out of 97). It is important to note that FBOP employees are trained to provide naloxone whenever overdose cannot be ruled out and not all instances of naloxone usage are for confirmed overdose.

Beyond our efforts to prevent and respond to overdose emergencies, the FBOP is committed to sustaining a culture of clinical excellence that prevents disease progression and death wherever possible. This is evident in our efforts to identify and treat Hepatitis C, where the FBOP cures more than 2300 patients a year of this deadly infection. The FBOP's innovative clinical pharmacy consultant programs expand our specialization and team-based medicine approach to complex health management. In this regard, the BOP's clinical management of hepatitis and human immunodeficiency virus (HIV) far exceed performance metrics of most state departments of corrections and have been shared with the National Institutes of Health and senior policy advisors in the White House for inclusion in federal strategic planning efforts to combat these diseases nationwide.

The FBOP dedicates significant resources to our clinical teams to ensure they have access to continuous education and training focused on correctionally sound, evidence-based care. Clinical support tools like Up to Date and the Sanford Guide are available to clinicians to inform their practice and care planning. FBOP's Health Services Division supports many avenues for continued education for its clinical and administrative professionals, including a robust residential training program that will offer more than 20 training opportunities in FY24, live and asynchronous virtual training, scholarship funding for community-based conferences and symposia, and dedicated funding for institutions to determine local training needs and programs based on their missions and care levels.

Page 3 of 10

Additionally, we use sound correctional practices throughout the country to prevent homicides in our custody. We use our National Gang Unit, Counter Terrorism Unit, and Intelligence and Investigations Unit to forestall potential conflicts that could lead to homicide. Moreover, we work proactively with external partners to continually monitor and assess risks and vulnerabilities that can lead to violence.

Also, FBOP has recently undertaken several initiatives to reduce deaths by suicide, including issuing guidance for employees to carry cutdown tools on their person; reducing the incidence of celling individuals in custody alone; and conducting specialized reviews at institutions that have higher incidence of suicide deaths. When our best efforts are not successful and death does occur, we conduct a vigorous review of homicides through our After-Action and mortality review process.

In sum, we are grateful for OIG's thorough review and thoughtful recommendations in its Report, and welcome the opportunity to continue FBOP's ongoing efforts to improve in this area. We have completed our review of the draft Report and offer the following comments regarding the recommendations.

**Recommendation 1:** Develop strategies to ensure that staff assign accurate, consistent, and timely Mental Health Care Level designations to inmates.

**FBOP Response:** FBOP concurs with this recommendation and will continue to enhance current strategies to ensure that employees assign accurate, consistent, and timely Mental Health Care Level designations to AICs. FBOP is already implementing several strategies to accomplish this important goal, as described below.

Program Statement 5310.17, Psychology Services Manual, provides time frames for assignment of mental health care levels. Per policy, AICs are to be assigned a mental health care level within two weeks of arrival to the institution at which they are initially designated. In fact, this is a program review element and good compliance has been demonstrated.

Clinicians are guided by Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness, when determining mental health care levels of adults in custody. That policy details categorical markers which guide Psychology Services clinicians in assigning mental health care levels to adults in custody. The policy also lists required documentation when certain mental health care levels are assigned. Notably, the clinical opinion of the Psychology Services clinician assessing the AIC drives the mental health care level assignment. Variability in mental health care level assignments is inherent, given the necessary reliance on the subjective clinical opinion of clinicians.

At the institutional level, Chief Psychologists should review documentation of subordinate psychologists, including documentation related to changes in mental health care level. Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness, suggests a multidisciplinary and holistic team approach to treatment of AICs and is required for those assigned Care2-MH, Care3-MH, and Care4-MH mental health care levels. During institution

Page 4 of 10

Care Coordination and Reentry Team meetings, professionals from multiple disciplines (e.g., Psychology Services, Health Services, Unit Team, Custody, Social Work, etc.) discuss numerous factors impacting the treatment of those AICs. In those settings, this multidisciplinary group discusses the accuracy of mental health care level in light of the information shared by employees from the varying disciplines.

Psychology Services Branch (PSB) clinicians in Central Office frequently review significant events from an AIC's previous institution locations, including incidents involving self-directed violence, suicide attempts, violence toward others, behavioral observations, incident reports received, etc. After reviewing such incidents and associated documentation, PSB clinicians often contact previous institutions, current supervisors, and Regional/Central Office psychologists to consult about these cases and associated clinical treatment needs. When mental health care level assignments appear inaccurate, clinicians adjust care levels accordingly to reflect historical and current presentation and treatment needs.

Additionally, PSB presents "Lessons Learned" during national psychologist trainings (to include Psychologist Familiarization, Chief Psychologist Familiarization, and Brief Cognitive-Behavioral Therapy for Suicide Prevention) when concerns regarding mental health care level assignments have arisen across the agency during psychological reconstructions of death by suicide. PSB also presents several national trainings each year targeted at discussing clinical care and treatment planning, which includes the topic of appropriate care levels.

