# **EXHIBIT C**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Docket No: 0422 1:23CR00119-001 |
| Plaintiff | ) | U.S. District Judge Leonie M. Brinkema |
| v. | ) | AFFIDAVIT OF |
| CONOR BRIAN FITZPATRICK | ) | ROBERT NAGLE PsyD |
| Defendant. | ) | |

### DECLARATION OF ROBERT NAGLE

I, Dr. Robert Nagle, declare that the following statements are true:

### BACKGROUND OF DECLARANT

1. I currently work as a Consultant/Licensed Clinical Psychologist after retiring in December 2022 from a 24-year career with the Federal Bureau of Prisons (BOP).

2. During my last 30 months with the BOP, I worked in the Central Office as the Chief of Mental Health Services with national oversight responsibilities for all agency staff and inmate mental health services. I am a consulting expert on BOP policy issues.

3. I served as the National Suicide Prevention Coordinator in the Central Office during the previous 7.5 years. I oversaw the national suicide prevention program for the BOP and was responsible for creating and implementing policy throughout the agency to enhance suicide prevention.

4. I also served as Chief Psychologist at FCC Coleman, USP Atwater, and FCC Petersburg.

After those assignments I was the Mid-Atlantic Region Psychology Services Administrator where I was responsible for training staff in the region as well as supervising the Regional Psychology Treatment Program Coordinator.

5.   A copy of my resume which includes my relevant work experience is attached to this report as Exhibit A.

6.   The opinions I have expressed in this report represent my true and complete professional opinions on the matter to which they refer.

## STATEMENT OF WORK

7.   I was engaged by attorney Peter Katz of the Law Offices of Peter Katz, who represent defendant Conor Brian Fitzpatrick, to assess likely conditions of confinement, considering the defendant's complex psychological, neurodevelopmental and social needs, if he is committed to the BOP for service of a custodial sentence.  In preparing this letter I reviewed the following documentation:

- Presentence Investigation Report (PSR) dated January 8, 2023
- Psychological Evaluation by Dr. Jill Belchic Schwartz dated August 22, 2023
- Psychological Assessment by Dr. Darrel B. Turner, dated May 8 and 19, 2025
- Defendant's Memorandum In Aid of Sentencing
- Judgement In a Criminal Case
- Position of The United States With Respect to Sentencing
- Exhibits A, B, C, and D
- Defendant's Memorandum in Aid of Sentencing

## EXECUTIVE SUMMARY

8.   Mr. Conor Fitzpatrick has pled guilty to Conspiracy to Commit Access Device Fraud, 18 U.S.C. § 1029(b) and 3559(g)(1); Solicitation for the Purpose of Offering Access Devices, 18 U.S.C. § 1029(a)(6) and Possession of Child Pornography, 18 U.S.C. § 2252(a)(4)(B) and (b)(2) in the Eastern District of Virginia.

9. He is 22 years old and was diagnosed with Autism Spectrum Disorder (ASD) in 2023 and Attention Deficit Hyperactivity Disorder (ADHD) in 2020, although he has shown a constellation of symptoms across his lifespan. His daily life is characterized by a paucity of social connection, relational naivete, distractibility, anxiety, depression, and self-directed violence (SDV) and suicide attempts. Mr. Fitzpatrick attended Charlie Health, for medication management, a virtual intensive outpatient group treatment program and individual session between May 2023 until August 2023. He returned to Westchester Jewish Community Service (WCJS) on September 29, 2023, and has been meeting for weekly therapeutic sessions. He is currently prescribed Zoloft, commonly used to treat depression, social anxiety and panic.

10. This is Mr. Fitzpatrick's first involvement with the criminal justice system. With court ordered outpatient treatment that addresses ASD associated vulnerabilities (e.g., social affect, social perspective taking, social communication skills, social interaction skills, emotional and behavioral regulation, social problem solving skills, emotional labeling, etc.), behavioral activation to increase interpersonal comfort and effectiveness, monitored electronic device usage, preventative treatment to reduce the risk of suicide (e.g., Brief Cognitive Behavior Therapy for Suicide; Cognitive Behavioral Therapy-Suicide Prevention; Collaborative Management and Assessment of Suicidality, etc.) and sex offender treatment that targets sexual self-regulation deficits and sexual deviancy, intimacy skills deficits and emotional self-regulation using cognitive behavioral techniques to focus on skills acquisition and practice he is at reduced risk for reoffending and can increase and properly share his valued assets with society.

## BOP DESIGNATION

11. If Mr. Fitzpatrick is ultimately sentenced to a term of incarceration, the BOP will make the decision about where he serves his time after sentencing is complete. This process is known as designating. Ms. Shannon Race, a Prisonology expert previously worked for the BOP in the Designation and Sentence Computation Center (DSCC) and was responsible for determining security classification and complex sentence computations. She concluded that Mr. Fitzpatrick's initial security classification will likely be Low security (See Exhibit B), due to the Public Safety Factor (PSF) of sex offender even though he has no prior criminal history, no history of violence or escape and no additional pending charges.