To improve upon the efforts already made to ensure clinicians assign accurate, consistent, and timely Mental Health Care Level designations to adults in custody, PSB will include case examples and national trainings offered throughout the year. These case examples will allow for clinical conceptualization and discussion of diagnostic and care levels and associated documentation. New Chief Psychologist training will include a focus on supervision of clinical care and treatment and documentation. The National Chief Conference held in FY2024 will also include training and clinical discussion on Diagnostic and Care Level Formulation (DCLF), associated documentation, and supervision of clinician's clinical work in this area. PSB will also release a national PSB News Article on the topic of DCLFs and associated policy. Additionally, during routine consults with the field, PSB will review case documentation and treatment needs and discuss care levels for adults in custody as needed.

**Recommendation 2:** Ensure that all institutions conduct required mock suicide drills and develop strategies to increase staff participation in those drills.

**FBOP Response:** FBOP concurs with this recommendation and will continue ongoing efforts to ensure that all institutions conduct required mock suicide drills and develop strategies to increase employee participation in those drills. FBOP notes that mock suicide drills are already required. Additionally, it is important to note that the goal of any type of mock exercise is to involve as many employees as possible without disrupting the safe, secure, and orderly operation of the facility. However, FBOP will assess whether relevant employees are involved in drills and develop strategies to increase employee participation in these drills.

Program Statement 5324.08, Suicide Prevention Program, already requires institutions to conduct at least three mock suicide drills per year. To ensure compliance with this requirement, the Reentry Services Division (RSD), in conjunction with the Program Review Division (PRD) has included this task within program review guidelines for the Psychology Services Department. Should an institution be found deficient with regard to mock suicide drill requirements, that institution must propose and implement Corrective Action Plans (CAP) to improve compliance with policy (Program Statement 1210.23, Management Control and Program Review Manual). CAPs are reviewed to determine effectiveness.

During mock suicide drills, the number of employees responding is directly influenced by many variables, including the number of employees on shift, other operational needs of the institution, or if employees are needed for supervising AICs or contractors. Additionally, each institution maintains an emergency response plan with outlined expectations for employees who respond from each area of the institution to allow for a timely response while maintaining the safety and security of the facility. When employees respond to mock suicide drills, they are to do so while simultaneously ensuring adequate monitoring of AICs such that safety, security, and orderly management of the institution are all maintained.

Institution mock suicide drills are also reviewed during Operational Reviews (reviews conducted by the employees at the institution using guidelines established by the responsible FBOP Division and FBOP's Program Review Division) to ensure routine tracking and oversight of this important drill. Additionally, if emergency response is a concern identified during a suicide reconstruction, the team conducting the reconstruction reviews mock suicide drills to ensure they included adequate employee participation and realistic mock experiences to allow employees the ability to practice using emergency response equipment.

**Recommendation 3:** Ensure that all appropriate staff are trained in automated external defibrillator use and that automated external defibrillators are strategically placed, readily available, and regularly checked to ensure that they are in working order at each BOP institution.

**FBOP Response:** FBOP concurs with this recommendation and will continue to ensure that all appropriate employees are trained in automated external defibrillator use and that automated external defibrillators are strategically placed, readily available, and regularly checked to ensure that they are in working order at each FBOP institution.

Currently, all FBOP employees must complete Annual Training, including appropriate automated external defibrillator (AED) training managed by FBOP's Human Resources and Management Division and performed by employees certified as instructors by the American Heart Association. Health Services Units purchase AED's and ensure that these devices are inspected per the manufacturer recommendations. The locations of all AEDs are determined locally by the layout and accessibility of the site. Additionally, HSD evaluates recommendations made from After-Action reports to inform considerations for the appropriate location of AEDs.

Page 6 of 10

**Recommendation 4:** Ensure that cut-down tools in working order, are accessible to staff in each housing unit at each institution, that staff are trained on proper use of the tool, and that the BOP determines whether staff should be issued and required to keep their own cut-down tool on their duty belt during their entire shift.

**FBOP Response:** FBOP concurs with this recommendation and will continue to ensure that cut-down tools in working order are accessible to employees in each housing unit at each institution, that employees are trained on proper use of the tool, and that FBOP determines whether employees should be issued and required to keep their own cut-down tool on their duty belt during their entire shift. FBOP guidance already requires certain employees, including all those in housing units, to carry cut-down tools. FBOP distributed that guidance to the field in July 2023 and provided an update in September 2023. Additionally, the cut down tool and its use in emergency situations is addressed in required Annual Training, and further training in the use of cut-down tools is being developed.