## MENTAL HEALTH

12. Mr. Fitzpatrick presents mental health, neurodevelopmental, and SDV histories. In 2019, he was diagnosed with social anxiety disorder and paraphilia, followed by ADHD and depression in 2020 and ASD in 2023.

13. Mr. Fitzpatrick was evaluated by Dr. Schwartz who states:

> Conor was referred for this evaluation at the request of his parents and attorney to determine if his constellation of symptoms met criteria for an autism spectrum disorder (ASD). In addition, the treating psychiatrist during Conor's most recent inpatient psychiatric hospital stay as well as his recent outpatient therapist, raised concerns that he may have autism. Per this evaluation of Conor with the ADOS-2, he does in fact meet criteria for ASD. While he performed well within the structure of a 1:1 interaction, his difficulties were evident within the area of Social Affect on the ADOS-2. Conor showed weaknesses in the area of 'social affect' which included features of his 'social communication skills' and his 'social interaction skills' are impacted by his specific difficulty with direct 'eye contact.' This one feature of Conor's social behavior is particularly noticeable to others, and likely interferes with his quality of social interaction, especially with unfamiliar/new peers and adults. Of note, during the ADOS-2 administration, Conor did not display any of the 'rigid/restricted or repetitive behaviors' associated with an autism spectrum disorder. However, he has a clear history of difficulties in this area. Conor's performance on

the ADOS-2 clarifies his areas of needed intervention, which are related to 'social affect' including his 'comfort' in social interactions and (fluid) social communication/pragmatic skills as well as emotional and behavioral regulation (emotional labeling and more effective social problem-solving skills).

14. He engaged in SDV, routinely cutting his leg, between 2019 and 2023. Mr. Fitzpatrick first attempted suicide in November 2019 by overdosing on Benadryl and cough syrup due to school-related stress. He was hospitalized for two weeks and began outpatient counseling with WJCS. In April 2023, following his arrest on the instant offense, he attempted suicide a second time by ingesting a combination of medications including Benadryl, Hydroxyzine, Sertraline, Adderall, and Ropinirole. He was again hospitalized and referred to a intensive outpatient care following his discharge.

15. Mr. Fitzpatrick also reported being a victim of online sexual abuse by older men. According to the PSR:

> The defendant noted that when he was around the age of 13 or 14, he engaged in "online sexual abuse" with older men. He stated that he would meet the men on twitter and that the men would ask him to send pictures and videos of his genitalia, which he did. The defendant continued to send pictures and videos until he was approximately 16 and that is when he realized it was not normal. He never reported the abuse to his parents or to law enforcement. According to a Westchester Jewish Community Services Initial Assessment-Child, dated June 13, 2019, the defendant was taken to the assessment by his parents after an incident with the FBI. The defendant was contacted by the FBI after posting explicit sexual images of himself and then sending them to a 14-year-old boy. The defendant indicated the images were exchanged between both parties and that the defendant received nude images from the other boy. The incident occurred in 2018 but the FBI contacted the family in 2019. The defendant and his parents met with the FBI and spoke with them briefly. The defendant was told not to exchange explicit images anymore.

**PRISON CONDITIONS**

16. There are several broad categories of prison life that can be challenging, difficult to understand and/or distressing for all people but particularly those with ASD, SDV and suicide attempts and psychological concerns, like Mr. Fitzpatrick. These include:

a. Elevated Risk of Death

    i. Mental health services in the BOP are seriously understaffed and treatment is prioritized based on a combination of staff availability and/or inmate need. This results in unpredictability, under treatment or neglect. Inmates with serious conditions like Mr. Fitzpatrick are often left to their ingenuity to manage complicated psychological concerns. Death by suicide and SDV are significant concerns. The number one cause of death in federal prison is suicide. Following an investigation into the causes of death in federal prisons, The Office of Inspector General found that the BOP identified a total of 344 inmate deaths at BOP institutions from FY 2014 through FY 2021 that fell into one of four categories: (1) suicide, (2) homicide, (3) accident, and (4) those resulting from unknown factors. Suicides comprised most of these deaths, with homicides the next most prevalent. Many of the deaths that occurred under accidental or otherwise unknown circumstances involved drug overdose.[1] The following is a graphic from that report:

Inmate Deaths by Type, FYs 2014–2021



Source: OIG analysis of BOP data

---

[1] Department of Justice Office of the Inspector General, "Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions – Evaluation and Inspections Division (24-041), February 2024.

b. Sensory sensitivities

   i. Prisons are extraordinarily loud. Construction materials (e.g., concrete and steel), layout (e.g., large rooms with high ceilings) and décor (e.g., non-absorbing) result in sound amplification and echoing. Inmate conversations, arguments, homemade radio speakers, telephone calls, game playing/exercise, activities of daily living (e.g., cooking, cleaning, showering) all generate noise that is not easily ignored or dissipated. Staff two-way radios, telephones and overhead announcements are unpredictable and contribute to the persistently high noise level. In addition to this may be sounds from overhead lights or other electronic buzzing (e.g., stand alone or hand-held metal detectors). Most people can habituate to loud environments. People with ASD are frequently impaired in this area and are subject to being perpetually overwhelmed. It is well documented that up to 95% of individuals with ASD experience atypical responses to sensory stimuli.

   ii. Prisons have strong smells such as body odor from reduced bathing by choice or prison schedules. Often urine and feces can be detected because cells have not been properly cleaned between housing assignment changes, limited availability of cleaning resources not infrequently intentionally withheld, or behaviorally disordered or mentally ill inmates engage in fecal misuse. Food preparation, whether in the formal dining hall or informally with canteen items in microwaves within housing units, generate strong odors.