**Recommendation 5:** Ensure that each institution has a sufficient number of maneuverable gurneys in strategic locations to provide proper medical response during inmate transport.

**FBOP response:** FBOP concurs with this recommendation and will continue to ensure that each institution has a sufficient number of maneuverable gurneys in strategic locations to provide proper medical response during AIC transport.

All FBOP employees are educated during Annual Training on the use of patient movers (maneuverable gurneys) utilized at that site. Each site must have the ability to efficiently move a patient and determines the most appropriate type of patient movers based on their infrastructure. FBOP plans to add language to its policy on Patient Care requiring the development of individualized institution guidance, also known as Institutional supplements. These Institutional Supplements will detail what each site must do to meet policy requirements related to transport equipment (stretchers, wheelchairs, etc.). Institutional Supplements will ensure that a national standard is appropriately applied at the local level, taking the specific characteristics of each institution into account.

**Recommendation 6:** Issue standard, enterprise-wide guidance and training to staff on using the radio to communicate clear, descriptive information during inmate medical emergencies.

**FBOP Response:** FBOP concurs with this recommendation and will continue to provide standard, enterprise-wide guidance and training to employees on using the radio to communicate clear, descriptive information during AIC medical emergencies.

Currently, new employees are trained on all emergency communication devices in phase 1 of the "Introduction to Correctional Techniques" training, and additional communication training is provided in phase 2 of the same training. Further, FBOP's mandatory Annual Training covers radio etiquette each year and information related to proper communication during emergencies. BOP will examine guidance and training currently provided to determine where improvements for clarity and descriptiveness can be made.

Page 7 of 10

**Recommendation 7:** Ensure that staff receive both the initial and refresher naloxone training and are fully prepared to administer naloxone to an unresponsive inmate suspected of having experienced a drug overdose.

**FBOP Response:** FBOP concurs with this recommendation and will continue to ensure that employees receive both initial and refresher naloxone training and are fully prepared to administer naloxone to an unresponsive AIC suspected of having experienced a drug overdose. A policy for naloxone was first issued in July 2018 as an operations memorandum. The naloxone policy institutes mandatory initial training, annual training, locations, and inventory management. The current version of the policy Program Statement 1610.01, Naloxone Procedures and Protocol for Reversal of Opioid Overdoes, was issued in December 2020.

Further, all employees are required to complete "Nasal Naloxone Administration." This course must be completed within sixty days of entry on duty and has an annual recertification requirement. Employees recertify during annual training. HSD is responsible for curriculum development and will review current training to assess for opportunities to make improvements that address identified barriers to use.

**Recommendation 8:** Ensure that all Evidence Recovery Teams are properly trained on post-incident evidence recovery protocols.

**FBOP Response:** FBOP concurs with this recommendation and will continue to ensure that all Evidence Recovery Teams are properly trained on post-incident evidence recovery protocols. Currently, FBOP institutions are required by Program Statement 5510.14, Crime Scene Management and Evidence Control, to provide eight hours of training every quarter on post-incident evidence recovery protocols. Every FBOP facility's Emergency Preparedness Officer must ensure that employees on the Evidence Recovery Team are completing this required training.

**Recommendation 9:** Develop procedures to ensure that all required death-related records are completed and collected consistently and in accordance with established deadlines.

**FBOP Response:** FBOP concurs with this recommendation and will continue to enhance procedures to ensure that all required death-related records are completed and collected consistently and in accordance with established deadlines.

HSD's Population and Correctional Health Branch, Quality Improvement Section has already begun substantive improvements to its mortality review and record tracking systems, most of which were implemented between June 2023 and January 2024. These actions include: implementing a new resource email box to improve communication between institutions and central office as it relates to AIC deaths; updating the required Multilevel Mortality Review Form (MLMR) to include additional data collection fields, expanded drop-down menu options, and electronic submission capabilities that will minimize transcription of data and input errors; updating the root cause analysis (RCA) form to provide more detail and more appropriate implementation of corrective actions; training quality improvement employees on the use of both

Page 8 of 10

forms; requiring follow up from HSD regional or central office at 6 and 12 months; establishing a multidisciplinary panel to evaluate overall appropriateness and comprehensiveness of RCAs received from institutions; and providing HSD employees with clearer guidance on required forms, timelines, and submission routes to standardize messaging and processes. We will be providing OIG with documentation of these efforts.

**Recommendation 10:** Assess the benefit and feasibility of expanding its policy requiring After Action Reviews to include reviews of all inmate homicides and deaths by accidental and unknown factors, not just for inmate suicides.

**FBOP Response:** FBOP concurs with this recommendation and has already considered the feasibility of expanding its policy requiring After-action Reviews to include reviews of all AIC homicides and deaths by accidental and unknown factors. FBOP has concluded that such a change would be overly burdensome on limited FBOP resources. However, it is important to emphasize that this is not just a resource issue. In fact, there are already steps in place that allow for reviews of all deaths in FBOP facilities, as described below.