7

iii. Lighting serves security needs and is frequently unaligned with the natural light dark cycle common outside of prison. For example, lights outside of prison building are very bright and remain on all night. They often shine in cell windows and inmates have no means to block them out. Although an inmate generally turns off his cell light at night this can be overridden by any staff member and interrupt normal sleep cycles. Officers making rounds throughout the night shine bright flashlights into cells to ensure the presence and well-being of inmates. This process is also very disruptive, and a small number of officers may use it as an informal means of harassment or "get-even" for perceived slights with some inmates. Inmates with ASD may be considerably agitated and/or disoriented.

c. Isolation

i. According to the Department of Inspector General, "…inmates with mental illness spend disproportionately longer periods of time in restrictive housing then do their peers.[2] " This separation from general population exacerbates a broad range of psychological distress as evidenced by hopelessness, helplessness, paranoia, functional impairment, impaired motivation and suicidality. It also reduces the ability to access peer supports and delegitimizes the idea that inmates with a mental illness can function independently albeit with some targeted interventions.

---

[2] DOJ-OIG. "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates With Mental Illness." July 2017.

    ii. It is well documented that inmates with ASD spend more time in restrictive housing. This may be driven by peculiar and idiosyncratic behaviors and rituals that are not socially acceptable or tolerated by the larger prison population. In prison vernacular they may be run-in. If their rituals are considered more extreme, bizarre or challenging to the overall culture the consequences may be more immediate and extreme.

    iii. Inmates with ASD may be anxious and fearful and isolate in restrictive housing out of an abundance of caution. These fears may appear unfounded to many but often reflect challenges in understanding the complex formal and informal social hierarchies of prison life.

d. Disruption of routines

    i. A characteristic of ASD is cognitive rigidity or the inability to think about things in a different way. Prison is generally considered as a place that affords structure and predictability. When examined more closely though this does not account for common and sudden changes (e.g., transfers, lockdowns, discharge of firearm, fights and assaults, etc.) that inject instability and unpredictability. For anyone with ASD these incidents can cause outsized levels of anxiety and stress.

e. Relationships with staff and other inmates.

    i. Inmates with ASD experience difficulties in being able to read the emotional expression on other people's faces which can lead to confusion. Making and maintaining eye contact is a known issue for

9

people with ASD and in prison they may be perceived as uninterested or as being overly aggressive or challenging. Both issues can have life altering consequences. Additionally, they may not understand the unwritten social rules in the prison environment such as the need to maintain proper body spacing.

ii. Due to a general lack of understanding of the nuances of how people with ASD present and process information, correctional staff generally afford them less empathy, assistance and support than they require. This exacerbates their adjustment issues and leads to further isolation and difficulty adjusting to prison.

f. Violence Prone Characteristics

i. Deprivation of material goods. The correctional setting controls inmate's access to resources such as telephones, email, commissary (e.g., food, clothing and healthcare/hygiene items), employment, showers, and housing (e.g., cells). By controlling access to limited resources, staff create competition among inmates and incentivize underground economies. Because inmates resist impoverishment and loss of self-image, they will go to extremes to mitigate material deprivation. For example, even when staff provide an inmate with a cell or desirable employment, Mr. Fitzpatrick may have to pay a financial, commissary, safety or sexual fee to other inmates or risk losing what he has so tenuously gained.

ii. High risk of victimization. Survival in a correctional setting is predicated on understanding and adapting to the many formal prison rules along with the informal and ever-evolving ethos established by the inmate population. Inmates will view Mr. Fitzpatrick as easy prey because he is identified as someone convicted of a sex offense and has a mental illness and neurodevelopmental challenges. As a result, he will draw predatory attention and need to develop strategies to ensure his safety. This is especially dangerous when peers are motivated by power and status without consideration for a person's mental health needs or other pro-social concerns.

iii. Loss of Personal Autonomy. Incarceration is characterized by severely limited self-determination. Inmates are told when, where and how quickly they can walk, what programming they must attend, where and with whom they will live, what they will eat, when to sleep and wake, and how they must dress, comport and interact with others. Any inmate's actions are subject to the scrutiny and judgement of any staff member at any time. With such restricted autonomy inmates are sensitized to the balance of power between them and other inmates, the imbalance of power with staff, and whether power is legitimate.

iv. Lack of non-violent routes for resolving conflicts. Inmates lack formal avenues to resolve disputes nonviolently. There are no impartial dispute mediators, opportunities to negotiate win-win solutions, or safe settings to address grievances. These absences leave inmates reliant on what

they bring with them from outside as well as what the predominate inmate culture imposes.