All deaths in FBOP facilities (except legal executions) undergo a Multilevel Mortality Review (MLMR) process conducted by a multidisciplinary team of institution Health Services employees and executive leadership. This requirement is a quality improvement process that affords the institution the opportunity to identify clinical and administrative processes that can be improved through corrective actions or root cause analyses.

Further, all AIC deaths in custody by homicide and deaths by accidental and unknown factors are currently investigated and reported through a report of incident by the institution. Also, current policy allows the Regional Director the discretion to appoint an After-Action Review Team to further investigate the incident and prepare an After-Action Report.

FBOP Program Statement 5500.14, Correctional Services Procedures Manual, addresses After-action Reviews in Chapter 6, and already includes "homicides" as a major incident requiring after-action review and reporting. Additionally, "other incidents as identified by the respective Regional Director and Assistant Director, Correctional Programs Division" may also be considered major incidents requiring after-action review and reporting.

The Program Statement also indicates that, "[w]hen a major incident occurs at a Bureau or contract facility, the Regional Director may, at his or her discretion, appoint an After-Action Review Team to investigate the incident and prepare an After-Action Report." This provision allows Regional Directors discretion to consider all aspects of an incident and use sound correctional judgement in determining when an After-Action Review Team should be assembled. Current policy, therefore, already allows Regional Directors, in their discretion, to designate deaths by accidental and unknown factors as major incidents requiring after-action review and reporting, on a case-by-case basis.

However, notwithstanding the review processes that are currently in place, FBOP will assess ways to enhance its review processes so that they reach the level of effectiveness of After-Action reviews.

**Recommendation 11:** Clarify responsibility for tracking at an enterprise level the reports and recommendations required in the wake of an inmate death by suicide, homicide, accident, or unknown factors, and assess the information contained therein for broader trends, applicability, and implementation.

**FBOP Response:** FBOP concurs with this recommendation and will clarify responsibility for tracking at an enterprise level the reports and recommendations required in the wake of an AIC death by suicide, homicide, accident, or unknown factors, and will assess the information contained therein for broader trends, applicability, and implementation.

Currently, HSD's Population and Correctional Health Branch, Quality Improvement Section has established quarterly meetings with Reentry Services Division, Correctional Programs Division, and the Office of General Counsel, each of whom has an intersection with mortalities to review all deaths in the previous quarter. These meetings ensure accurate and coordinated data sharing between divisions and have already assisted in accurate reconciliation of death information. The FBOP will explore processes to improve communication between divisions who are primarily responsible for the report types that may be indicated following an AIC death, ensuring each division is aware of work being conducted in other divisions, and has access to final reports and recommendations issued through those reports.

**Recommendation 12:** Evaluate existing electronic devices used for inmate screening to identify whether they are functioning as intended, and, if necessary, implement any needed adjustments or upgrades.

**FBOP Response:** FBOP concurs with this recommendation and will continue its ongoing efforts to evaluate existing electronic devices used for AIC screening to identify whether they are functioning as intended, and, if necessary, implement any needed adjustments or upgrades.

Electronic screening devices for AICs have formed the nucleus of the agency's contraband interdiction system for over 15 years. Electronic screening devices include well-established whole body imaging metal detection technologies, and newer, emerging security technologies such as contraband cellphone identification and mitigation and Counter Unmanned Aircraft Systems (C-UAS) identification and mitigation.

FBOP's Office of Security Technology (OST) uses a continuous evaluation process for all the devices in the agency's contraband interdiction system. In fiscal years 2022 and 2023, OST evaluated whole-body imaging devices that were deployed in 2012 and were end-of-life. OST initiated replacement of these devices with newer technology that offers higher fidelity X-ray scans for contraband identification in AIC body orifices.

Page 10 of 10

98

# Appendix 6: OIG Analysis of the BOP's Response

The OIG provided a draft of this report to the BOP for its comment. The BOP's response is included in Appendix 5 to this report.

The BOP stated in its response that one of its priorities is to address the physical and mental health needs of those in its care and custody. While we acknowledge the many challenges that the BOP described in its response, including that those in its care and custody are often predisposed to acute and chronic illness and have a higher incidence of mental illness and substance use disorders than the general U.S. population, our prior OIG reports and recent unannounced inspections of BOP facilities have identified significant operational concerns in the BOP's delivery of medical care, including both physical and mental healthcare, to inmates. The BOP also noted in its response that, because its population is more susceptible to health and personal circumstances that can increase mortality risk, it utilizes many approaches to help prevent inmate deaths.