## ADJUSTMENT TO PRISON

17. Mr. Fitzpatrick exhibits underdeveloped and misapplied social and emotional skills, inability to appropriately navigate routine social exchanges, off-putting non-verbal communications, and emotional discomfort and neglect.  What is often confusing for individuals like Mr. Fitzpatrick, are the unwritten rules and the sub-culture established by inmates.  Survival in a correctional setting is predicated on understanding and adapting to formal prison rules along with the informal and ever-evolving ethos established by the inmate population.  It is likely that Mr. Fitzpatrick will have difficulty adapting to unwritten inmate rules and be more prone to inadvertently breaking the rules when pressured and spending time in the Special Housing Unit (SHU).  This is especially dangerous in a correctional setting when those peers are motivated by power and status without consideration for a person's health needs or other pro-social concerns.

18. People like Mr. Fitzpatrick who have ASD and a history of being sexually abused are at an increased risk for victimization, sexual assault, exploitation (e.g., financial, material goods, protection, etc.) and a range of other negative outcomes because of how they present to others and their diminished understanding of the emotional aspects of interactions. Mr. Fitzpatrick may struggle to consistently and successfully adapt his behavior in ways which would be protective.  This same dynamic will manifest itself in his relationship with staff who purportedly exist to afford him safety and guidance.

19. Inmates will view Mr. Fitzpatrick as easy prey because he is weak, awkward, and socio-emotionally unsophisticated.  As a result, he will be ostracized and isolated.  Mr.

Fitzpatrick's social awkwardness, underdeveloped communication skills, and his inability to read/interpret non-verbal cues make him much more susceptible to abuses by gang members, sexual predators, and criminal miscreants one encounters in the correctional setting.

20. As a result of his neurodevelopment, mental health problems and sexual abuse history he is likely to face significant risks to his physical safety, challenges to establishing appropriate, reasonable, and reliable staff and inmate relationships, and an elevated risk of being victimized physically, mentally, and emotionally, by stronger, more skilled, socially adept, and manipulative inmates.

21. Due to naiveté and behavioral oddities, it is probable Mr. Fitzpatrick will subjectively experience a harsher sentence than other offenders by orders of magnitude. Inmates are deliberate about the complex, unspoken social dynamics that focus on the accumulation of power and influence using violence, sexual predation, contraband, gang affiliation and illicit schemes. Complicating this is Mr. Fitzpatrick's social and emotional challenges.

22. If a lengthy sentence of incarceration is imposed, Mr. Fitzpatrick will probably be exposed to inmate machinations and may be preyed upon due to his eccentricities, social awkwardness, standoffishness, and difficulty reading and responding to emotional cues. This is a highly significant consideration when making designation and treatment recommendations where inmates are constantly evaluating each other to determine social dominance roles. In simplified terms one is either prey or victimizer.

23. The SHU is a specialty housing unit primarily to separate inmates from the general population for disciplinary, safety and security purposes. Whatever the reason it is universally understood to be aversive and negatively contributes to inmate well-being.

When housed in SHU inmates are afforded limited recreation opportunities, increased risk of violence, significantly reduced agency and ability to protect themselves, reduced staff accessibility and interaction, and an overall degradation of psychological well-being. For an individual such as Mr. Fitzpatrick, who would arrive in SHU with considerable deficits and challenges, it is easy to appreciate its considerable detrimental effects.

24. If Mr. Fitzpatrick spends considerable time in the SHU due to ASD associated conflicts, misunderstandings, and difficulties with staff and inmates, as is predicted, it would directly affect his ability to complete recommend programming. This is another example of how his sentence will be notably worse.

25. Mr. Fitzpatrick will face additional obstacles during his incarceration. Due to his diagnosis of ASD with mental health and sexual regulation problems, he will face enhanced scrutiny and rejection when he is considered for residential reentry placement (e.g., halfway house.) This will be due to several factors such as limited RRCs with a specialty in working with inmates who are neurodiverse, have mental health and behavioral disorders and have been convicted of a sex offense.

26. The BOP will offer assurances that they will consider judicial recommendations for a facility, treatment program and other considerations. However, they will also assert that in the end they have final decision-making authority. Mr. Fitzpatrick's diagnosis and its downstream consequences will have little impact on the ultimate decision made about where he is designated.

## TREATMENT AVAILABLE TO MR. FITZPATRICK

27.  At this time the BOP does not have a treatment program targeted to address the specific needs of people with ASD. The most relevant residential treatment resource is the Skills Program that exists at two facilities (e.g., FCC Coleman Medium and FCI Danbury Low). This is a residential treatment program designed to improve institutional adjustment for those who have intellectual and social impairments. The Skills Program may offer some limited assistance with Mr. Fitzpatrick's social and emotional needs.