Regarding inmate suicides, the BOP stated that it has long prioritized suicide prevention and that it continuously monitors, researches, and implements best practices for preventing inmate suicides. While this report acknowledged the BOP's ongoing suicide prevention work and its recent efforts, we highlighted several areas in which the BOP's actions have not been sufficient or fully consistent with its Suicide Prevention Program policy. For example, although the BOP has recommended against single-celling inmates, noting that the practice increases the risks of inmate suicide, we found that more than half of the 187 inmates who died by suicide during the 8-year period of our evaluation were in single-cell confinement. Similarly, the BOP likely should have assigned multiple inmates who died by suicide a higher Mental Health Care Level (MHCL) designation, which would have resulted in more frequent mental health interactions and possible interventions prior to the suicides. We also found that staff did not sufficiently conduct required rounds or counts, important opportunities to monitor inmate well-being, in over a third of the inmate suicides. Some institution staff also failed to communicate with each other and coordinate efforts across departments to provide necessary treatment or follow-up with inmates in distress. Ensuring that staff assign accurate, consistent, and timely MHCL designations to inmates and increasing staff participation in mock suicide drills can help mitigate inmate suicide risk, and we encourage the BOP to prioritize completing and publishing its revised Special Housing Unit policy with language addressing single-celling of inmates.

Additionally, notwithstanding the BOP's staff training efforts, we found significant shortcomings in staff's emergency responses to nearly half of the inmate deaths in our evaluation scope. These shortcomings include a lack of urgency in emergency response, failure to bring or use appropriate emergency equipment, unclear radio communications, and issues related to administration of naloxone. Ensuring that BOP staff are trained in the use of automated external defibrillators (AED) and cut-down tools and that all equipment is in working order and readily available at each institution would better prepare institution personnel to respond to high-stress, potentially life-threatening inmate emergency situations. Similarly, enhanced staff training on using the radio to communicate clear, descriptive information during inmate medical emergencies; administering naloxone to an unresponsive inmate suspected of having experienced a drug overdose; and executing post-incident evidence recovery protocols would collectively help mitigate the risks that contribute to the deaths of inmates in federal custody.

Finally, the BOP stated that it uses sound correctional practices to prevent inmate homicides and that it conducts a vigorous review of the homicides that do occur. However, our report found deficiencies in

information collection, recordkeeping, and post-death review that limit the BOP's ability to maintain a full and accurate understanding of the deaths that occur in its custody.  We also found that the BOP is inconsistent in its requirements for post-death reviews, depending on the circumstances of the death, and that it requires After Action Reviews only for suicides but not homicides, accidents, or deaths of unknown manner.  In assessing the benefit and feasibility of expanding its After Action Reviews to include all inmate homicides and deaths by accidental and unknown factors, we urge the BOP to consider how it can better glean lessons learned from all inmate deaths, understand any contributing systemic factors and challenges, and identify and implement any enterprise-wide changes that may be warranted to minimize deaths.  To fully identify any corrective actions that may be necessary to help prevent future deaths from occurring, the BOP must develop procedures to ensure that all required death-related records are completed and collected consistently and in a timely manner.  Clarifying responsibility for tracking at an enterprise level the reports and recommendations required in the wake of inmate deaths and assessing the information for broader trends, applicability, and implementation are essential to the BOP's overall inmate death prevention strategy.

The OIG's analysis of the BOP's response regarding specific recommendations and the actions necessary to close them are discussed below.

## Recommendation 1

Develop strategies to ensure that staff assign accurate, consistent, and timely Mental Health Care Level designations to inmates.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will continue to enhance current strategies to ensure that employees assign accurate, consistent, and timely MHCL designations to inmates.  The BOP stated that it is already implementing several strategies to accomplish this important goal.

The BOP stated that institution Chief Psychologists should review documentation of subordinate psychologists, including documentation related to changes in MHCLs and that, during institution Care Coordination and Reentry Team meetings, professionals from multiple disciplines (e.g., Psychology Services, Health Services, Unit Team, Custody, Social Work) discuss numerous factors impacting inmate treatment, including the accuracy of MHCLs.  Psychology Services Branch (PSB) clinicians in Central Office frequently review significant events from an inmate's previous institution locations, including incidents involving self-directed violence, suicide attempts, violence toward others, behavioral observations, and incident reports.  After reviewing such incidents and associated documentation, PSB clinicians often contact previous institutions, current supervisors, and Regional/Central Office psychologists to consult about these cases and associated clinical treatment needs.  When MHCL assignments appear inaccurate, clinicians adjust care levels accordingly to reflect historical and current presentation and treatment needs.  The PSB presents Lessons Learned during national psychologist trainings when concerns regarding MHCL assignments have arisen across the agency during psychological reconstructions of deaths by suicide, and the PSB also presents at several national trainings each year targeted at discussing clinical care and treatment planning, which includes the topic of appropriate care levels.