28.  As noted below, the BOP continues to experience persistent staffing problems. This includes the hiring and retention of Psychologists, Treatment Specialists, Unit Team staff, and Correctional Officers for mental health treatment programs such as the Skills Program. Reduced staffing impacts the routine availability of programming, full implementation of treatment protocols, and implementation of milieu learning with necessary staff mentoring. The BOP has addressed this problem by creating waiting lists for entry into the programs as well as reducing the number of participants who can participate in treatment at any given time. These solutions create significant treatment log jams as treatment capacity never catches up with treatment need. The priority for the BOP is always agency need and it supersedes the safety considerations, treatment needs and quality of life considerations of inmates.

29.  An additional concern is if Mr. Fitzpatrick is lucky enough to be designated to the Skills Program is that the BOP will not provide any assurances as to when it will occur. Mr. Fitzpatrick, even if he receives a judicial recommendation or is identified within the BOP as likely benefiting from the Skills Program, may not arrive for months or even years into his sentence. This negates any safety, and treatment benefits the BOP advertises.

## BOP SYSTEMIC CHALLENGES

30. The BOP continues to experience well publicized examples of staffing shortages that result in lapses of professionalism such as misconduct and policy failures with expected negative consequences. The resultant physical, emotional and psychological harms result in unjust but preventable suffering. Staffing shortages mean that inmates receive less frequent, lower quality services in everything from medical care, safety from self and others, case management, and psychological care. Without routine contact and investment in the well-being of Mr. Fitzpatrick it is likely he will withdraw and may be subject to unnecessary inmate exploitation outside of the awareness of correctional staff.

31. BOP staff struggle to build affirming, positively reinforcing and engaged professional relationships with inmates. Optimally, these model pro-social attitudes and negate the most corrosive effects of incarceration such as isolation, boredom and overexposure to criminality. The BOP did not always have these problems and many factors such as position eliminations, Congressional underfunding, staffing shortages, an unspoken belief in the redeemability of individual inmates, a refusal to integrate academic knowledge into practical correctional approaches, widespread training deficiencies, and a cultural affinity for emotionally driven retribution have contributed to recent failures within the BOP. Mr. Fitzpatrick's crime, behavioral oddities, and socio-emotional deficits will likely cause him to be neglected in ways that exacerbate the worst tendencies of agency staff.

## CONCLUSION

32. The BOP routinely answers inquiries about their ability to manage and treat people like Mr. Fitzpatrick referring to care levels, medical centers, doctoral level psychologists and the Skills Program. It is also true that there is no developed expertise in treating Neurodevelopmental Disorders in the BOP to include intensive residential programming or structured non-residential interventions. What expertise may exist tends to be random rather than the result of centralized planning and training.

33. Deficits in social communication and social interaction are routinely considered low risk, low priority problems that do not pose significant security and management concerns. Resources to optimize interventions such as trained, certified, collaborative, resourced and well-intentioned teams made up of Psychology Services, Health Services and Correctional Services are usually fragmented and minimally effective due to overwork, competing interests and inadequate resource allocation. Medication, environmental contingencies, and individualized treatment are rarely agreed upon due to reduced staffing, reluctance to support long term, complex treatment by institutional, regional and agency leadership and a cultural unwillingness to accept that good treatment is good security.

34. Mr. Fitzpatrick is compliant on home confinement, which I will remind the Court is a part of the BOP's program for reintegration of inmates back into society. Under the Second Chance Act, the BOP commonly places inmates in the community during the last part of their sentence. Inmates are allowed up to 365 days of pre-release custody in the community of which a portion, 10% of the imposed sentence capped at 6 months, can be on home confinement. Whatever term of incarceration the Court imposes, will most certainly end in a similar term of supervision toward the end of his sentence.

35. The security level of Mr. Fitzpatrick will place him in a low security prison, not a minimum-security camp.   As an inmate convicted of a sex offense with neurodevelopmental concerns he will be subjected to bullying, social exclusion, extortion and, at worst, physical assault in prison.  This could possibly lead to protective custody, isolation in Special Housing and ultimately transfer to another facility.

36. Mr. Fitzpatrick's mental health and his past suicide attempts present real concerns.  While the BOP has mental health professionals, prison presents many challenges for caring for inmates with mental health diagnoses.  Even those who with no mental health concerns can have a difficult time transitioning to prison.  Those with mental health and neurodevelopmental concerns have a more difficult time.

37. It is widely accepted that the loss of freedom that results when a period of incarceration is imposed should be the sole punishment.   Additional pains of incarceration (e.g., death/serious injury due to assault, sexual exploitation, reduced custodial safety, programming, or visitation, chronic understaffing, etc.) will place complex burdens upon Mr. Fitzpatrick, who has a very limited ability to improve his lot.  This stacked punishment is considerable, unnecessary, and excessive.

38. As noted earlier, Mr. Fitzpatrick is considered to have a low risk of reoffending if the court will consider an alternative and orders outpatient treatment that addresses ASD associated vulnerabilities, behavioral activation to increase interpersonal comfort and effectiveness, monitored electronic device usage, preventative treatment to reduce the risk of suicide and sex offender treatment.