To improve upon the efforts already made to ensure that clinicians assign accurate, consistent, and timely MHCL designations to inmates, the BOP stated that the PSB will include case examples and national trainings offered throughout the year, which will allow for clinical conceptualization and discussion of diagnostic and care levels and associated documentation.  The new Chief Psychologist training will include a focus on supervision of clinical care and treatment and documentation.  Additionally, the National Chief Conference to be held in FY 2024 will also include training and clinical discussion on Diagnostic and Care Level Formulation, associated documentation, and supervision of clinicians' clinical work in this area and the PSB will release a national PSB News Article on Diagnostic and Care Level Formulations and associated policy.  Lastly, the BOP stated that during routine consults with the field the PSB will review case documentation and treatment needs and discuss care levels for inmates as needed.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has developed strategies to ensure that staff assign accurate, consistent, and timely MHCL designations to inmates.

## Recommendation 2

Ensure that all institutions conduct required mock suicide drills, and develop strategies to increase staff participation in those drills.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will continue ongoing efforts to ensure that all institutions conduct required mock suicide drills and develop strategies to increase employee participation in those drills.  The BOP noted that mock suicide drills are already required; the goal is to involve as many employees as possible without disrupting the safe, secure, and orderly operation of the facility.  The number of employees responding during mock suicide drills is directly influenced by many variables, including the number of employees on shift, other operational needs of the institution, and whether employees are needed for supervising inmates or contractors.  Each institution maintains an emergency response plan with outlined expectations for employees who respond from each area of the institution to allow for a timely response while maintaining safety and security.  When employees respond to mock suicide drills, they are to do so while simultaneously ensuring adequate monitoring of inmates such that safety, security, and orderly management of the institution are all maintained.

The BOP stated that the Reentry Services Division (RSD), in conjunction with the Program Review Division (PRD), ensures compliance with this requirement by including it within the program review guidelines for the Psychology Services Department.  Should an institution be found deficient with mock suicide drill requirements, the institution must propose and implement Corrective Action Plans to improve compliance with policy, and the Plans are reviewed to determine effectiveness.  Institution mock suicide drills are also reviewed during Operational Reviews using guidelines established by the responsible BOP division and the PRD to ensure routine tracking and oversight of this important drill.  If emergency response is a concern identified during a suicide reconstruction, the BOP stated that the team conducting the reconstruction reviews the mock suicide drills to ensure that they included adequate employee participation and realistic mock experiences to allow employees the ability to practice using emergency response equipment.

**OIG Analysis:** The BOP's planned actions are responsive to the recommendation. By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has ensured that all institutions conduct required mock suicide drills and has developed strategies to increase staff participation in those drills.

## Recommendation 3

Ensure that all appropriate staff are trained in automated external defibrillator use and that automated external defibrillators are strategically placed, readily available, and regularly checked to ensure that they are in working order at each BOP institution.

**Status:** Resolved.

**BOP Response:** The BOP concurred with this recommendation and stated that it will continue to ensure that all appropriate employees are trained in AED use and that AEDs are strategically placed, readily available, and regularly checked to ensure that they are in working order at each BOP institution. The BOP stated that all employees must complete Annual Training, including appropriate AED training managed by the BOP's Human Resources and Management Division and performed by employees certified as instructors. Health Services Units purchase AEDs and ensure that the devices are inspected per the manufacturer recommendations and that the locations of all AEDs are determined locally by the layout and accessibility of the site. The BOP stated that the Health Services Division (HSD) evaluates recommendations made from After Action Reports to inform considerations for the appropriate location of AEDs.

**OIG Analysis:** The BOP's planned actions are responsive to the recommendation. By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has ensured that all appropriate staff are trained in AED use and that AEDs are strategically placed, readily available, and regularly checked to ensure that they are in working order at each BOP institution.

## Recommendation 4

Ensure that cut-down tools in working order are accessible to staff in each housing unit at each institution, that staff are trained on proper use of the tool, and that the BOP determines whether staff should be issued and required to keep their own cut-down tool on their duty belt during their entire shift.

**Status:** Resolved.

**BOP Response:** The BOP concurred with this recommendation and stated that it will continue to ensure that cut-down tools in working order are accessible to employees in each housing unit at each institution and that employees are trained on proper use of the tool, in addition to determining whether employees should be issued and required to keep their own cut-down tool on their duty belt during their entire shift. The BOP stated that guidance already requires certain employees, including all those in housing units, to carry cut-down tools and that it distributed that guidance to the field in July 2023 and provided an update in September 2023. The BOP stated that the cut-down tool and its use in emergency situations is addressed in the required Annual Training and that further training in the use of cut-down tools is being developed.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has ensured that cut-down tools in working order are accessible to staff in each housing unit at each institution, that staff are trained on proper use of the tool, and that the BOP has determined whether staff should be issued and required to keep their own cut-down tool on their duty belt during their entire shift.