Signed on this 15th day of August 2025 by:

*Robert Nagle*
_____

Robert W. Nagle, PsyD

**EXHIBIT A**

**Robert William Nagle, Psy.D.**

Prisonology

Info@Prisonology

617-858-5008

## WORK EXPERIENCE:

Middleton Psychology Services – Private Contractor, Clinical Psychologist    10/2022 – Present
Frederick, MD

Duties and Skills:

- Provide psychological services for adults eighteen years of age and older who have a broad range of motivations and interests to change. Recognize clients and their unique sociocultural contexts, experiences, and needs, offering psychotherapy of depth, insight and relationship, from an interpersonal perspective, to help them live out lives of integrity, wholeness and beauty.

Prisonology – Mental Health Consultant, Clinical Psychologist    1/2024 - Present

- Mitigation strategies for clients facing sentencing considering mental health needs and situational demands of the correctional environment.

Bureau of Prisons – Central Office, *Chief of Mental Health Services*    5/2020 – 12/2023
Washington DC

Supervisor: Alison Leukefeld, Ph.D., Psychology Services Branch Administrator

Duties and Skills:

- National oversight responsibilities for all agency staff and inmate mental health.
- Supervised seven doctoral level psychologists and one master level treatment specialist with
- Identified mental health treatment program needs, requested new programs, secured sites, and collaborated on development and construction.
- Improved integrated treatment approaches between mental health, substance use and sexual offending components.
- Collaborated with Congressional and Executive Branch partners.
- Provided responses to media inquiries.
- Developed national mental health training.
- Developed and executed budget for national mental health programs.
- Conceived, wrote, negotiated, and implemented agency mental health policies.
- Identified vulnerabilities in national mental health services and created strategic plans to remediate them.
- Consulted and collaborated with Regional Psychology Administrators to assess needs and develop interventions.
- Represented the agency with other government entities.
- Mentored and developed Psychology Services psychologists.
- Participated in cross section initiatives such as recruitment and retention strategies and

19

interpersonal violence intervention program and training development.
- Acted for Psychology Services Branch Administrator.
- Organized strategic problem-solving approaches across the agency.

Bureau of Prisons - Central Office, *National Suicide Prevention Coordinator.*   1/2013 – 5/2020
 Washington DC

Duties and Skills:
- Oversaw the national suicide prevention program for the agency.
- Wrote national suicide prevention policy.
- Collaborated with national psychology leaders on suicide prevention measures.
- Monitored trends of self-directed violence and developed intervention approaches to disseminate to treatment providers.
- Led psychological reconstruction teams following inmate deaths to improve suicide prevention, assessment and treatment.  Reports inform staff training, policy development, and legal questions.
- Developed national training modules and provided in-person and online training for psychologists.
- Identified suicide prevention treatment professionals and organized training for agency psychologists.
- Created mental health and suicide prevention training material for agency wide development of staff.
- Mentored, developed and supported agency chief psychologists.
- Consulted with agency professionals to enhance suicide prevention (e.g., Residential Reentry, Privatization).
- Represented the agency with other governmental entities.
- Provided on-site technical assistance visits.
- Participated in Program Reviews (Quality Control Auditing).

Bureau of Prisons – Mid-Atlantic Regional Office, *Mid-Atlantic Region Psychology Services Administrator*                                                                3/2010 - 1/2013

 Annapolis Junction, MD

Duties and Skills:
- Remotely supervised and developed psychologists at sixteen correctional facilities with approximately 27,000 inmates.
- Conducted psychological reconstructions, evaluated self-directed violence trends, and reviewed all suicide risk assessments.
- Provided case consultations, clinical conceptualizations and treatment and management strategies with service providers.
- Direct supervision of the Regional Psychology Treatment Program Coordinator.
- Recruited and developed clinical staff for advancement in the agency.
- Advised Regional and Deputy Regional Director in technical and professional matters related to Psychology Services.
- Participated in an acting capacity for the Deputy Regional Director and Wardens as requested.
- Managed the Regional Psychology Services budget.  Identified and requested funding for institutional needs.

- Organized and provided annual training for regional chief psychologists.

Bureau of Prisons – Federal Correctional Complex Petersburg, *Chief Psychologist*

6/2006 - 3/2010

Petersburg, VA

Duties and Skills:
- Supervised twenty-three mental health staff which included nine psychologists, one psychology technician, eleven drug treatment specialists and two sex offender management program treatment specialists.
- Coordinated primary, secondary and tertiary mental health services at a federal correctional complex with minimum, low and medium security facilities with 2,200 inmates.
- Provided group and individual treatments with the inmate population.
- Directed two Residential Drug Abuse Treatment Programs, three Non-Residential Drug Abuse Treatment Programs, a Sex Offender Management Programs, and a Pre-Doctoral Psychology Internship.
- Managed the Suicide Prevention Program targeting prevention of self-directed violence and treatment of complex suicidal behavior in inmates with serious mental illness and severe personality disorders.
- Administered the Employee Assistance Program.
- Interpreted and implemented Federal Bureau of Prisons policy to meet local needs.
- Provided professional support to complex executive staff.
- Acted for Associate Warden and Regional Psychology Administrator.