## Recommendation 5

Ensure that each institution has a sufficient number of maneuverable gurneys in strategic locations to provide proper medical response during inmate transport.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will continue to ensure that each institution has a sufficient number of maneuverable gurneys in strategic locations to provide proper medical response during inmate transport.  All BOP employees are educated during Annual Training on the use of patient movers (maneuverable gurneys) and the ability to efficiently move a patient and determine the most appropriate type of patient movers based on infrastructure.  The BOP plans to add language to its Patient Care policy requiring the development of individualized institution guidance, also known as Institutional Supplements, which will detail what each site must do to meet policy requirements related to transport equipment (e.g., stretchers, wheelchairs, etc.).  The BOP stated that the Institutional Supplements will ensure that a national standard is appropriately applied at the local level, taking the specific characteristics of each institution into account.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has ensured that each institution has a sufficient number of maneuverable gurneys in strategic locations to provide proper medical response during inmate transport.

## Recommendation 6

Issue standard, enterprise-wide guidance and training to staff on using the radio to communicate clear, descriptive information during inmate medical emergencies.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will continue to provide standard, enterprise-wide guidance and training to employees on using the radio to communicate clear, descriptive information during inmate medical emergencies.  The BOP stated that new employees are trained on all emergency communication devices in Phase 1 of the Introduction to Correctional Techniques training and that additional communication training is provided in Phase 2 of the same training.  Further, the BOP stated that mandatory Annual Training covers radio etiquette each year and information related to proper communication during emergencies.  The BOP stated that it will examine guidance and training currently provided to determine where improvements for clarity and descriptiveness can be made.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has issued standard, enterprise-wide guidance and training to staff on using the radio to communicate clear, descriptive information during inmate medical emergencies.

## Recommendation 7

Ensure that staff receive both the initial and refresher naloxone training and are fully prepared to administer naloxone to an unresponsive inmate suspected of having experienced a drug overdose.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will continue to ensure that employees receive both initial and refresher naloxone training and are fully prepared to administer naloxone to an unresponsive inmate suspected of having experienced a drug overdose.  The BOP stated that a naloxone policy was first issued in July 2018 as an operations memorandum, which instituted mandatory initial training, annual training, naloxone locations, and inventory management.  The BOP issued the current version of the policy, Program Statement 1610.01, Naloxone Procedures and Protocol for Reversal of Opioid Overdose, in December 2020.  Further, the BOP stated that all employees are required to complete the Nasal Naloxone Administration course within 60 days of entry on duty and are required to recertify annually.  The HSD is responsible for curriculum development, and the BOP stated that it will review current training to assess opportunities to make improvements addressing identified barriers to use.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has ensured that staff receive both the initial and refresher naloxone training and are fully prepared to administer naloxone to an unresponsive inmate suspected of having experienced a drug overdose.

## Recommendation 8

Ensure that all Evidence Recovery Teams are properly trained on post-incident evidence recovery protocols.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will continue to ensure that all Evidence Recovery Teams (ERT) are properly trained on post-incident evidence recovery protocols.  BOP institutions are required by policy to provide 8 hours of training every quarter on post-incident evidence recovery protocols, and every BOP facility's Emergency Preparedness Officer must ensure that employees on the ERT are completing this required training, the BOP stated.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has ensured that all ERTs are properly trained on post-incident evidence recovery protocols.

## Recommendation 9

Develop procedures to ensure that all required death-related records are completed and collected consistently and in accordance with established deadlines.

**Status:** Resolved.

**BOP Response:** The BOP concurred with this recommendation and stated that it will continue to enhance procedures to ensure that all required death-related records are completed and collected consistently and in accordance with established deadlines. The HSD's Population and Correctional Health Branch, Quality Improvement Section, has already begun substantive improvements to its mortality review and record tracking systems, most of which were implemented between June 2023 and January 2024. These actions include: implementing a new resource email box to improve communication between institutions and Central Office on inmate deaths; updating the required Multilevel Mortality Review (MLMR) Form to include additional data collection fields, expanded drop-down menu options, and electronic submission capabilities to minimize transcription of data and input errors; updating the root cause analysis form to provide more detail and more appropriate implementation of corrective actions; training quality improvement employees on the use of both forms; requiring follow-up from the HSD at Regional or Central Office at 6 and 12 months; establishing a multidisciplinary panel to evaluate overall appropriateness and comprehensiveness of root cause analysis received from institutions; and providing HSD employees clearer guidance on required forms, timelines, and submission routes to standardize messaging and processes.

**OIG Analysis:** The BOP's planned actions are responsive to the recommendation. By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has developed procedures to ensure that all required death-related records are completed and collected consistently and in accordance with established deadlines.