Federal Bureau of Prisons – United States Penitentiary Atwater, *Chief Psychologist*

12/2004 - 5/2006

Atwater, CA

Duties and Skills:
- Supervised a Psychology Services department of four doctoral level psychologists, one drug treatment specialist and two Challenge Program treatment specialists in a high security male institution with 1,000 inmates.
- Organized and provided crisis services to inmates with lethal behavioral and emotional dysregulation.
- Provided group and individual treatments with the inmate population.
- Developed and implemented behavior management plans to manage self-directed violence with inmates who experienced serious mental illness and severe personality disorders.
- Consulted with executive staff on matters of psychological expertise relevant to the safe, secure, and orderly running of the institution.
- Generated and implemented a comprehensive plan to improve clinical services of the Psychology Department, including the CHALLENGE (High Security Substance Use and Mental Health) and Drug Abuse Programs, following a program review highlighting areas requiring immediate change.
- Administered the Employee Assistance Program.
- Acted for the Associate Warden.

21

Bureau of Prisons – Federal Correctional Complex Coleman, *Chief Psychologist*

4/2002 - 11/2004

Coleman, FL

Duties and Skills:
- Directed a Psychology Department inside a medium security male correctional setting with 1,800 inmates and a minimum-security female facility with 510 inmates.
- Provided comprehensive mental health services to include crisis intervention and management of inmates with serious mental illnesses and personality disorders.
- Provided group and individual treatments with the inmate population.
- Supervised four doctoral level psychologists and two drug treatment specialists and one Skills Program treatment specialist.
- Managed, implemented, and provided direct clinical services to the Suicide Prevention Program to monitor, assess and treat self-directed violence and elevated suicide risk.
- Administered the Employee Assistance Program.

St. Leo University - *Adjunct Professor*

1/2002 - 8/2004

Ocala & Gainesville Florida Campuses

Duties and Skills:

- Created lesson plans, instructed and graded undergraduate classes in Forensic Psychology, Developmental Psychology, and Independent Seminars.

Bureau of Prisons – Federal Correctional Complex Coleman, *Skills Program Coordinator*

1/1999 - 4/2002

Coleman, FL

Duties and Skills:
- Collaborated on writing policy and starting a new national treatment program serving inmates with cognitive deficits.
- Completed comprehensive psycho-educational, personality and intellectual assessments and developed treatment plans.
- Provided group and individual treatments for the inmate population.
- Supervised the Skills Program Treatment Specialist and Special Learning Needs Teacher.
- Operated a residential treatment program with sixty-four inmate participants and sixty four inmate mentors.
- Coordinated crisis management for inmates with self-directed violence risk and behavioral dysregulation.
- Acted for Chief Psychologist

Florida State Hospital, *Psychologist*                    8/1998 - 1/1999

Chattahoochee, FL

Duties and Skills:

- Participated and collaborated with professionals on multi-disciplinary treatment teams on a long term unit with persons experiencing severe mental illness.
- Provided group and individual psychotherapy.
- Assessed, treated, and documented suicide risk.
- Created, implemented, monitored, and evaluated individualized behavior management plans.

Florida State Hospital, *APA Approved, Pre-Doctoral Intern*

9/1997 - 8/1998

Chattahoochee, FL                                         Supervisor: Ellen Resch, Ph.D.

Duties and Skills:

- Completed clinical rotations in civil admissions, medium security forensic, maximum security admission forensic units, and assisted with community evaluations to determine mental status at the time of the offense and competency to proceed status.
- Evaluated competency to proceed and wrote reports for courts.
- Completed violence risk assessments, personality and intellectual testing, neuropsychological screening, NGRI discharge determinations, crisis intervention and wrote reports.

**EDUCATION:**

University of Denver - Graduate School of Professional Psychology Denver, Colorado

- Doctor of Psychology – August 1998
- Major: Clinical Psychology

Montclair State University Upper Montclair, New Jersey

- Bachelor of Arts – December 1991
- Major: Psychology
- Honors: Cum Laude

**AFFILIATIONS:**
- National Register of Health Service Providers in Psychology
- International Society for the Psychological Treatments of the Schizophrenia and Other Psychoses
- Maryland Psychological Association
- International Society For The Science of Existential Psychology

**CREDENTIALS:**

- Licensed Clinical Psychologist, Maryland #05521 - Active
- Licensed Clinical Psychologist, Florida PY6374 - Inactive
- Licensed Clinical Psychologist, Virginia #0810003814 - Inactive