## Recommendation 10

Assess the benefit and feasibility of expanding its policy requiring After Action Reviews to include reviews of all inmate homicides and deaths by accidental and unknown factors, not just for inmate suicides.

**Status:** Resolved.

**BOP Response:** The BOP concurred with this recommendation and stated that it has already considered the feasibility of expanding its policy requiring After Action Reviews to include reviews of all inmate homicides and deaths by accidental and unknown factors. The BOP concluded that such a change would be overly burdensome on its limited resources and that procedures are already in place to allow for reviews of all deaths in BOP facilities. The BOP stated that all deaths in BOP facilities (except legal executions) undergo a MLMR process conducted by a multidisciplinary team of institution Health Services employees and executive leadership. This requirement affords the institution the opportunity to identify clinical and administrative processes that can be improved through corrective actions or root cause analyses. Further, the BOP stated that all inmate deaths by homicide, accidental, and unknown factors are currently investigated and reported through a Report of Incident by the institution. The BOP noted that current policy allows the Regional Director the discretion to appoint an After Action Review team to further investigate the potential homicide, accidental, and unknown death incidents and prepare an After Action Report.

Nevertheless, the BOP stated that it will assess ways to enhance its review processes so that they reach the level of effectiveness of After-Action Reviews.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  While BOP policy requires that all deaths at BOP facilities undergo an MLMR, we found that the MLMRs do not delve as far as After Action Reviews in identifying root causes and effective recommendations to prevent similar deaths in the future.  Also, while Regional Directors have the discretion to conduct an After Action Review for major incidents, including homicides, without a policy requirement, resource limitations and other factors could mean that Regional Offices can simply decline to conduct an After Action Review, thereby missing a vital opportunity to contribute to the BOP's broader understanding of lessons learned, contributing systemic factors and challenges, and enterprise-wide changes that may be warranted to minimize deaths.  While we recognize the BOP's resource limitations, we believe that it is imperative that the BOP consider requiring After Action Reviews of all homicides, as well as deaths resulting from accidental or unknown factors.  By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has assessed the benefit and feasibility of expanding its policy requiring After Action Reviews to include reviews of all inmate homicides and deaths by accidental and unknown factors, not just for inmate suicides.

## Recommendation 11

Clarify responsibility for tracking at an enterprise level the reports and recommendations required in the wake of an inmate death by suicide, homicide, accident, or unknown factors, and assess the information contained therein for broader trends, applicability, and implementation.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will clarify responsibility for tracking at an enterprise level the reports and recommendations required in the wake of an inmate death by suicide, homicide, accident, or unknown factors and will assess the information contained therein for broader trends, applicability, and implementation.  The BOP stated that the HSD's Population and Correctional Health Branch, Quality Improvement Section, has established quarterly meetings with the RSD, Correctional Programs Division, and the Office of General Counsel, each of which review all deaths that occurred during the previous quarter.  These meetings ensure accurate and coordinated data sharing between divisions and have already assisted in accurate reconciliation of death information.  The BOP stated that it will explore processes to improve communication between divisions primarily responsible for the report types that may be indicated following an inmate death, ensuring that each division is aware of work being conducted in other divisions and has access to final reports and recommendations issued in those reports.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has clarified responsibility for tracking at an enterprise level the reports and recommendations required in the wake of an inmate death by suicide, homicide, accident, or unknown factors, and assessed the information contained therein for broader trends, applicability, and implementation.

## Recommendation 12

Evaluate existing electronic devices used for inmate screening to identify whether they are functioning as intended, and, if necessary, implement any needed adjustments or upgrades.

**Status:**  Resolved.

**BOP Response:**  The BOP concurred with this recommendation and stated that it will continue its ongoing efforts to evaluate existing electronic devices used for inmate screening to identify whether they are functioning as intended, and, if necessary, implement any needed adjustments or upgrades.  The BOP stated that electronic screening devices for inmates have formed the nucleus of its contraband interdiction system for over 15 years.  Those devices include whole body imaging metal detection technologies and newer, emerging security technologies to identify and mitigate contraband cell phones and Unmanned Aircraft Systems.  The BOP stated that its Office of Security Technology uses a continuous evaluation process for all the devices in the agency's contraband interdiction system.  During FYs 2022 and 2023, the Office of Security Technology evaluated whole body imaging devices that were deployed in 2012 and at end-of-life.  As a result, the BOP stated, it initiated replacement of these devices with newer technology that offers higher fidelity x-ray scans for contraband identification in inmate body orifices.

**OIG Analysis:**  The BOP's planned actions are responsive to the recommendation.  By May 15, 2024, please provide the OIG with information and documentation evincing that the BOP has evaluated existing electronic devices used for inmate screening to identify whether they are functioning as intended and, if necessary, implemented any needed adjustments or upgrades.