## EXHIBIT B

**Prisonology**

(617) 858-5008

info@prisonology.com

11231 US Highway 1 #310, North Palm Beach, FL 33408

| INMATE LOAD DATA | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1.   REGISTER NUMBER    **49364-510** | | | | | | | | |
| 2.   LAST NAME  **FITZPATRICK** | | 3.   FIRST NAME  **CONOR** | | | 4.   MIDDLE  **BRIAN** | | 5.   SUFFIX | |
| 6.   RACE **W** | 7.   SEX **M** | 8.   ETHNIC **O** | | | | 9.   DATE OF BIRTH  **09-26-2002** | | |
| 10.   OFFENSE/SENTENCE | | | | | | | | |
| 11.   FBI NUMBER   **2622A6060** | | | | | 12.   SSN NUMBER | | | |
| 13.   STATE OF BIRTH  **NY** | | 14.   OR COUNTRY OF BIRTH   **US** | | | 15.   CITIZENSHIP  **US** | | | |
| 16.   ADDRESS STREET | | | | | | | | |
| 17.   CITY  **PEEKSKILL** | | 18.   STATE **NY** | 19.   ZIP   **10566** | | 20.   OR FOREIGN COUNTRY | | | |
| 21.   HEIGHT  **5,10** | | 22.   WEIGHT  **170** | 23.   HAIR COLOR  **BN** | | 24.   EYE COLOR  **GY** | | | |
| 25.   ARS ASSIGNMENT | | | | | | | | |

| SECURITY DESIGNATION DATA | | | | | |
|---|---|---|---|---|---|
| 1.   JUDGE   **LEONIE M. BRINKEMA** | 2.   REC FACILITY | | 3.   REC PROGRAM | 4.   USM OFFICE | |
| 5.   VOLUNTARY SURRENDER STATUS               **0** = NO<br>IF YES, MUST INDICATE: 5A. V/S DATE ____ 5B. V/S LOCATION | | | | (-3) = YES | 0 |
| 6.   MONTHS TO RELEASE ___ | | | | | |
| 7.   SEVERITY OF          **0** = LOWEST               **3** = MODERATE          **7** = GREATEST<br>CURRENT OFFENSE     **1** = LOW MODERATE       **5** = HIGH | | | | | 5 |
| 8.   CRIMINAL HISTORY POINTS __0__        **0** = 0-1     **4** = 4-6      **8** = 10-12<br>                                              **2** = 2-3      **6** = 7-9     **10** = 13+<br>8A. SOURCE DOCUMENT DATE: ____ 8A. SOURCE OF DOCUMENTED ___ PSR OR ___ NCIC | | | | | 0 |

| 9.   HISTORY OF<br>VIOLENCE | | NONE | >15 YEARS | 10-15 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 3 | 5 | 0 |
| | SERIOUS | 0 | 2 | 4 | 6 | 7 | |

| 10.   HISTORY OF<br>ESCAPE OR<br>ATTEMPTS | | NONE | >15 YEARS | >10 YEARS | 5-10 YEARS | <5 YEARS | |
|---|---|---|---|---|---|---|---|
| | MINOR | 0 | 1 | 1 | 2 | 3 | 0 |
| | SERIOUS | 0 | 3 (S) | 3 (S) | 3 (S) | 3 (S) | |

| 11.   TYPE OF DETAINER | **0** = NONE                      **3** = MODERATE              **7** = GREATEST<br>**1** = LOWEST/LOW MODERATE    **5** = HIGH | | | 0 |
|---|---|---|---|---|
| 12.   AGE | **0** = 55 AND OVER          **4** = 25 THRU 35<br>**2** = 36 THRU 54           **8** = 24 OR LESS | | | 8 |
| 13.   EDUCATIONAL   **0** = VERIFIED HIGH SCHOOL DEGREE OR GED<br>LEVEL              **1** = ENROLLED IN AND MAKING SATISFACTORY PROGRESS IN GED PROGRAM<br>                      **2** = NO VERIFIED HIGH SCHOOL DEGREE/GED AND NOT PARTICIPATING IN GED PROGRAM<br>13A. HIGHEST GRADE COMPLETED ___ | | | | 0 |
| 14.   DRUG/ALCOHOL ABUSE | **0** = NEVER/>5 YEARS          **1** = <5 YEARS          U = UNKNOWN | | | 0 |
| 15.   TOTAL | | | | 13 |
| 16.   PUBLIC<br>SAFETY<br>FACTORS | A NONE<br>B DISRUPTIVE GROUP (MALES ONLY)<br>C GREATEST SEVERITY OFFENSE (MALES ONLY)<br>F SEX OFFENDER<br>G THREAT TO GOVERNMENT OFFICIALS<br>H DEPORTABLE ALIEN | I SENTENCE LENGTH (MALES ONLY)<br>K VIOLENT BEHAVIOR (FEMALES ONLY)<br>L SERIOUS ESCAPE<br>M PRISON DISTURBANCE<br>N JUVENILE VIOLENCE<br>O SERIOUS TELEPHONE ABUSE | | | F |
| 17.   REMARKS | | | | |
| SEVERITY OF CURRENT OFFENSE: SERIOUS SEXUAL OFFENSE | | | | |
| 18.   OMDT REFERRAL: (YES/NO) SCRN LEVEL: MD= MH=___ SENT TO OMDT ON: CONSIDER RDAP? Y OR N/ | | | | |